# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

|  |  |
|---|---|
| MICHAEL COLLINS, JEFFREY COSBY, THELA ELLIOTT, GRACIE LEWIS, DEJUAN NASH, TIFFANY PRICE, LEAGUE OF WOMEN VOTERS OF KENTUCKY, LOUISVILLE URBAN LEAGUE, and KENTUCKY CONFERENCE OF NAACP BRANCHES,<br><br>*Plaintiffs*,<br><br>v.<br><br>MICHAEL ADAMS, in his official capacity as the Secretary of State of Kentucky; ANDREW BESHEAR, in his official capacity as the Governor of Kentucky; and ALBERT BENJAMIN CHANDLER, III, in his official capacity as the Chairman of the Kentucky Board of Elections,<br><br>*Defendants*. | Civil Case No. 3:20-CV-375-CRS |

## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

## Factual Background

I.     The COVID-19 Pandemic .................................................................................. 3

    A.     Global/National Impact ....................................................................... 3

    B.     Kentucky Impact ................................................................................. 6

    C.     Risks for Especially Vulnerable Kentuckians ....................................... 8

II.    The Challenged Requirements: Kentucky's Election Law Regime ................................ 10

    A.     The Excuse Requirement ..................................................................... 10

    B.     The Photo ID Law ............................................................................... 10

    C.     Modifications for the June Primary Election ........................................ 12

III.   Health Risks of Voting in Person During COVID-19: Lessons from the June Primary ........................................................................................................... 13

    A.     The June Primary Demonstrates the Health Risks of In-Person Voting .............. 14

    B.     The June Primary Demonstrates the Need for Expanded Mail-In Absentee Voting ......................................................................................... 18

    C.     Primary Elections in Other States Reinforce the Same Lessons Regarding the Health Risks of In-Person Voting .................................................. 20

## ARGUMENT

I.     Legal Standard ................................................................................................ 21

    A.     The Four-Part Test for a Preliminary Injunction ................................... 21

    B.     The *Anderson-Burdick* Test Governing Restraints on Voting Rights ................. 22

II.    The First and Fourteenth Amendments Require Elimination of the Excuse Requirement During the Pendency of the COVID-19 Pandemic ..................................... 25

    A.     Plaintiffs Are Likely To Prevail on the Merits Because the Excuse Requirement Threatens Voters' Health and Safety During the COVID-19 Pandemic ......................................................................................... 25

        1.     The Excuse Requirement Imposes an Extremely Heavy Burden on the Right to Vote During the Pandemic .................................................. 25

2.      The State's Interests Do Not Outweigh the Extremely Heavy
        Burden on Plaintiffs' Right To Vote......................................................... 28

B.      Plaintiffs Will Suffer Irreparable Injury If the Excuse Requirement Is Not
        Enjoined ................................................................................................... 30

        1.      Individual Kentucky Voters Will Suffer Irreparable Injury By
                Being Forced To Choose Between their Health and their Right to
                Vote................................................................................................ 30

        2.      Voting Rights Organizations Will Suffer Irreparable Injury
                Diverting Resources To Contend With the Challenged Restrictions........ 31

C.      The Balance of Equities and Public Interest Favor an Injunction During
        the Pandemic ............................................................................................. 33

III.    The First and Fourteenth Amendments Prohibit Implementation of the Photo ID
        Law During the Pendency of the COVID-19 Pandemic..................................... 34

A.      Plaintiffs Are Likely to Succeed on the Merits Because Implementation of
        the Photo ID Law Threatens Voters' Health and Safety During the
        COVID-19 Pandemic................................................................................. 34

        1.      Implementation of the Photo ID Requirement During the Pandemic
                Imposes a Substantial Burden on Voters ................................................ 34

        1.      The State's Interests in Implementing the Photo ID Law During the
                Pandemic Do Not Outweigh the Substantial Burdens on Plaintiffs ........ 37

        2.      Plaintiffs Will Suffer Irreparable Injury During the Pandemic If the
                Photo ID Law Is Not Enjoined................................................................ 39

B.      The Balance of Equities and Public Interest Weigh in Favor of Plaintiffs
        During the Pandemic.................................................................................. 40

II.     The First And Fourteenth Amendments Require Kentucky To Provide Voters in
        the November General Election with the Three Voting Protections Provided for
        the June Primary ............................................................................................ 41

A.      Plaintiffs Will Likely Succeed in Demonstrating that Failure to Implement
        the June Signature Match Protections Unduly Burdens the Right to Vote
        and Violates Voters' Due Process Rights ............................................................ 41

        1.      Plaintiffs Will Likely Establish that the Failure to Extend the June
                Signature Match Protections to the November Election Cannot
                Survive Under *Anderson-Burdick*............................................................ 42

2.  Failure to Implement Signature Match Notice and Cure Protections for the November Election Violates Voters' Fourteenth Amendment Procedural Due Process Rights ............................................. 42

B.  Failure to Waive the Notarization Requirement in November Unduly Burdens the Right to Vote ...................................................................... 44

C.  Failure to Accept Mail-In Absentee Ballots Postmarked by Election Day Unduly Burdens the Right to Vote During the Pandemic ..................................... 46

D.  Plaintiffs Will Suffer Imminent Irreparable Injury During the Pandemic If the June Voting Protections Are Not Maintained for the November Election ............................................................................................. 48

E.  The Balance of Equities and Public Interest Favor Maintaining the Three June Voting Protections for the November General Election .............................. 49

## INTRODUCTION

The recent increase in the number of reported cases of COVID-19 in the United States confirms a sobering fact: the virus is not going away anytime soon.  There is no factual basis to think that it will vanish by November.  Nor is there any realistic prospect of a vaccine or herd immunity by that date.  The question here is straightforward: can Kentucky force voters to choose between their right to vote and their health?

Without the relief sought by Plaintiffs expanding the ability of Kentuckians to vote by mail, it is highly unlikely that even many of those Kentuckians who choose to vote in person in November will be able to effectuate that choice.  The "unrestricted opportunity to vote by absentee mail-in ballot" is an essential pillar of what this Court has called the "Triple Crown of voting options [that] wins against the pandemic's risk of disenfranchising the Kentucky voter."  *Nemes v. Bensinger*, No. 3:20-cv-00407-CRS, 2020 WL 3402345, at *11 (W.D. Ky. June 18, 2020). Without broad access to mail-in absentee ballots, efforts to render in-person voting safe during the pandemic will be ineffectual.  Large crowds at polling places, with long lines, will eviscerate any well-intentioned palliative measures.

The experience of the statewide primary on June 23, 2020 ("June Primary") confirms this point.  Expanded access to mail-in absentee ballots resulted in record-high voter turnout in Kentucky, even though the state offered far fewer polling sites for voters on Election Day because of staffing shortages resulting from poll workers' COVID-19 fears.  Election officials were able to accommodate in-person voters on Election Day only because the vast majority of voters—over 80%[1]—cast mail-in absentee ballots.  Even then, polling places in Lexington experienced long

---

[1] WKYT, *Secretary of State Michael Adams Speaks About Primary Election Results* at 1:50 (June 30, 2020), https://rb.gy/bgat4q.

waiting lines and Louisville experienced large traffic jams.  But for the broad availability of mail balloting, the crowds at the polling sites would have overwhelmed any efforts to provide for safe in-person voting even more.  Against these facts, the essence of this case is whether Defendants can ensure that all Kentuckians can safely vote in November when it is expected that twice as many voters will vote than in June.

Broad access to mail-in absentee ballots requires the suspension of the requirement that Kentucky voters satisfy enumerated excuses (the "Excuse Requirement") before they are entitled to vote safely from home.  While Kentucky effectively did just that for the June Primary by expanding the definition of a "medical emergency," it has declined to extend that measure to the November general election.

Curbing COVID-19's "risk of disenfranchising the Kentucky voter"[2] also requires suspension of the newly enacted photo ID requirement in S.B. 2 (the "Photo ID Law"), which threatens to scratch the winning solutions Kentucky implemented to defeat that very risk.  The Photo ID Law burdens the right to vote by requiring voters, including those who are at high risk of severe illness due to COVID-19, to interact with third parties in order to obtain the newly required photo ID and to make copies of an existing photo ID if they are to vote by mail.  And whatever the questionable justifications for the Photo ID law in general, the utility of the photo ID requirement is vanishingly small for voters using mail-in absentee ballots.

Finally, protecting voters' health requires continuing the three critical voting rights measures that Kentucky put in place for the June Primary: (1) eliminating the notary requirement for the medical emergency exemption; (2) permitting the postmarking of mail-in absentee ballots by 5:00 p.m. on Election Day; and (3) providing that any voter whose mail-in absentee ballot is

---

[2] *Nemes*, 2020 WL 3402345, at *11.

rejected due to an alleged signature defect will be notified of this fact and given an opportunity to cure the problem.  The rationale for all of these measures was a reasoned response to the pandemic as it existed in June.  COVID-19 will still be with us in November.  In Governor Beshear's words: "We just had the largest primary turnout in our state's history.  Let's not move backwards."[3]

## I.   The COVID-19 Pandemic

### A.   Global/National Impact

COVID-19 is a novel disease that has spread across the globe at an unprecedented pace. Contracting COVID-19 can ultimately result in death, blood clots, and/or severe and lasting organ damage.  Medical professionals continue to identify new effects of COVID-19, including lung, heart, and brain damage.  Ex. A, Declaration of Dr. Megan Murray (Murray Decl.) ¶¶ 7, 27–33.

The United States has had more COVID-19 cases than any other country in the world.  As of July 9, 2020, the number of confirmed cases in the United States has surpassed three million, and at least 132,056 people have died as a result of contracting COVID-19.[4]  Due to testing shortages, false negatives, and asymptomatic individuals, the actual numbers of cases and deaths are likely much higher than reported.[5]

COVID-19 is highly contagious and spreads through close contact between individuals. The virus is primarily transmitted through respiratory droplets when an infected person coughs or sneezes, and it may also spread when individuals touch their mouth, nose, or eyes after touching a

---

[3] Gov. Andy Beshear, *Daily Media Briefing 06.30.2020* at 47:20–47:26 (June 30, 2020), https://youtu.be/DIEbxBB7fyw

[4] CDC, *Coronavirus Disease 2019 (COVID-19):Cases in the US* (last updated July 9, 2020), https://rb.gy/bf6ojt.

[5] Apoorva Mandavilli, *Actual Coronavirus Infections Vastly Undercounted, C.D.C. Data Shows*, N.Y. Times (June 27, 2020), https://perma.cc/SX7E-DMF2.

surface or object that has the virus on it.[6]  Murray Decl. ¶¶ 13, 34–35.  As of July 9, 2020, the World Health Organization has also confirmed that "droplets carrying the coronavirus may be airborne indoors and that people who spend long periods in crowded settings with inadequate ventilation may be at risk of becoming infected."[7]  The virus can be spread by symptomatic, asymptomatic, and pre-symptomatic individuals, which means that only isolating those who are symptomatic will not slow the spread of COVID-19.  Murray Decl. ¶¶ 14, 39.

To reduce the spread of the virus, public health experts recommend several measures, including staying home and maintaining at least six feet of distance from people outside their household.[8]  Public health experts caution against prematurely ending social distancing measures, warning that the absence of adequate precautions "will have the deleterious consequence of more infections and more deaths."[9]

The public health crisis caused by COVID-19 has no clear end in sight.  Cases continue to mount, with 38 states and territories currently experiencing a rise in new cases.[10]  On June 30, 2020, Dr. Anthony Fauci testified that the United States adds more than 40,000 new cases of

---

[6] CDC, *Coronavirus Disease 2019 (COVID-19): Social Distancing* (last updated July 6, 2020), https://rb.gy/wdwyqf.

[7] N.Y. Times, *Under Pressure from Scientists Globally, the W.H.O. Acknowledges That the Virus Can Linger in the Air Indoors* (July 9, 2020), https://rb.gy/ba45tu.

[8] CDC, *Coronavirus Disease 2019 (COVID-19): Social Distancing* (last updated July 6, 2020), https://rb.gy/wdwyqf; Murray Decl. ¶¶ 41–43 (social distancing is the most comprehensive means for reducing the spread of the virus).

[9] Rev, *Dr. Anthony Fauci & CDC Director Senate Testimony Transcript May 12* at 2:08:04 (May 12, 2020), https://perma.cc/8ARJ-YWNS; *see also* Murray Decl. ¶¶ 15, 45.

[10] N.Y. Times, *Coronavirus in the U.S.: Latest Map and Case Count* (last updated July 9, 2020), https://nyti.ms/39jvJEY.

4

COVID-19 each day, and he "would not be surprised if we go up to 100,000 a day."[11]  Moreover, this surge in cases has been linked to the attempted re-openings in several states.  Murray Decl. ¶ 45.

It is fully apparent that the virus will not soon disappear.  Murray Decl. ¶ 54.  Many public health experts warn that a further resurgence of cases in the fall and/or winter is "inevitable."[12]  In his recent testimony, lead member of the White House's COVID-19 Task Force Dr. Fauci described this prediction, stating: "We will have coronavirus in the fall. . . .  I am convinced of that because of the degree of transmissibility that it has, the global nature."[13]  *See also* Murray Decl. ¶¶ 53–63 (setting forth bases, including three distinct models, for concluding that the virus will continue into the fall and winter).

Because there is no realistic prospect of "herd immunity" in the near future, COVID-19 will continue to impose an imminent and serious threat to Americans' health and safety until a reliable and widely accessible vaccine is available.  Murray Decl. ¶¶ 73–74.  And as Dr. Fauci explained to the U.S. Senate and the House Energy and Commerce Committee, it is highly unlikely that an effective vaccine will be available by the fall.[14]

---

[11] Rev, *Dr. Fauci, CDC Director Redfield Testimony Transcript for Senate Committee on Health, Education, Labor, and Pensions* at 2:03:58 (June 30, 2020), https://perma.cc/QJ75-PRX7.

[12] Christina Maxouris, *US Could Be in for 'a Bad Fall and a Bad Winter' If It's Unprepared for a Second Wave of Coronavirus, Fauci Warns*, CNN Health (Apr. 29, 2020), https://rb.gy/xol1oc.

[13] *Id.*

[14] *See Dr. Anthony Fauci & CDC Director Senate Testimony Transcript May 12* at 52:25, 1:20:43, Rev (May 12, 2020), https://rb.gy/sgpffq; Rev, *Dr. Fauci & CDC Chief Dr. Redfield Testimony Transcript June 23* at 26:56, 1:18:29 (June 23, 2020), https://perma.cc/B69G-KUGU.

### B.       Kentucky Impact

COVID-19 has spread throughout Kentucky at an exponential rate.  As of July 9, 2020, the Commonwealth has confirmed 17,491 positive cases and 608 deaths from COVID-19 in Kentucky.[15]

In response to the unprecedented COVID-19 pandemic, on March 22, 2020, Governor Beshear issued a statewide "healthy-at-home" order that encouraged Kentuckians to practice social distancing, and ordered a variety of strict limitations on public gatherings in Kentucky, including requiring all non-life sustaining businesses to cease in-person services and advising that schools close for the remainder of the term.[16]  Starting May 11, and again on June 29, Governor Beshear began allowing some businesses to reopen, subject to strict social distancing and capacity rules.[17]  But Governor Beshear acknowledged: "[the] reopening of our economy is tenuous, it's fragile. . . . It can be upended by a spike in cases at any time."[18]

Since reopening, new cases in Kentucky have continued to increase.  In the same week this brief was filed, Kentucky "posted its second-highest number of cases" two days in a row and the Commonwealth's number of new daily cases surpassed its previous peak in May:

---

[15] Ky. Dep't of Pub. Health, *Kentucky Coronavirus Monitoring*, https://rb.gy/gsav70 (last visited July 9, 2020); *see also* Murray Decl. ¶ 64 (setting forth data as of June 22, 2020).

[16] Ky. Office of the Governor, *State of Emergency*, Exec. Order No. 2020-257 (Mar. 25, 2020), https://perma.cc/6SPR-R7V9; Ky. Office of the Governor, *State of Emergency*, Exec. Order No. 2020-246 (Mar. 22, 2020), https://perma.cc/7U33-CWNE; Ky. Office of the Governor, *Kentucky's Response to COVID-19* (last updated June 30, 2020), https://governor.ky.gov/covid19.

[17] *See, e.g.*, Ky. Office of the Governor, *Healthy at Work: Requirements for Restaurants*, (May 22, 2020), https://perma.cc/2FYM-JK9T; *see also* Bruce Schreiner, *Kentucky Governor Urges Mask Wearing as Economy Reopens,* Richmond Register (May 21, 2020), https://perma.cc/Z6DU-TQFZ (even as businesses reopen, Governor Beshear continues to urge Kentucky residents to take precautionary measures, such as wearing masks).

[18] Bruce Schreiner & Dylan Lovan, *Rallygoers Sue Beshear; Gov Says Rally Sent Message of Hate*, AP (May 12, 2020), https://perma.cc/NCU2-QU45.



Moreover, these figures likely understate the actual number of cases in Kentucky given (a) the relative paucity of tests and (b) the number of false negatives associated with many of the common tests.  Murray Decl. ¶ 64.

This re-opening effect is consistent with the national data.  In a House Energy and Commerce Committee hearing on June 23, 2020, Dr. Fauci "told House lawmakers that the nation is experiencing a 'disturbing surge' of coronavirus infections as states reopen too quickly and without adequate plans for testing and tracing the contacts of those infected."[20]  In the first week of June, Kentucky—along with 14 other states—reported its "highest daily average case increases since the pandemic started," and the total number of confirmed cases in Lexington more than doubled between May 11 and June 11.[21]  This trend is expected to continue.  Murray Decl. ¶56.

---

[19] WKYT, *State Reports 402 New COVID-19 Cases, 6 New Deaths on Wednesday* (July 8, 2020), https://rb.gy/wpfy3t; Joe Sonka & Grace Schneider, *Beshear Hints at New Requirements as Kentucky's COVID-19 Numbers Show 'Disturbing' Trend*, Louisville Courier Journal (July 8, 2020), https://rb.gy/0qwvii ("Kentucky's seven-day rolling average of new cases is now just shy of 300 as of Wednesday, the state's highest total since the onset of the pandemic in early March."); N.Y. Times, *Kentucky Coronavirus Map and Case Count* (July 10, 2020), https://nyti.ms/3dJNcJa; *cf.* Murray Decl. ¶ 64 (including graphic of case trajectory from June 22, 2020).

[20] N.Y. Times, *Fauci Warns of a 'Disturbing' Uptick of Infections in Some States and Contradicts Trump on Testing* (June 23, 2020), https://perma.cc/URH4-5U2R.

[21] Jeremy Chisenhall, *Lexington Tops 1,000 COVID-19 Cases. More Than Half Were in the Last Month*, Lexington Herald Leader (June 11, 2020), https://rb.gy/tn4a5c.

Even Defendants have acknowledged that the situation in Kentucky is getting materially worse, and the virus is not going away anytime soon.  Accordingly, on July 9, 2020, Governor Beshear announced a mandatory statewide mask requirement for at least the next 30 days.[22]  And the Supreme Court of Kentucky went as far as to cancel the in-person bar examinations for both the July 28–29 and September 30–October 1 sessions "due to ongoing concerns about the COVID-19 pandemic."[23]  Such measures further demonstrate the ongoing severity of the pandemic in Kentucky.

### C.    Risks for Especially Vulnerable Kentuckians

*Voters with co-morbidities* face heightened risks from contracting COVID-19 while voting in person.  Murray Decl. ¶¶ 7, 30–31.  Data show that COVID-19 poses a more serious threat to people with certain chronic medical conditions that are especially commonplace in Kentucky, which leads the nation in rates of adult obesity, diabetes, and cancers.  Murray Decl. ¶ 65.  Indeed, in a nationwide assessment of state populations' risk for COVID-19, Kentucky scores 76 out of 100, where a score of 100 reflects the most vulnerable popluation.  Murray Decl. ¶ 71.

*Older voters* also face heightened risks.  According to the Center for Disease Control ("CDC"), individuals over 65 are at a higher risk for severe illness and death from COVID-19.  Murray Decl. ¶¶ 7, 28–29.  As of July 9, 2020, approximately 7,440 of the 17,895 Kentuckians that have contracted COVID-19 are over the age of 50, with people over 50 accounting for 594 of 612 deaths in the Commonwealth.[24]

---

[22] Sentinel Echo, *Gov. Andy Beshear July 9 Press Briefing* at 39:24–39:39, 40:19–40:29 (July 9, 2020), https://rb.gy/vf3blg.

[23] Supreme Court of Ky., Am. Order 2020-50 (July 9, 2020), https://rb.gy/xupizl.

[24] Ky. Dep't of Pub. Health, *KY COVID-19 Daily Summary* (July 9, 2020), https://rb.gy/omswdj.

*Black voters* are more likely to experience serious complications from COVID-19.  Murray Decl. ¶ 31.  They are more likely to rely on public transportation or ride sharing to get to their polling places, increasing their risk of exposure and infection.[25]  Racial disparities in election day wait times also subject Black voters to a higher risk of contracting COVID-19 while waiting in disproportionately longer lines.[26]  Black people disproportionately suffer from medical conditions that exacerbate COVID-19 complications, and inequities in the health care system, such as lack of health insurance, disproportionately impede their ability to access quality care.[27]  Consequently, the CDC has recognized that recent data suggest that members of racial and ethnic minority groups face an "increased risk of getting COVID-19 or experiencing severe illness."[28]  Kentucky data on the impact of COVID-19 serves as evidence of this phenomenon: although only 8.3% of the Kentucky population is Black,[29] 15.3% of Kentuckians who have died from COVID-19 have been Black.[30]

*Voters with disabilities* also face heightened risks from voting in person during the pandemic.  Like Black voters, many voters with disabilities also rely on public transportation to

---

[25] National Equity Atlas, *Car Access* (2015), https://perma.cc/SN54-FX2H; ReNika Moore, *If COVID-19 Doesn't Discriminate, Then Why Are Black People Dying at Higher Rates?*, ACLU (Apr. 8, 2020), https://perma.cc/MW5G-KYSJ.  *See also* Murray Decl. ¶ 26.

[26] M. Keith Chen et al., *Racial Disparities in Voting Wait Times: Evidence from Smartphone Data* (Nov. 14, 2019), https://perma.cc/7BFS-QJRQ.

[27] Office of Minority Health, Profile: Black/African Americans, U.S. Dep't of Health & Hum. Servs. (Aug. 22, 2019), https://perma.cc/GZJ2-6ZT4; Elizabeth Thomas & Dr. Nancy A. Anoruo, *Coronavirus is Disproportionately Killing the Black Community. Here's What Experts Say Can Be Done About It*, ABC News (Apr. 9, 2020), https://perma.cc/T9QC-S496.

[28] CDC, *Coronavirus Disease 2019 (COVID-19): Racial and Ethnic Minority Groups* (last updated June 25, 2020), https://rb.gy/yiqevc; Murray Decl. ¶¶ 26–27 & Ex. 31.

[29] Ky. Dep't of Pub. Health, *2017 Kentucky Racial and Ethnic Distribution* (Sept. 21, 2017), https://perma.cc/XCY8-274M.

[30] Ky. Dep't of Pub. Health, *KY COVID-19 Daily Summary* (July 9, 2020), https://rb.gy/omswdj.

get to the polls, increasing their risk of exposure to COVID-19.  Once there, voters who cannot

mark paper ballots without assistance need to rely on interactions with poll workers and/or special

voting machines with features like ear phones and other modifications.[31]  And voters who are blind

or have limited vision cannot see visual markers on the ground instructing voters to line up six feet

apart from each other.

## II.     The Challenged Requirements: Kentucky's Election Law Regime

### A.      The Excuse Requirement

Kentucky voters cannot receive an absentee ballot unless they satisfy one of eight specific

qualifying excuses.  Ky. Rev. Stat. § 117.085(1)(a).[32]  Even if a voter does not meet one of these

listed excuses, they may vote absentee if they experience a "medical emergency" within "fourteen

(14) days or less of an election."  *Id.* § 117.077.  The application "shall be notarized" and "shall

state that the emergency condition occurred within the fourteen (14) day period."  *Id.*

### B.      The Photo ID Law

Senate Bill 2 ("S.B. 2") requires a photo ID from any voter seeking to vote in person or

applying to vote by mail-in absentee ballot, subject to certain exceptions.  S.B. 2 §§ 5(2), 15.  Valid

identification is a document that contains the voter's name and photograph and is issued by:

---

[31] Matt Vasilogambros, *How Voters With Disabilities Are Blocked From the Ballot Box, Pew Research Center* (Feb. 1, 2018), https://perma.cc/W5G5-YVW5; CDC, *Coronavirus Disease 2019 (COVID-19): How It Spreads*, https://perma.cc/7GBF-WCSA (last visited July 9, 2020).

[32] The eight categories of voters with qualifying excuses are: (1) eligible, registered uniformed-service voters or overseas voters, (2) students temporarily residing outside their county of residence, (3) incarcerated voters charged with a crime who have not been convicted, (4) voters who have changed their place of residence to another state after the deadline in their new state of residence has passed, (5) voters outside the state but still eligible to vote, (6) voters working outside their county of residence on all hours and all days of in-person absentee voting, (7) participants in the Secretary of State's crime victim address confidentiality protection program, and (8) those "[n]ot able to appear at the polls on election day on the account of age, disability, or illness," and have not been declared mentally disabled by a court of competent jurisdiction. *See* Ky. Rev. Stat. § 117.085(1)(a).

> (a) The United States or the Commonwealth of Kentucky . . . [;] (b) The . . . Department of Defense, a branch of the uniformed services, the Merchant Marines, or the Kentucky National Guard . . . [;] (c) A public or private college, university, or postgraduate technical or professional school . . . [;] or (d) Any city government, county government, or urban-county government, charter county government, consolidated local government or unified local government, which is located within this state . . . [.]

S.B. 2 § 23.

If a voter is unable to present a photo ID on Election Day or when voting absentee in person, the voter may still cast a ballot if they are: "(a) . . . eligible to vote under KRS 116.025; (b) . . . entitled to vote in that precinct; and (c) [i]n the presence of an election officer, executes a voter affirmation" on a form furnished by the Board of Elections.  S.B. 2 § 1(1).  To execute the voter affirmation required by S.B. 2, the voter must affirm, under penalty of perjury, various aspects of their identity and qualifications to vote, as well as confirm that one of eight possible "impediments" prevents them from procuring a photo ID (the "Impediment Requirement").  S.B. 2 § 1(1)(c)(8).[33]  A voter who cannot provide photo ID must also show certain non-photo identification documents, such as their Social Security card or a credit card with the voter's name on it.  S.B. 2 § 1(2).

S.B. 2 also imposes a photo ID requirement for the absentee ballot application, stating that "the voter shall provide a copy of his or her proof of identification" or an "executed voter affirmation" with the voter's mail-in absentee ballot application.  S.B. 2 § 5(2).  If a voter has a valid photo ID, the voter must submit a copy of that photo ID with the ballot application.  *Id.*

---

[33] The eight impediments enumerated in S.B. 2 are: (a) lack of transportation; (b) inability to obtain a birth certificate or other documents needed to show proof of identification; (c) work schedule; (d) lost or stolen identification; (e) disability or illness; (f) family responsibilities; (g) proof of identification has been applied for, but not yet received; or (h) a religious objection to being photographed.

### C.      Modifications for the June Primary Election

In response to the COVID-19 pandemic, Defendants enacted important safety modifications for the June Primary.  On May 1, 2020, the Board of Elections passed emergency regulations—based on Secretary Adams's initial recommendation and Governor Beshear's executive order—displacing conflicting laws and "allow[ing] for the conduction of elections that minimize the health-risk of all involved during the ongoing state of emergency related to the COVID-19 pandemic."  Ky. Bd. of Elections, *Procedures for June 23, 2020 Election*, 31 Ky. Admin. Regs. 4:190E (2020).  The Secretary of State and Governor then formally approved these emergency measures.[34]

Acknowledging the danger voters would face while voting in person, Defendants made several substantial changes to election procedures for the June Primary.  Most fundamentally, Defendants suspended the Excuse Requirement by defining the term "medical emergency" from Ky. Rev. Stat. § 117.077 as "a reasonable fear of infection or transmission during a state of public health emergency declared by the Governor."  31 Ky. Admin. Regs. 4:190E § 2.  In addition, the emergency regulations made three main changes to the June Primary (collectively, the "June Voting Protections").

First, Defendants waived the notarization requirement under Ky. Rev. Stat. § 117.077 for voters requesting a medical emergency absentee ballot, and instructed that ballot applications "need not be notarized" for the June Primary.  31 Ky. Admin. Regs. 4:190E § 3.

---

[34] Ky. Sec'y of State, *Approval of Procedures Established for Election During State of Emergency*, Exec. Order 2020-01 (May 1, 2020), https://perma.cc/883F-WHJ7; Ky. Office of the Governor, *State of Emergency Relating to Kentucky Elections*, Exec. Order No. 2020-311 (May 1, 2020), https://perma.cc/6J8M-YDGG.

Second, Defendants modified the Election Day absentee ballot receipt deadline set forth in Ky. Rev. Stat. § 117.086(1), instructing instead that officials must count all ballots postmarked by Election Day and received by the close of business on the following Saturday.  31 Ky. Admin. Regs. 4:190E § 6.

Third, Defendants created a signature match protocol for county officials verifying returned absentee ballots as required by Ky. Rev. Stat. § 117.087(3) ("June Signature Match Protections").  31 Ky. Admin. Regs. 4:190E § 9.  This protocol requires election officials to give voters notice if their mail-in absentee ballot is rejected because of an alleged signature mismatch. The voter must also be given an opportunity to cure the discrepancy.

None of these protections have been extended to the November general election. Defendants have acknowledged that voters would not be able to safely vote in the June Primary without these modifications: in their words, the June Voting Protections "reduce[] the amount of exposure voters, poll workers, and administrators have to possible infection," and the measures are "necessary" to conduct "free and fair elections" amidst the COVID-19 pandemic.  *Id.*  As Kentucky election officials tacitly recognize, failure to extend these modifications to the November general election will substantially burden Kentuckians' fundamental right to vote.

## III.  Health Risks of Voting in Person During COVID-19: Lessons from the June Primary

Voting in person during the COVID-19 pandemic presents numerous serious health and safety risks.  Murray Decl. ¶ 16 ("There is a substantial risk that an infection with Covid-19 acquired during voting at a poll booth in Kentucky in the fall of 2020 could result in symptomatic disease, hospitalization or death.").  This risk is exacerbated if the polling places are crowded and the lines are long, as will be likely if the number of polling places is limited and mail-in absentee ballots are not made generally available to Kentucky voters.  As Dr. Murray notes:

> To the extent that polling places are crowded, require people to wait in lines, involve interacting with polling staff or other voters at a close distance, move people through the process slowly, are poorly ventilated and/or involve people touching objects like pens, paper, or surfaces with the voting booth, they constitute a risk to voters.

Murray Decl. ¶ 16.

Public health experts confirm that being in close quarters with others increases the risk of COVID-19 infection.[35]  And while it may be possible to instruct voters to maintain physical distance of at least six feet,[36] such restrictions are difficult to enforce, as set forth in detail below.

As the CDC has recently acknowledged, "[t]he more an individual interacts with others, and the longer that interaction, the higher the risk of COVID-19 spread."[37]  States can lower this risk by providing "a wide variety of voting options," "longer voting periods (more days and/or more hours)," and "any other feasible options for reducing the number of voters who congregate indoors in polling locations at the same time."[38]  Voting by mail is precisely the sort of voting option that is required to protect the public health.  Indeed, recent experience has demonstrated that only broad access to mail-in absentee ballots can avoid the imposition of severe health risks on Kentucky voters that burden the right to vote.

### A.  The June Primary Demonstrates the Health Risks of In-Person Voting

The difficulties of enforcing safety measures at polling places were readily apparent in Kentucky's June Primary.  In advance of the election, Defendants promulgated regulations and

---

[35] CDC, *Coronavirus Disease 2019 (COVID-19): Social Distancing* (last updated July 6, 2020), https://rb.gy/wdwyqf (recommending at least six feet between persons); Murray Decl. ¶¶ 41–43.

[36] CDC, *Coronavirus Disease 2019 (COVID-19): Considerations for Election Polling Locations and Voters* (last updated June 22, 2020), https://perma.cc/97B4-EARU (encouraging voters to wear masks because social distancing at polling places is difficult).

[37] *Id.*

[38] *Id.*

policies in an attempt to try to keep in-person voters safe.  On April 23, 2020, Secretary Adams issued a letter recommending that the State Board of Elections propose emergency regulations to instruct county clerks to implement in-person voting procedures to "limit direct contact between individuals, whether poll workers or voters."  On April 24, 2020, Governor Beshear adopted this recommendation in an Executive Order.[39]  On May 1, 2020, the Board of Elections enacted such an emergency regulation, which similarly stated that "every reasonable effort shall be undertaken by County Clerks to see that in-person absentee voting is implemented in a manner that limits direct contact between voters, other voters, and election officials."  31 Ky. Admin. Regs. 4:190E § 10.  Governor Beshear and Secretary Adams both approved the emergency regulation.[40]

Pursuant to these directives, the County Clerks issued various instructions.  In Scott County, for example, the County Clerk instructed that "voters w[ould] be asked to keep a 6-foot distance while in line and voting."[41]  In Jefferson County, the County Clerk issued instructions that voters were to wear masks.[42]  In some other counties, however, no such specific instructions appear to have been provided.  *See* Ex. B, Declaration of Jayne Ponder (Ponder Decl.), ¶¶ 4–18 & Exs. 1–13 (various County Clerk instructions).  Notably, many County Clerks affirmatively encouraged voters to vote by mail.  *See, e.g.*, *id.* at ¶¶ 6, 7, 12 & Exs. 3, 4, & 9.

---

[39] Ky. Office of the Governor, *State of Emergency Relating to Kentucky Elections*, Exec. Order No. 2020-296 (Apr. 24, 2020), https://perma.cc/Q32R-549V.

[40] Ky. Sec'y of State, *Approval of Procedures Established for Election During State of Emergency*, Exec. Order 2020-01 (May 1, 2020), https://perma.cc/883F-WHJ7; Ky. Office of the Governor, *State of Emergency Relating to Kentucky Elections*, Exec. Order No. 2020-311 (May 1, 2020), https://perma.cc/6J8M-YDGG.

[41] Scott Cty. Clerk, *What Every Scott County Voter Needs to Know for Primary Election June 23, 2020* (May 27, 2020), https://perma.cc/E7QD-643X; *see also* Warren Cty. Clerk, *How You Can Vote in Warren County*, https://perma.cc/CE73-NMDW (last visited July 9, 2020) ("We are required to social distance between voters and to sanitize after each voter.").

[42] Jefferson County Clerk's Office, *2020 Primary Election*, https://perma.cc/XFE9-WUS5 (last visited July 9, 2020).

Regardless of how things were supposed to work on paper, not all voters wore masks in practice:



Nor did all voters stand six feet apart:



---

[43] Daniel Desrochers & Jack Brammer, *Lexington Voters Endured Waits of More Than an Hour at Kroger Field on Election Day*, Lexington Herald-Leader (June 24, 2020), https://rb.gy/teji8a.

[44] Christina A. Cassidy et al., *2 Republicans Opposed by Trump Win in Kentucky, N. Carolina*, WFTV9 ABC (June 24, 2020), https://rb.gy/yqbfbh; *see also* Ponder Decl. ¶ 19 & Exs. 14–17.

The conditions pictured above reflect the lines and crowding that resulted from less than 4,000 in-person voters in Fayette County.  The number of in-person voters was limited because the majority of voters in the county—*i.e,* 80,300 voters—chose to cast mail ballots.[45]  Yet, even with only 3,760 total in-person voters at the Kroger Field polling place, Fayette County voters reported standing in lines for up to two hours throughout the day.[46]  And as the photos make clear: that was two hours within six feet of other individuals not wearing masks.  As this experience indicates, even the most cautious in-person voter will have little control over their exposure to the virus, because they cannot protect themselves from fellow voters who fail to wear masks or maintain an appropriate social distance.

These photographs are corroborated by numerous social media posts which confirm that voters were not practicing social distancing and/or wearing masks at the polls.  *See* Ponder Decl. ¶ 19 & Exs. 14–17.  They are further confirmed by the testimony of percipient witnesses.  *See* Ex. C, Declaration of DeJuan Nash (Nash Decl.) ¶¶ 9–12.

To the extent that polling places are crowded, require people to wait in lines, involve interacting with polling staff or other voters at a close distance, or move people through the process slowly, they constitute a risk to voters.  Murray Decl. ¶¶ 16, 41.  Indeed, as recent experience in Wisconsin has demonstrated, even if various safety measures are attempted, in-person voting remains a very risky enterprise.  Murray Decl. ¶¶ 17–18, 47–51.

---

[45] Fayette Cty. Clerk, *Primary 2020* (June 30, 2020), https://perma.cc/N9M5-H32B.

[46] Daniel Desrochers & Jack Brammer, *Lexington Voters Endured Waits of More Than an Hour at Kroger Field on Election Day*, Lexington Herald-Leader (June 24, 2020), https://rb.gy/teji8a.

The overcrowded, unsafe conditions depicted above provide a chilling forecast for the November general election, where in-person turnout will be significantly higher, especially when Defendants reintroduce the Excuse Requirement.[47]

### B.  The June Primary Demonstrates the Need for Expanded Mail-In Absentee Voting

The June Primary demonstrated that expanded access to mail ballots is necessary to alleviate population pressure and crowding that results from consolidated poll sites.  Secretary Adams has stated that over 80% of the more than one million voters in Kentucky's June Primary voted by mail in absentee ballot,[48] yet the overcrowding depicted above still took place.  To put this in context: 1,913,287 Kentuckians voted in person in the last presidential election—nearly *ten times* the number of people who voted in person in June.[49]  Without the ability to vote by mail, these hundreds of thousands of voters will overcrowd polling locations and jeopardize Kentuckians' safety in the November 2020 election.

 Nor can Defendants reasonably expect to have the same number of polling locations available as in 2016.  In the lead up to the June Primary, Kentucky officials reduced the number of in-person polling places from 3,700 to fewer than 200 locations because Kentucky does not have the resources necessary to conduct in-person voting at full capacity during the COVID-19 pandemic, as Secretary Adams has admitted: "We just don't have enough locations that are capable

---

[47] Fayette Cty. Clerk, *General 2016*, rb.gy/g21khh (last visited July 9, 2020).

[48] WKYT, *Secretary of State Michael Adams Speaks About Primary Election Results* at 1:50 (June 30, 2020), https://rb.gy/bgat4q; Joe Sonka, *Amid Voter Suppression Claims, Black Voter Turnout in Louisville Increased in June Primary*, Louisville Courier Journal (July 7, 2020), https://rb.gy/y1txtt (1,003,678 Kentuckians voted statewide in June Primary).

[49] U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2016 Comprehensive Report* at 23 (2016), https://perma.cc/SVT9-5KZE.

of social distancing.  We don't have enough poll workers."[50]  The reduction in polling places was a manageable option in some Kentucky counties—both administratively and from a public health perspective—only because of the availability of ubiquitous mail voting.

For example, during the June Primary, Jefferson County, which has over 600,000 voters, had one open polling place.  Without a widely available option to vote absentee by mail, the crowds at the polling site would have been overwhelming.   But because 179,684 Jefferson County residents took advantage of the expanded access to mail-in absentee ballots, only 27,035 people voted in person in Jefferson County,[51] which dramatically decreased lines and crowding at the polling site for most of the day.  In contrast, 362,983 Jefferson County residents—over 13 times as many people—voted in person in the 2016 general election, when the Excuse Requirement was in place and mail-in absentee ballots were not widely available.[52]   And instead of the 88% of Jefferson County voters who were able to vote by mail-in absentee ballot in the June Primary, the percentage of absentee voters in Jefferson County is "usually closer to 1%."[53]  Similarly, the total number of in-person Fayette County voters in the 2016 general election was 32 times higher than the number of people who voted in person in the June Primary in Fayette County.[54]

---

[50] Jacqueline Pitts, *Kentucky Secretary of State Adams Says Changes to Voting for Primary Elections Will Keep People Safe and Make Needed Improvements to System*, Ky. Chamber of Commerce Bottom Line (May 12, 2020), https://rb.gy/nubnri; *see also Nemes*, 2020 WL 3402345, at *4; Michelle Ye Hee Lee, *Kentucky Braces for Ppossible Voting Problems in Tuesday's Primary Amid Signs of High Turnout*, Wash. Post (June 19, 2020), https://perma.cc/5PYM-QP3V.

[51] Jefferson Cty. Clerk, *2020 Unofficial Primary Election Results* (June 30, 2020), http://elections.jeffersoncountyclerk.org/2020/06/30/2020-unofficial-primary-election-official-results/.

[52] Jefferson Cty. Clerk, *General Election November 8, 2016* (Nov. 29, 2016), https://rb.gy/ecojvg.

[53] Joe Sonka, *Amid Voter Suppression Claims, Black Voter Turnout in Louisville Increased in June Primary*, Louisville Courier Journal (July 7, 2020), https://rb.gy/y1txtt.

[54] Daniel Desrochers & Jack Brammer, *Lexington Voters Endured Waits of More Than an Hour at Kroger Field on Election Day*, Lexington Herald-Leader (June 24, 2020), https://rb.gy/teji8a (3,851 in-person voters in Fayette County's June Primary); Fayette Cty. Clerk, *General 2016*,

The June Primary was far from perfect, and was marred by several serious flaws.  But one thing is clear: the problems would have been far worse but for the widespread use of mail balloting.

### C. Primary Elections in Other States Reinforce the Same Lessons Regarding the Health Risks of In-Person Voting

Other states' recent elections further confirm the substantial risks of in-person voting. During the Wisconsin primary election, for example, voters in Milwaukee and Green Bay faced excessive wait times, large crowds, and long lines, conditions that made social distancing nearly impossible.[55]  Despite local election officials' efforts to ensure the safety of polling places, research has concluded that Wisconsin counties with higher than average in-person voting had twice the rate of COVID-19 postitive tests when taking into account the appropriate period of time to measure infection rates, even after accounting for population density and social distancing measures.  Murray Decl. ¶¶ 47–51; Ex. D, Declaration of Adriel I. Cepeda Derieux (Cepeda Derieux Decl.), ¶ 4 & Ex. 1.  The Wisconsin Department of Health found that 71 voters tested positive for COVID-19, and economists have concluded that there was "a strong preponderance of statistical evidence demonstrating that more in-person voting per location is associated with a greater spread of COVID-19 infections in Wisconsin." Cepeda Derieux Decl., ¶ 4 & Ex. 1 at 15.

*     *     *

The lessons are clear: regardless of any aspirational safety precautions that are instituted for in-person voting, broadly-available mail voting is critical to public health and voters' safety.

---

https://perma.cc/5Z8M-K2EU (last visited July 9, 2020) (123,801 in-person voters in Fayette County's November 2016 election).

[55] Elise Viebeck, et al., *Long Lines, Anger and Fear of Infection: Wisconsin Proceeds with Elections under Court Order*, Washington Post (Apr. 7, 2020), https://perma.cc/ZX66-G8G5.

Only in that way can crowd size be limited and social distancing maintained.[56]  And only in that way can the right to vote be safeguarded.

## ARGUMENT

### I.    Legal Standard

#### A.    The Four-Part Test for a Preliminary Injunction

The Court must balance four factors: (1) whether plaintiffs are "likely to succeed on the merits," (2) whether plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief," (3) whether "the balance of equities tips in [plaintiffs'] favor," and (4) whether "an injunction is in the public interest."  *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

The first factor traditionally carries the most weight and "'often will be [] determinative.'"  *Id.* at 436–37 (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)).  Under the second factor, injuries to individual and organizational Plaintiffs are irreparable "if [they are] not fully compensable by monetary damages."  *Id.* at 436 (internal quotations omitted).  Consequently, "a restriction on the fundamental right to vote . . . constitutes irreparable injury."  *Id.* (citing *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986)).

The third factor balances the equities by measuring the irreparable harm to plaintiffs absent relief against the harm to defendants if the injunction is granted.  *Id.*; *see also Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982) (describing "balance of hardships," in which "irreparable harm to the plaintiff if there is no preliminary injunction is balanced against any injuries likely to be suffered by the defendant(s) if a preliminary injunction is granted").

---

[56] Cepeda Derieux Decl., ¶ __ & Ex. 1 at 4 (recommending that public officials increase the number of polling locations, voting times, early voting or absentee ballots, or mail-in voting to keep the density of people voting as low as possible).

Finally, the Court considers whether the "injunction is in the public interest." *Winter*, 555 U.S. at 20. This factor often turns on whether Plaintiffs' constitutional rights are violated, because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Monaghan v. Sebelius*, 931 F. Supp 2d. 794, 808–09 (E.D. Mich. 2013) (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)).

Movants bear the burden of demonstrating that preliminary injunctive relief is warranted, *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 441 (1974), but they are "not required to prove [their] case in full at a preliminary-injunction hearing." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (alteration in original).

### B.     The *Anderson-Burdick* Test Governing Restraints on Voting Rights

"The right to vote is a precious and fundamental right, and it is clear that this right is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 662–63 (6th Cir. 2016) (internal citations and quotation marks omitted). Accordingly, "[t]he Equal Protection Clause applies when a state either classifies voters in disparate ways . . . or places restrictions on the right to vote." *Obama for Am.*, 697 F.3d at 428–30. The Supreme Court has "creat[ed] a single standard for evaluating challenges to voting restrictions" under the First Amendment and the Equal Protection Clause: the *Anderson-Burdick* framework. *Id.* at 430 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 786 n.7 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189–91 (2008)).

Under *Anderson-Burdick*, "[t]he precise character of the state's action and the nature of the burden on voters will determine the appropriate equal protection standard." *Obama for Am.*, 697 F.3d at 428. "If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used." *Id.* at 429. "On the other extreme, when a state's classification 'severely' burdens the fundamental right to vote, as with poll taxes, strict scrutiny is the appropriate standard." *Id.* Such restrictions must "be narrowly tailored and advance a compelling state interest." *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 693 (6th Cir. 2015).

"Most cases fall in between these two extremes," *Obama for Am.*, 697 F.3d at 429, and require courts to "weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiffs' rights.'" *Burdick*, 504 U.S. at 434 (internal citations omitted). "This standard is sufficiently flexible to accommodate the complexities of state election regulations while also protecting the fundamental importance of the right to vote," *Obama for Am.*, 697 F.3d at 429, because it operates as a "sliding scale" test, "where the more severe the burden, the more compelling the state's interest must be." *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir. 2018); *see also Fusaro v. Cogan*, 930 F.3d 241, 257–58 (4th Cir. 2019); *Utah Republican Party v. Cox*, 892 F.3d 1066, 1077 (10th Cir. 2018). Even restrictions imposing "slight burdens" must be "justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (internal citations omitted).

23

"In determining the magnitude of the burden imposed by a state's election laws, the Supreme Court has looked to the associational rights at issue[;] the effect of the regulations on the voters, the parties and the candidates; evidence of the real impact the restriction has on the process; and the interests of the state relative to the scope of the election.'" *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 587 (6th Cir. 2006). "In evaluating the burden imposed by an election law," courts "must consider 'the combined effect of the applicable election regulations,' not simply each law in isolation." *Libertarian Party of Ohio v. Husted*, 831 F.3d 382, 400 (6th Cir. 2016) (quoting *Blackwell*, 462 F.3d at 586).

After determining the severity of the burden imposed by the challenged restrictions, courts must "'identify and evaluate' the state's interests and justifications for its restrictions" and "assess the 'legitimacy and strength' of those interests to determine whether the restrictions are constitutional burdens on ballot access." *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574–75 (6th Cir. 2016) (quoting *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 546 (6th Cir. 2014)).

A "law severely burdens voting rights if the burdened voters have few alternate means of access to the ballot," because such a law "impermissibly restricts 'the availability of political opportunity.'" *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998) (quoting *Anderson*, 460 U.S. at 793) (internal citations omitted). Accordingly, the Sixth Circuit has rejected the argument that "rational basis is the appropriate standard" where plaintiffs demonstrate that "'burdened voters have few alternate means of access to the ballot.'" *Obama for Am.*, 697 F.3d at 430–31 (quoting *Citizens for Legislative Choice*, 144 F.3d at 921).

As the Court applies these standards to the level of severity of the burdens on voters imposed by the Excuse Requirement and the implementation of the Photo ID Law in the context of the COVID-19 pandemic, it will be clear that the character and magnitude of the asserted injury

24

Plaintiffs seek to guard against are extraordinarily burdensome and grave: it is the right not to be forced to choose between voting and health.  Further, any purported interests pressed by Defendants in support of their conduct will be shown to be woefully unnecessary and inadequate to justify those burdens.

## II.    The First and Fourteenth Amendments Require Elimination of the Excuse Requirement During the Pendency of the COVID-19 Pandemic

### A.    Plaintiffs Are Likely To Prevail on the Merits Because the Excuse Requirement Threatens Voters' Health and Safety During the COVID-19 Pandemic

Requiring Kentuckians to vote in person while the risk of transmission of COVID-19 remains burdens their fundamental rights, because it "forces voters to make the untenable . . . choice between exercising their right to vote and placing themselves at risk of contracting a potentially terminal disease." *Thomas v. Andino*, No. 3:20-cv-01552-JMC, 2020 WL 2617329, at *17 n.20 (D.S.C. May 25, 2020) (finding that absentee voting is constitutionally protected when it "impacts voters' fundamental right to vote," including "during [the COVID-19] pandemic"); *see also League of Women Voters of Va. v. Va. State Bd. of Elections*, No. 6:20-CV-00024, 2020 WL 2158249, at *8 (W.D. Va. May 5, 2020) ("*LWVV*") ("In ordinary times, Virginia's witness signature requirement may not be a significant burden on the right to vote.  But these are not ordinary times.").

#### 1.    The Excuse Requirement Imposes an Extremely Heavy Burden on the Right to Vote During the Pandemic

Even if it might ordinarily pose a tolerable burden, "in our current era of social distancing," the Excuse Requirement's burdens are "substantial" because they make it impractical for individuals to "maintain a minimum of six feet from those outside their household" when they vote at over-crowded polling sites.  *LWVV*, 2020 WL 2158249, at *1 (approving consent decree, applying *Anderson/Burdick* flexible test to witness requirement for absentee ballots).  During the

pandemic, the Excuse Requirement will force hundreds of thousands of voters, including Plaintiffs, to choose between putting themselves at intolerable risk of illness and forfeiting their right to vote. *Thomas*, 2020 WL 2617329, at *17 n.20; *see also LWVV*, 2020 WL 2158249, at *8.

Defendants themselves effectively already acknowledged this point when they determined that the "reasonable fear of infection or transmission" of COVID-19 was a "medical emergency" that qualified voters to vote by mail in the June Primary.[57]  And as public health experts have warned, COVID-19 is likely to pose no less a risk in the fall.  *See* Murray Decl. ¶ 54.

Under these circumstances, other safe means of voting are not "not easily available." *Thomas*, 2020 WL 2617329, at *17 n.20.  Avoiding crowded polling places is an important factor in securing a safe election.  Murray Decl. ¶¶ 14, 16, 46.  During the pandemic, a shortage of poll workers will drive the need to limit the number of polling places (and given the persistence of the pandemic there is no reason to believe that this constraint will be eliminated by November). Excessive crowding at such polling places is a certainty if voters do not have broad access to mail-in absentee ballots.

Plainly put, the Excuse Requirement will force Plaintiffs from their homes, into close proximity with persons unknown to them, and exacerbate crowding at polling places—all of which puts them at increased risk of an often-devastating illness.  Otherwise, they must forgo their right to vote.  *See Thomas*, 2020 WL 2617329, at *17 n.20 ("[D]uring this pandemic, absentee voting is the safest tool [for] voters . . . *to effectuate* their fundamental right to vote.  To the extent access to that tool is unduly burdened, [it] effectively [denies] the franchise . . . .").  Indeed, as the events of the June Primary showed, expanded absentee voting was able to alleviate some, but not all, of

---

[57] Letter of Michael G. Adams, Sec'y of State, to Andy Beshear, Governor (Apr. 23, 2020), https://governor.ky.gov/attachments/20200423_Ltr-from-Sec-of-State-Adams.pdf.

the problems in voting caused by the pandemic.  With twice as many voters expected to vote in November than in June (per Secretary Adams's own estimation[58]), without expanded eligibility for absentee voting, many of those voters who choose to try to vote are likely to be shut out or, at a minimum, burdened by lines and traffic of extraordinary proportion.

The individual Plaintiffs are also exceedingly likely to show that the Excuse Requirement excessively burdens their right to vote because they are Black and at high risk of complications from COVID-19 due to their age or medical history.  Ex. E, Declaration of Michael Collins (Collins Decl.) ¶¶ 2–3; Ex. F, Declaration of Jeffrey Cosby (Cosby Decl.) ¶¶ 1–2; Ex. G, Declaration of Thela Elliott (Elliott Decl.) ¶¶ 2, 4; Ex. H, Declaration of Gracie Lewis (Lewis Decl.) ¶¶ 2, 4; Nash Decl. ¶¶ 2–3; Ex. I, Declaration of Tiffany Price (Price Decl.) ¶¶ 2, 4.  So are many of the organizational Plaintiffs' members.  *See* Declaration of Ex. J, Raymond Burse (Burse Decl.) ¶¶ 17, 20; Ex. K, Declaration of Sadiqa Reynolds (Reynolds Decl.) ¶ 22; Ex. L, Declaration of Frances Wagner (Wagner Decl.) ¶¶ 15, 19.  Because COVID-19 could prove fatal, disproportionately, to these voters, the stakes of having to leave home and be exposed to countless unknown persons are even greater.

Public health experts and officials—including Defendants—have not minced words: COVID-19 is a particularly dire risk to the elderly, people with certain underlying health conditions, and Black people.[59]  As of July 9, 2020, 90.79% of Kentuckians who have died from

---

[58] WKYT, *Secretary of State Michael Adams Speaks About Primary Election Results* at 10:30, https://rb.gy/bgat4q (Secretary Adams noting that "[t]urnout in November is going to be twice as high as it was for June—or higher.").

[59] CDC, *Coronavirus Disease 2019 (COVID-19): Who Is at Increased Risk for Severe Illness?* (June 25, 2020), https://rb.gy/ktomif (explaining that older populations and individuals with comorbidities are at greater risk); CDC, *Coronavirus Disease 2019 (COVID-19): Racial & Ethnic Minority Groups* (last updated June 25, 2020), https://rb.gy/yiqevc.

COVID-19 were over the age of 60 and 15.3% were Black, despite Black people making up only approximately 8.3% of the state population.[60]

The gravity of the risks that COVID-19 poses to these categories of individuals is well-known and has been highly publicized nationally and statewide.  Nothing suggests that the risks specific to persons in these categories will abate by November.  To the contrary, all plans to "re-open" Kentucky have stressed that singularly at-risk individuals, including the elderly, should take additional precautions to prevent severe illness.[61]  *See LWVV*, 2020 WL 2158249, at *8 (COVID-19 mitigation practices like "wearing masks" or social distancing "come up far short" for "many" voters needing a witness for their absentee ballots, "especially the elderly, immunocompromised, and others at greatest risk of medical complications").

In this context, the Excuse Requirement imposes gravely oppressive burdens on Plaintiffs, all of whom fall into one or multiple categories of persons considered at risk for serious illness from COVID-19.  Murray Decl. ¶¶ 7, 30–31.

### 2. The State's Interests Do Not Outweigh the Extremely Heavy Burden on Plaintiffs' Right To Vote

By compelling voters either to leave home and risk exposure to grave illness or sit out the November election altogether, the Excuse Requirement all but fully deprives Plaintiffs the opporutnity to vote in that election.  The extremely heavy burdens placed on voters due to restrictive enforcement of the Excuse Requirement outweigh any discernible state interest.

---

[60] Ky. Dep't of Pub. Health, *KY COVID-19 Daily Summary* (July 9, 2020), https://rb.gy/omswdj; Ky. Dep't of Pub. Health, *2017 Kentucky Racial and Ethnic Distribution* (Sept. 21, 2017), https://perma.cc/XCY8-274M.

[61] *See, e.g.*, Ky. Office of the Governor, *Healthy at Work: Reopening Kentucky* (last updated July 9, 2020), https://govstatus.egov.com/ky-healthy-at-work.

First, Defendants have effectively conceded that this pandemic requires the elimination of the Excuse Requirement.  The Kentucky Board of Elections emergency regulation for the June Primary, among other measures, changed the definition of "medical emergency" in Ky. Rev. Stat. § 117.077 to allow those with a reasonable fear of contracting or transmitting COVID-19 during a state of public health emergency to apply for an absentee ballot.  31 Ky. Admin. Regs. 4:190E § 2. The rationale for this determination was plain.  Defendants stated that these measures were "necessary given that the Kentucky Constitution requires free and fair elections, yet the COVID-19 pandemic . . . poses a risk to the health and well-being of voters."  *Id.*

The same rationale applies to the November general election.  Public health officials say it is "inevitable" and are "convinced" that COVID-19 will continue to threaten voters' health and safety this fall due to a looming wave of the virus,[62] and the Trump administration has consequently acknowledged that it is "preparing for the possibility that a second wave of Covid-19 could hit the United States in the fall."[63]  Experts warn that the virus will continue to pose a serious threat to public health and safety until a vaccine becomes available, and have also projected that it is unlikely that an FDA-approved vaccine will be mass produced and widely available in time for the November election.  Murray Decl. ¶¶ 73–74.

Second, Defendants admit there is no relation between the Excuse Requirement and preventing voter fraud or protecting election integrity.  Secretary Adams not only recommended that all voters have the option to vote safely from home in the June Primary, but noted that the "presumption that absentee voting is less secure is frustrating because Kentucky has safeguards in

---

[62] Christina Maxouris, *US Could Be in for 'a Bad Fall and a Bad Winter' If It's Unprepared for a Second Wave of Coronavirus, Fauci Warns*, CNN (Apr. 29, 2020), https://perma.cc/45U6-39LN.

[63] Veronica Stracqualursi, *White House Adviser: Trump Administration Preparing for Possible Second Wave of Coronavirus in the Fall*, CNN (June 21, 2020), https://perma.cc/PZ2H-M6UP.

place to protect against fraud."[64]   Adams is "not aware of any instance over the past decade in which voter fraud was committed in Kentucky by someone impersonating another eligible voter," and he acknowledged there "is no evidence of extensive fraud in U.S. elections or of multiple voting."[65]   Indeed, having campaigned on the issue of voter fraud, Adams now says that "it's my job now to calm people's fears" about mail-in absentee ballots. [66]

### B.   Plaintiffs Will Suffer Irreparable Injury If the Excuse Requirement Is Not Enjoined

#### 1.   Individual Kentucky Voters Will Suffer Irreparable Injury By Being Forced To Choose Between their Health and their Right to Vote

The Excuse Requirement would force "unnecessary exposure to COVID-19" and therefore "provides a basis to find that [Plaintiffs] will suffer irreparable injury" by forcing voters to choose between the right to vote and their health.  *Perez-Perez v. Adducci*, No. 20-10833, 2020 WL 2305276, at *8 (E.D. Mich. May 9, 2020).  All individual Plaintiffs and Declarants are registered voters who need to vote by mail-in absentee ballot in November to avoid the health risks of in-person voting.[67]   Regardless of any safety measures implemented on Election Day, large crowds will exacerbate the health risks entailed by any in-person voting scheme.[68]   These conditions will force Plaintiffs to put themselves and their families at risk of potentially deadly infection to vote.

---

[64] *See* Pam Fessler, *'It's Partly On Me': GOP Official Says Fraud Warnings Hamper Vote-By-Mail Push*, NPR (May 15, 2020), https://perma.cc/5869-4YMU.

[65] Joe Sonka, *Kentucky Republicans Say Voter ID Bill Will 'Increase Confidence' in Election Process*, Louisville Courier Journal (Jan. 8, 2020), https://perma.cc/24TY-KJX7; LRC Public Information, *Voter ID Bill Receives Favorable Hearing*, Richmond Register (Jan. 22, 2020), https://rb.gy/jxbuon.

[66] *See* Pam Fessler, *'It's Partly On Me': GOP Official Says Fraud Warnings Hamper Vote-By-Mail Push*, NPR (May 15, 2020), https://perma.cc/5869-4YMU.

[67] Cepeda Derieux Decl., Ex. 1 at 15 (concluding that there are more positive cases of COVID-19 where more people voted in-person in Wisconsin).

[68] *Id.*, Ex. 1 at 4 (recommending measures to reduce the number in-person voter on Election Day).

Plaintiffs Collins, Cosby, Elliott, Lewis, Nash, and Price have voted in person in recent years, and do not qualify for any absentee excuses currently available under Kentucky law, but each of them is at heightened risk for contracting and suffering from severe complications from COVID-19.  All individual Plaintiffs are Black.  Plaintiffs Cosby and Lewis are over 65 years old.  And each Plaintiff suffers from serious underlying conditions including COPD, hypertension, diabetes, chronic kidney disease, and cancer.  Collins Decl. ¶ 2–3, 9–10; Cosby Decl. ¶ 1–2, 9; Elliott Decl. ¶¶ 2, 4, 10–11; Lewis Decl. ¶¶ 2, 4, 11–13; Nash Decl. ¶¶ 2–3, 8; Price Decl. ¶¶ 2, 4, 10, 11.  Because of their risk of infection, they will be forced to make an unacceptable decision between protecting their health and exercising their right to vote if the Excuse Requirement is reinstated for the November election.

If the Excuse Requirement is not enjoined, even voters who are not themselves at heightened risk will be forced to choose between their right to vote and potentially spreading COVID-19 to family members who are at high risk.  Declarants Hanner and Pregliasco are both the primary caregivers for family members with dangerous underlying health conditions.  Ex. M, Declaration of Marlene Hanner (Hanner Decl.) ¶ 2; Ex. N, Declaration of Delores Pregliasco (Pregliasco Decl.) ¶ 2.  Declarant Hanner would not vote in November if the Excuse Requirement remains in place because her exposure to the virus would threaten her husband's health and safety.  Hanner Decl. ¶ 10.  Declarant Pregliasco similarly recognizes that the Excuse Requirement will force her to choose between unnecessarily increasing her husband's likelihood of contracting COVID-19 and being unable to vote.  Pregliasco Decl. ¶ 10–11.

### 2. Voting Rights Organizations Will Suffer Irreparable Injury Diverting Resources To Contend With the Challenged Restrictions

As an initial matter, if the Excuse Requirement is enforced in the November election, the members of Plaintiff organizations will also have to risk their health or the health of their

communities to cast a ballot on Election Day.  The League of Women Voters of Kentucky ("LWVKY"), Louisville Urban League ("LUL") and Kentucky NAACP ("KYNAACP") all have members who are registered voters who plan to vote in November and have chronic or underlying health conditions that put them at heightened risk of complications from COVID-19.  Wagner Decl. ¶¶ 15, 19; Reynolds Decl. ¶ 22; Burse Decl. ¶¶ 17, 20.  Each organization also has members who live with family members or in communities with people who are in an at-risk population. Wagner Decl. ¶ 19; Reynolds Decl. ¶ 22; Burse Decl. ¶ 20.  For instance, KYNAACP member Mary Johnson is the primary caregiver for her elderly father and two special needs children.  Burse Decl. ¶ 20.  Johnson needs to vote by absentee ballot in November because the risk of exposure to COVID-19 at the polls could lead her to infect her father or children, *id.*, but the Excuse Requirement will force her to choose between disenfranchisement and exposure to COVID-19.

Organizational Plaintiffs will also have to divert resources from their 2020 priorities if Kentucky fails to waive the Excuse Requirement, which will irreparably impact their ability to register voters, assist in felon reinfranchisement, and/or assist voters adversely affected by the recent purge of the voter rolls.  For the 2020 election cycle, each organization planned to continue its voter registration and engagement efforts: all three organizations planned to attempt to register the 150,000 people with criminal convictions who had their voting rights restored by the Governor on December 12, 2019, and KYNAACP planned to contact individuals among the 170,000 voters who state officials listed as "inactive" as part of a plan to conduct massive purges of registration records.  Wagner Decl. ¶¶ 6, 12; Reynolds Decl. ¶¶ 12, 15; Burse Decl. ¶¶ 10–11.

Because of Defendants' decision to reintroduce the Excuse Requirement for the November election despite the ongoing COVID-19 pandemic, the Plaintiff organizations are now ensuring that voters, especially those with underlying conditions, are educated about their options for voting

during the COVID-19 pandemic.  *See, e.g.*, Wagner Decl. ¶¶ 16, 20–21.  Defendants' decision to reintroduce the Excuse Requirement and abandon the safeguards they put in place for the June Primary will require the plaintiff organizations to educate voters about the rule changes from the June Primary to the November general election, especially for the hundreds of thousands of Kentucky voters who requested absentee ballots for the June Primary.  In particular, voters will need to be educated as to the fact that a request for an absentee ballot that does not meet the Excuse Requirement will be rejected for the November election, even if it would have been accepted for the June Primary.  Plaintiff organizations expect that these efforts to educate Kentucky voters about their ever-changing and limited options for voting during the pandemic will divert substantial resources from their originally planned activities.  *See, e.g.*, Wagner Decl. ¶¶ 20–21.

### C.  The Balance of Equities and Public Interest Favor an Injunction During the Pandemic

Defendants would incur little if any harm from enjoining enforcement of the Excuse Requirement.  The administrative burden is clearly manageable, as reflected by Defendants' decision to effectively eliminate the Excuse Requirement for the June Primary.  And because Plaintiffs seek relief months in advance of November, Defendants have time to plan and implement modifications for the general election.  Indeed, modifications for the June Primary offer a clear blueprint on how to prepare for November.  And, in any event, "administrative convenience" cannot justify deprivation of a constitutional right.  *Taylor v. Louisiana*, 419 U.S. 522, 535 (1975).  Likewise, the insubstantiality of any impact on the public interest as regards the deterrence of alleged fraudulent voting, as addressed above, cannot justify maintaining the Excuse Requirement.

An injunction extending Kentucky's Excuse Requirement modifications to the November election would favor the public interest by "permitting as many qualified voters to vote as possible" without contracting a deadly virus.  *Obama for Am.*, 697 F.3d at 437.  The "public has a strong

33

interest in exercising the fundamental political right to vote" because voting in a "free and unimpaired manner is preservative of other basic civil and political rights."  *Obama for Am.*, 697 F.3d at 436–37 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)); *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (internal citations omitted).

The public interest also "lies with safeguarding public health."  *Pashby v. Delia*, 709 F.3d 307, 331 (4th Cir. 2013); *see also Diretto v. Country Inn & Suites by Carlson*, No. 16-cv-1037, 2016 WL 4400498, at \*4 (E.D. Va. Aug. 18, 2016) ("The public interest is clearly in remedying dangerous or unhealthy situations and preventing the further spread of disease.").  Defendants agree.  As Defendants stated, their emergency regulations for the June Primary "allow[ed] for the conduction of elections that minimize the health-risk of all involved[.]"  Ky. Bd. of Elections, *Procedures for June 23, 2020 Election*, 31 Ky. Admin. Regs. 4:190E (2020).  The need to protect the health and safety of voters will still exist in November.

## III.   The First and Fourteenth Amendments Prohibit Implementation of the Photo ID Law During the Pendency of the COVID-19 Pandemic

### A.   Plaintiffs Are Likely to Succeed on the Merits Because Implementation of the Photo ID Law Threatens Voters' Health and Safety During the COVID-19 Pandemic

#### 1.   Implementation of the Photo ID Requirement During the Pandemic Imposes a Substantial Burden on Voters

As applied during the COVID-19 pandemic, the Photo ID Law threatens to disenfranchise Kentucky voters who do not currently have a qualifying photo ID, including Louisville Urban League members and clients without photo IDs.  *See, e.g.*, Reynolds Decl. ¶¶ 14, 16.  A conservative analysis demonstrates that at least 100,000 Kentucky voters lack the requisite photo ID.  Ex. O, Declaration of Dr. Eitan Hersh (Hersh Decl.) ¶¶ 15, 24, 26.  Such voters will need to go to a public office to obtain a photo ID such as a driver's license, subjecting them to a substantial risk of infection.  Murray Decl. ¶ 19.

34

With limited exceptions, Kentucky voters must visit their local circuit court clerk's office or REAL ID Regional Driver's Licensing Office in person to obtain a photo ID.[69]  But as of the date of filing this motion, many of these offices remain closed: half of the Commonwealth's REAL ID offices remain closed, half of the circuit court clerk's offices in Jefferson County remain closed, and "in-person services are no longer available" at Fayette County's circuit court clerk's offices.[70] Until all license issuance locations have fully reopened, many voters will simply be unable to obtain the photo ID that is required under S.B. 2.

Even when licensing offices reopen, many Kentuckians will still struggle to fulfill S.B. 2's requirements for at least three reasons.

First, traveling to and entering licensing offices to obtain a photo ID presents the same threats to voter health and safety as going to polling places, including use of public transportation, proximity to others, indoor crowding, officials interacting with multiple people throughout the day, and touching common items and surfaces.  These burdens will be especially pronounced for Kentucky voters who face increased risk of suffering severe illness or death from COVID-19, including voters with underlying medical conditions, Black voters, older voters, and voters with disabilities.  *See supra* at 8–10 (discussing heightened risks for especially vulnerable Kentuckians).

Second, the office that voters will need to visit will likely be more crowded given that Kentucky's implementation of the Photo ID Law coincides with its rollout of the REAL ID Act. The REAL ID Act is a separate change to driver's licensing that has created "significant unforeseen

---

[69] The exceptions concern voters whose licenses expired between March 1 and June 30, 2020.  Ky. Court of Justice, *Driver's Licensing Services Reopening Plan*, https://perma.cc/MV68-2ATS (last visited July 9, 2020).

[70] *See id.*; Ky. Transp. Cabinet, *Schedule*, https://rb.gy/5hsglt (last visited July 9, 2020); Ky. Court of Justice, *Driver's License Services*, https://kycourts.gov/Pages/DLreopeningplan.aspx (last visited July 9, 2020).

workload and staffing issues" at Kentucky licensing offices.[71]   The combination of the reduced capacity of Kentucky licensing offices and increased demand for photo IDs associated will mean that voters will have to hazard visits to crowded offices in order to obtain the IDs they need for voting.  Indeed, as some offices have reopened, long lines have become the norm, including a more than four hour wait to get a driver's license in Jefferson County.[72]

Third, even for Kentuckians with qualifying photo IDs, S.B. 2 creates an additional set of life-threatening risks for voters attempting to comply with the Photo ID Law while voting by mail-in absentee ballot.  If a voter does not have a photocopy machine or printer at home, they will be forced to go into a public space to make the statutorily required photocopy of their ID to attach to their application for a mail-in absentee ballot.  *See* S.B. 2 § 5(2).  This means a voter must choose between either entering a business or library—many of which are not yet open—to use copying and printing equipment, a possible vector for contracting COVID-19, or losing their right to vote. Individual Plaintiffs, members of organizational Plaintiffs, and the hundreds of thousands of Kentucky voters without photo IDs will be forced to put their health at risk to comply with the Photo ID Law.  For example, Plaintiffs Cosby, Elliott, and Price do not own a printer or copier, so they or their family members would need to leave their homes and break social distancing practices to obtain a photocopy of their photo ID.  Cosby Decl. ¶ 10; Elliott Decl. ¶¶ 13–14.

---

[71] Ben Tobin & Sarah Ladd, *Kentucky Halts Real ID Rollout as Federal Deadline for Travelers Looms*, Louisville Courier Journal (Mar. 3, 2020), https://perma.cc/XSE8-D5K7.

[72] WLKY, *Bowman Field Driver's License Branch Leaves People Waiting for Hours* (July 6, 2020), https://rb.gy/cdpfwb.

2.   **The State's Interests in Implementing the Photo ID Law During the Pandemic Do Not Outweigh the Substantial Burdens on Plaintiffs**

Even under the flexible standard used to evaluate more moderate burdens, *see Green Party of Tenn.*, 767 F.3d at 546, enforcing the Photo ID Law during the pandemic is unconstitutional. Whatever interest Kentucky may have in deterring voter fraud by implementing the Photo ID law for the November election is outweighed by the substantial burdens on the right to vote.  This is true for three reasons.

First, by Defendants' own admission, the state's interest in deterring voter fraud in Kentucky cannot be presumed to be significant.  As noted above, Secretary Adams has conceded that he is "not aware of any instance over the past decade in which voter fraud was committed in Kentucky by someone impersonating another eligible voter," and he has further acknowledged there "is no evidence of extensive fraud in U.S. elections or of multiple voting."[73]  Regarding the June Primary—which was conducted without the Photo ID Law—Adams has said that Kentucky "had a clean election" with "no reported incidents of fraud."[74]  Likewise, Governor Beshear has remarked that the June Primary demonstrated that Kentucky "can safely do voting by mail, and we proved that we can without fraud."[75]

---

[73] Joe Sonka, *Kentucky Republicans Say Voter ID Bill Will 'Increase Confidence' in Election Process*, Louisville Courier Journal (Feb. 20, 2020), https://perma.cc/24TY-KJX7; LRC Public Information, *Voter ID Bill Receives Favorable Hearing*, Richmond Register (Jan. 22, 2020), https://rb.gy/jxbuon.

[74]  WKYT, *Secretary of State Michael Adams Speaks About Primary Election Results* at 6:25, https://rb.gy/bgat4q; *see id.* at 13:10 ("I think I've shown that we can make absentee ballots work without fraud.").

[75] Gov. Andy Beshear, *Daily Media Briefing 06.30.2020* at 46:09–47:02 (June 30, 2020), https://youtu.be/DIEbxBB7fyw.

Second, the narrow question presented is the degree to which the Photo ID Law incrementally deters voter fraud above and beyond existing safeguards. Such measures include the non-photo identification requirements that existed under the law as it stood before S.B.2 was enacted. *See* Ky. Rev. Stat. § 117.227 (requiring election officers to confirm voter identity with photo or non-photo ID, such as Social Security card or credit card). And to make an online request for an mail-in absentee ballot, prospective voters are already required to enter their Social Security number and date of birth.[76] Further, voter fraud is already deterred by virtue of criminal penalties that attach to illegal voting. Ky. Rev. Stat. § 117.995(5) (criminalizing "vot[ing] an absentee ballot other than the one issued in his or her name" or "appl[ying] for the ballot for the use of anyone other than" themselves).

Third, in the context of mail-in absentee ballots, there is a complete disconnect between preventing voter fraud and requiring voters to include a photocopy of their photo ID with their mail-in absentee ballot application. Put simply, there is "no way for the state election officials to determine whether the photo ID actually belonged to the absentee voter," because the voter "wouldn't be presenting his face at the polling place for a comparison with the photo." *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 954 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) (dicta). Ultimately, because "the absence of a person standing before the election officials precludes linking the enclosed identification with the person actually casting the ballot," "nothing suggests that absentee ballot fraud would be limited by a photo-identification requirement that applied to absentee voting." *Am. Civ. Liberties Union of N.M. v. Santillanes*, 546 F.3d 1313, 1320 (10th Cir. 2008) (dicta).

---

[76] N. Ky. Tribune, More Than 100,000 Kentucky Voters Successfully Apply Online for Absentee Ballot as of Tuesday (May 27, 2020), https://rb.gy/kmkq8v.

3.      **Plaintiffs Will Suffer Irreparable Injury During the Pandemic If the Photo ID Law Is Not Enjoined**

The number of registered Kentucky voters who lack the required Photo ID is conservatively estimated to be at least 100,000.  Hersh Decl. ¶¶ 15, 24, 26.  Those voters will have to undergo the risk of visiting a public office (if and when they re-open) in order to exercise their right to vote. And those with a photo ID will need to visit a copy center if they are to vote by mail.  This constitutes an irreparable burden on the right to vote.

Organizational Plaintiffs have members without photo IDs who will be impacted by the new law.  *See, e.g.*, Reynolds Decl. ¶¶ 14, 16.  And the organizational Plaintiffs themselves have had to divert limited resources from their original 2020 priorities—namely, registering voters and assisting with restoration of voting rights to Kentuckians with felony records—to respond to the impact of the Photo ID Law.  All three organizations have already begun working to educate their members and constituencies about the Photo ID Law, and when and how to obtain a qualifying photo ID.  Burse Decl. ¶¶ 14–16; Wagner Decl. ¶ 10–11, 13; Reynolds Decl. ¶¶ 12, 16–18.

LWVKY is already revising its existing voter educational materials, and it anticipates that it will need to reduce resources on other voter services to conduct advertising to spread crucial information about the Photo ID Law to the public.  Wagner Decl. ¶ 11.  Responding to the Photo ID Law will strain LWVKY volunteers' time and the organization's tight financial resources. Wagner Decl. ¶¶ 10–11, 13.

KYNAACP is already is developing educational materials on the Photo ID Law for voters and training volunteers on the Photo ID Law's new requirements so they can better educate voters. Burse Decl. ¶ 14. KYNAACP will also devote resources to assist voters to obtain qualifying photo ID, especially seniors and voters who rely on public transportation.  Burse Decl. ¶¶ 14. KYNAACP  anticipates that volunteer time devoted to clearing up the confusion caused by the

Photo ID Law will reduce time that volunteers would otherwise spend registering voters, including voters with felony records whom KYNAACP had prioritized for assistance.  Burse Decl. ¶¶ 9–16.

LUL has already reevaluated its planned spending on civic engagement activities in light of the new Photo ID Law, and determined that it will need to spend tens of thousands of dollars in staff resources on outreach campaigns and logisitical assistance to mitigate the impacts of the Photo ID Law on disconnected youth.  Reynolds Decl. ¶¶ 18.  In addition, LUL anticipates that it will need to devote resources and staff time to providing guidance and transportation to seniors, homeless persons, and individuals who recently had their rights restored who need a qualifying photo ID.  Reynolds Decl. ¶¶ 13–17.  LUL anticipates that it will need to reduce staff time spent on critical activities like voter registration to adequately respond to the Photo ID Law.  Reynolds Decl. ¶ 17.

### B.   The Balance of Equities and Public Interest Weigh in Favor of Plaintiffs During the Pandemic

The balance of equities and the public interest weigh in favor of granting an injunction and protecting Kentucky voters.  There would be little to no harm in enjoining Defendants from enforcing the Photo ID Law during this unprecedented pandemic.  And Kentucky officials have acknowledged that voter fraud is, at worst, a minimal problem in the state.  The difficulties and dangers inherent in obtaining the newly required ID decisively outweigh the additional incremental protection against this minimal amount of fraud provided by S.B. 2.  As to implementing the law for voters who cast absentee ballots, there is no connection between placing a photocopy of a photo ID in an absentee ballot application and verifying voter identity.  By contrast, failing to enjoin the Photo ID Law would put at least 100,000 Kentucky voters at risk of either being excluded from exercising a fundamental right or contracting a deadly virus.  Hersh Decl. ¶¶ 15, 24, 26.

The public interest also weighs in favor of granting an injunction, because "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge*, 23 F.3d at 1079. "Quite simply, allowing for easier and more accessible voting for all segments of society serves the public interest." *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1224 (N.D. Fla. 2018). It cannot be in the public interest to force more voters to enter public spaces to vote and risk their lives.

## IV. The First And Fourteenth Amendments Require Kentucky To Provide Voters in the November General Election with the Three Voting Protections Provided for the June Primary

The three June Voting Protections implemented to modify Kentucky election laws and rules for the June Primary—(1) notice and opportunity to cure signature discrepancies, (2) waiving the notarization requirement for medical emergencies, and (3) extending the absentee ballot deadline—were necessary to protect voters' constitutional right to vote during the ongoing COVID-19 pandemic. Defendants have failed to extend these modifications to the November general election. The Kentucky election rules currently in effect for November—Ky. Rev. Stat. § 117.077 (the "Notarization Requirement"), Ky. Rev. Stat. § 117.086(1) (the "Mailing Deadline"), and the lack of June Signature Match Protections (collectively, the "Challenged Rules")—impose unacceptable burdens on Kentucky voters attempting to cast ballots during the COVID-19 pandemic.

### A. Plaintiffs Will Likely Succeed in Demonstrating that Failure to Implement the June Signature Match Protections Unduly Burdens the Right to Vote and Violates Voters' Due Process Rights

If Defendants fail to implement the June Signature Match Protections during the November election, all absentee ballots cast will be verified through a largely arbitrary system dependent on the judgment of individual election officials. Ex. P, Declaration of Dr. Linton Mohammed (Mohammed Decl.) ¶¶ 23–26, 28, 52. Most important, without notice and an opportunity to cure,

voters will have no chance to correct an arbitrary denial of their right to vote.  Thus, absent notice and cure safeguards, to be assured that their vote is counted, Kentuckians must choose between the risk of being disenfranchised and the risks associated with voting in person on Election Day.

> **1.    Plaintiffs Will Likely Establish that the Failure to Extend the June Signature Match Protections to the November Election Cannot Survive Under *Anderson-Burdick***

The state's interest in reverting to the pre-June signature match process is slight and cannot justify the burdens imposed on voters by that process.  While the state has an interest in preventing voter fraud and upholding election integrity, there is scant support for the proposition that ballots with perceived signature mismatches are submitted fraudulently.  *See Fl. Democratic Party v. Detzner*, No. 4:16-CV-607-MW/CAS, 2016 WL 6090943, at \*7 (N.D. Fla. Oct. 16, 2016) ("*Detzner I*").  In fact, various courts have found that a wide range of legitimate factors can affect the accuracy of an individual's signature.  *Id.*; *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217–18 (D.N.H. 2018); Indeed, ensuring that voters can cure errors would prevent—not increase—voter fraud, since election supervisors would be confirming the identity of voters before their ballots are counted.  *See Detzner I*, 2016 WL 6090943, at \*7.

Defendants recognize that the burden imposed by the pre-June signature match process outweighs any interest in reintroducing that process during the pandemic.  By implementing the June Signature Match Protection, Defendants implicitly acknowledge that the pre-June signature match process would arbitrarily disenfranchise an unprecedented number of voters.  *See Democratic Exec. Comm. v. Detzner*, 347 F. Supp. 3d 1017 (N.D. Fla. 2018) ("*Detzner II*").

> **2.    Failure to Implement Signature Match Notice and Cure Protections for the November Election Violates Voters' Fourteenth Amendment Procedural Due Process Rights**

Establishing a procedural due process violation requires showing "the deprivation of [a constitutionally protected interest] without due process of law." *Zinermon v. Burch*, 494 U.S. 113,

125 (1990).  Determining what process is due rests on the balancing of three factors: (i) the interest affected; (ii) the risk of erroneous deprivation under the current procedures, and the "probable value, if any, of additional or substitute procedural safeguards"; and (iii) the state's interest, including the "fiscal and administrative burdens" additional procedures would entail.  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

All three factors lean heavily in Plaintiffs' favor.  First, when a state provides absentee voting, courts have confirmed that Plaintiffs' ability to vote by absentee ballot is a liberty interest "deserving of due process."  *Saucedo*, 335 F. Supp. 3d at 217 (quoting *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990)); *Zessar v. Helander*, 2006 WL 642646, at *6 (N.D. Ill. Mar. 13, 2016) (citing *Paul v. Davis*, 424 U.S. 693, 711 (1976)).

Second, the risk of erroneous deprivation is high.  Experts generally agree that handwriting analysis by laypersons—which is what signature comparisons require—"is fraught with error." *Saucedo*, 335 F. Supp. 3d at 217.  Where the state employs no standards for signature comparisons, officials are likely to commit errors, and are more likely to disqualify authentic signatures than identify fraudulent ones.  Mohammed Decl. ¶¶ 23–25, 52; *Saucedo*, 335 F. Supp. 3d at 217–18. In addition, errors increase when election officials—who do not receive any training in handwriting analysis—are not checked by meaningful review or oversight by state agencies or the public.  *Saucedo*, 335 F. Supp. 3d at 218.  And the risk of arbitrary disenfranchisement will be heightened in November, since the pandemic will prevent many voters from visiting polling places in person and Kentucky will have a much higher level of absentee voting compared to prior elections.  Yet Kentucky's pre-June signature match process fails to provide any remedy for these errors: it provides no notice to voters if their ballot is rejected due to a perceived signature mismatch and no opportunity to cure.  Therefore, additional procedural safeguards that prevent, or

at least limit, such instances of arbitrary disenfranchisement are necessary to protect Kentuckians' right to vote. *See id*. at 219.

Third, the state's interest does not outweigh the value of notice and cure procedures that safeguard the right to vote. While the state has an interest in election integrity and preventing voter fraud, providing voters an opportunity to cure any perceived signature mismatch in no way diminishes that interest. In fact, such validation would advance the state's goals and affirm public confidence in the election. *See id*. at 220; *Detzner I*, 2016 WL 6090943, at *7 ("[L]etting mismatched-signature voters cure their vote by proving their identity further prevents voter fraud—it allows supervisors of elections to confirm the identity of that voter before their vote is counted."). Nor can any fiscal or administrative burdens that result from implementing notice and cure procedures for the November election outweigh the risk created by non-implementation—the heightened threat of widespread disenfranchisement. *See Taylor*, 419 U.S. at 535. Since the absentee ballot application requires voters to submit contact information (e.g., email address and phone number), moderators need only make a simple telephone call or send an email to provide notice. As Defendants recognized when they implemented notice and cure procedures for the June Primary, such burdens do not outweigh the benefits of these safeguards.

Defendants' pre-June signature match process thereby violates procedural due process, and Plaintiffs should be afforded appropriate relief for the November election. *See, e.g.*, *Self Advocacy Solutions N.D. v. Jaeger*, 2020 WL 2951012, at *9 (D.N.D. June 3, 2020); *Saucedo*, 335 F. Supp. 3d at 222.

### B. Failure to Waive the Notarization Requirement in November Unduly Burdens the Right to Vote

As noted above, for the June Primary, Defendants broadly construed the "medical emergency" excuse, under Ky. Rev. Stat. § 117.077, to apply to all voters who have "a reasonable

fear of infection or transmission during a state of public health emergency declared by the Governor." 31 Ky. Admin. Regs. 4:190E § 2.  And Defendants waived the requirement that voters notarize applications for these ballots.  *Id.* § 3.  If the notarization requirement is not similarly waived for the November election, voters confined due to a medical emergency may be forced to leave their confinement to properly execute their absentee ballot application.  In addition, where a voter's medical emergency is COVID-19 itself, the notarization requirement would seemingly require that voter to violate quarantine and visit a notary public.

The state also fails to provide realistic alternatives for these voters that permit them to avoid social contact.  In late March, the state enacted a bill that permits notarization by video teleconference, during the duration of the state of emergency declared on March 6, 2020.  *See* S.B. 150 § 1(11), 2020 Gen. Assemb., Reg. Sess. (Ky. 2020).  However, the bill does not lay out how remote notarizations would work for time-sensitive absentee ballot applications, and the Secretary of State provided no further guidance on the topic.  It is also unclear whether commissioned notaries who perform these remote video notarizations must follow the state's registration process for electronic notaries.  This process involves a series of steps, which include posting a $1,000 surety bond.[77]  It therefore may be difficult or impossible for voters to locate and contact an electronic notary public.  Many voters may be unfamiliar with the process or unsure where to access resources.  Given the confusion around these issues, remote notarization is likely not a realistic alternative for most voters that qualify for emergency ballots.

Any state interest in reintroducing the notarization requirement for the November election does not justify the corresponding burdens on voters.  Under Kentucky law, the only voters

---

[77] Ky. Sec'y of State, *Electronic and Remote (Online) Notary Public*, https://perma.cc/LJC7-ELT3.

required to notarize absentee ballot applications are those experiencing a medical emergency. Although notarization requirements typically serve to protect against voter fraud, there is no evidence that a notarization requirement applied only to this particular group of voters advances the state's interest in protecting against fraud. *See Thomas*, 2020 WL 2617329, at *20 ("While states certainly have an interest in protecting against voter fraud and ensuring voter integrity, the interest will not suffice absent 'evidence that such an interest made it necessary to burden voters' rights.'") (quoting *Fish v. Schwab*, 957 F.3d 1105, 1133 (10th Cir. 2020)). Defendants implicitly acknowledged that this notarization requirement was unnecessary when they waived it for the June Primary.

### C. Failure to Accept Mail-In Absentee Ballots Postmarked by Election Day Unduly Burdens the Right to Vote During the Pandemic

Kentucky's current absentee ballot receipt deadline, Ky. Rev. Stat. § 117.086(1), will impose a substantial burden on voters during the COVID-19 pandemic. State absentee ballot receipt deadlines impose heavy burdens when the state does not provide voters with sufficient time to receive, complete, and return absentee ballots prior to the deadline, and where voters have no meaningful alternatives for casting a ballot. *See, e.g., Doe v. Walker*, 746 F. Supp. 2d 667, 679–80 (D. Md. 2010) (finding right to vote violation where deadlines made it virtually impossible for military personnel overseas to cast absentee ballots). During the early days of the COVID-19 pandemic, one federal court ruled that a state's Election Day receipt deadline imposed a heavy burden, where voters did not have sufficient time to receive, complete and return their absentee ballots. *Democratic Nat'l Comm. v. Bostelmann*, 2020 WL 1638374, at *17–18 (W.D. Wisc. Apr. 2, 2020).[78]

---

[78] While the Supreme Court reversed *Bostelmann*'s extension of the absentee ballot submission deadline to six days after Election Day, the Court ultimately maintained an extension of the

Here, anticipating an increased demand for mail balloting, Defendants modified the receipt deadline for the June Primary to accept ballots postmarked by Election Day.  For the November general election, even the most diligent voter will likely have difficulty returning their absentee ballot by the Election Day deadline.  The increased demand for absentee ballots will create pressure on county clerks to process unprecedented backlogs of absentee ballot applications, and on the U.S. Postal Service ("USPS") to timely deliver ballots to and from voters.  In light of these pressures, delays in processing applications and delivering ballots, sometimes lasting weeks, have occurred across the country, as well as in Kentucky in the lead up to the June Primary.[79]  USPS General Counsel and Executive Vice President, Thomas J. Marshall, recently noted that the Postal Service "cannot guarantee a specific delivery date or alter standards to comport with individual state election laws."[80]  He then recommended that election officials allow for at least one week to deliver ballots to voters, and that voters, in turn, return ballots at least one week prior to the due date established by state law.

In light of these challenges, many voters who submit their application for an absentee ballot within two weeks of Election Day will likely receive their ballot with insufficient time to vote and return that ballot.  Even voters who apply more than two weeks in advance may similarly receive

---

deadline for submitting absentee ballots to an Election Day postmark deadline.  *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, No. 19A1016, 2020 WL 1672702 (Apr. 6, 2020) (per curiam) (finding that the Election Day postmark deadline "was designed to ensure that the voters of Wisconsin can cast their ballots and have their votes count.").

[79] Ben Tobin, *'Doing the Best We Can': Local Election Officials Scramble to Meet Absentee Ballot Demand*, Louisville Courier Journal (June 9, 2020), https://rb.gy/ojgzc9; Mark Niesse, *Absentee Ballots Delayed and Polls Close as Georgia Primary Approaches*, Atlanta Journal-Constitution (June 3, 2020), https://perma.cc/MSX5-6AF2.

[80] Thomas J. Marshall, U.S. Postal Service, *Election Mail* (May 29, 2020), https://rb.gy/nubmb2.

ballots late, as backlogs of applications cause processing delays in county clerks' offices.[81]  These diligent voters will not have sufficient time to receive, complete, and return their ballots in a manner that ensures that they are counted.  *Doe*, 746 F. Supp. 2d at 679.

The state's interest in the receipt deadline is not sufficiently weighty to justify the burden it imposes on voters.  The deadline serves the state's legitimate interest in "ensuring final, fair and orderly elections."  *Id*.  However, that interest does not "overcome the burden faced by voters who, through no fault of their own, will be disenfranchised by the enforcement of the law."  *Democratic Nat'l Comm.*, 2020 WL 1638374, at *17.  More important, Defendants have already acknowledged that their interest in finality does not outweigh the burdens imposed by the deadline in the context of the pandemic, as Defendants modified the deadline for the June Primary.

### D. Plaintiffs Will Suffer Imminent Irreparable Injury During the Pandemic If the June Voting Protections Are Not Maintained for the November Election

Individual Plaintiffs and organizational Plaintiffs' members are likely to suffer irreparable harm to their constitutional rights if any of the Challenged Rules remain in place during the November election.  As set forth above, Plaintiffs who personally suffer from underlying conditions—or live with someone who does—are at high risk of experiencing serious health consequences from contracting COVID-19 while voting in person, so they plan to vote by mail-in absentee ballot if this Court enjoins the Excuse Requirement.  However, even if permitted to vote by mail, the Challenged Rules will impair the ability of these Plaintiffs and voters to exercise their right to vote and, as explained above, will result in disenfranchisement for many voters.

---

[81] A recent South Carolina district court decision rejected a challenge to an election day receipt deadline based on the conclusion that voters had "ample time to request an absentee ballot and timely submit it to [election officials] well before Election Day."  *Thomas*, 2020 WL 2617329, at *26 n.26.  Here, however, the evidence from the June Primary demonstrates that processing and delivery delays threaten to leave many voters without sufficient time to cast their ballots.

Accordingly, the Challenged Rules must also be enjoined to effectuate Plaintiffs' right to vote during the pandemic.

The Challenged Rules will force voters to choose between exposing themselves to COVID-19 by voting in person or accepting potential disenfranchisement without an opportunity to cure if their mail-in absentee ballot is rejected due to perceived signature mismatch or mailing delays. Courts have held that such threats to constitutional rights constitute irreparable harm. *See Self Advocacy Solutions N.D.*, 2020 WL 2951012 (finding irreparable harm in case involving a signature match claim); *Thomas*, 2020 WL 2617329 (finding irreparable harm in case involving a witness signature verification requirement).

### E.     The Balance of Equities and Public Interest Favor Maintaining the Three June Voting Protections for the November General Election

The balance of the equities weighs heavily in favor of an injunction implementing the three June Voting Protections during the November general election. The administrative burden on Defendants to implement any of the three protections for the November election is slight. Defendants have already adopted and are currently implementing these changes for the June Primary. Moreover, Plaintiffs seek relief several months in advance of November, giving Defendants enough time to plan and implement the modifications for the general election. Harm to Plaintiffs' constitutional rights easily outweighs these administrative concerns. *See Taylor*, 419 U.S. at 533. Defendants cannot claim that an injunction harms their interest in enforcing state election law requirements, given that their decision to adjust election laws for the June Primary to account for the COVID-19 pandemic reveals that any burden on that interest is also slight.

The public interest also favors the issuance of an injunction implementing the three June Voting Protections during the November election. The public "interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful.

*Obama for Am.*, 697 F.3d at 437.  Consequently, "the public interest . . . favors permitting as many qualified voters to vote as possible."  *Id*.  The extension of the three June Voting Protections to November fulfills this standard, as these protections will ensure that as many voters as possible can cast votes successfully during the general election.  In addition, the protections are designed to ensure that voters can exercise their constitutional right, and "it is always in the public interest to prevent violation of a party's constitutional rights."  *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 929 (6th Cir. 2020).  Finally, the public interest is served by minimizing crowds during the COVID-19 pandemic, and the June Voting Protections, by inspiring increased confidence in Kentucky's absentee ballot regime, will help alleviate crowds at poll sites on Election Day.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a preliminary injunction: (1) enjoining the Excuse Requirement during the pendency of the COVID-19 pandemic, (2) enjoining the Photo ID Law during the pendency of the COVID-19 pandemic, and (3) enjoining Defendants' elimination of the June Voter Protections during the pendency of the COVID-19 pandemic.

Respectfully submitted,

*/s Corey Shapiro*_____

Adriel I. Cepeda Derieux
Sophia Lin Lakin
Dale E. Ho
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
acepedaderieux@aclu.org
slakin@aclu.org
dho@aclu.org

Ceridwen Cherry
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15TH STREET, NW
Washington, DC 20005-2313
(202) 675-2326
ccherry@aclu.org

Ezra Rosenberg
Ajay Saini
Natasha Chabria
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
    UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
asaini@lawyerscommittee.org
nchabria@lawyerscommittee.org

Corey Shapiro, Ky. Bar No. 96897
    *Counsel of Record*
Heather Gatnarek, Ky. Bar No. 95113
ACLU OF KENTUCKY FOUNDATION
325 W. Main Street, #2210
Louisville, KY 40202
(502) 581-9746
corey@aclu-ky.org
heather@aclu-ky.org

Megan C. Keenan
Mary Elise Holman
Scott J. Garfing
Jayne Ponder
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
mkeenan@cov.com
eholman@cov.com
sgarfing@cov.com
jponder@cov.com

Robert D. Fram
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
rfram@cov.com

Date:  July 10, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of July 2020, I electronically filed the foregoing Motion for Preliminary Injunction with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel of record.

_____/s Corey Shapiro_____
Corey Shapiro