# EXHIBIT P

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KENTUCKY**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL COLLINS, JEFFREY COSBY, THELA ELLIOTT, GRACIE LEWIS, DEJUAN NASH, TIFFANY PRICE, LEAGUE OF WOMEN VOTERS OF KENTUCKY, LOUISVILLE URBAN LEAGUE, AND KENTUCKY CONFERENCE OF NAACP BRANCHES,<br><br>        Plaintiffs,<br><br>        v.<br><br>MICHAEL ADAMS, in his official capacity as the Secretary of State of Kentucky; ANDREW BESHEAR,  in his official capacity as the Governor of Kentucky; and ALBERT BENJAMIN CHANDLER, III, in his official capacity as the Chairman of the Kentucky Board of Elections,<br><br>        Defendants. | Civil Case No. 3:20-cv-375-CRS<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br>**DECLARATION OF DR. LINTON A. MOHAMMED** |

## DECLARATION OF DR. LINTON A. MOHAMMED

I, Linton A. Mohammed, declare as follows:

1.    I am a Forensic Document Examiner ("FDE"), certified by the American Board of Forensic Document Examiners. I have been engaged in this matter on behalf of Plaintiffs to opine on the reliability of the procedures and techniques of the Kentucky signature verification process for absentee ballot applications and absentee ballot envelopes as set forth in Kentucky elections laws and guidance.

## I.   QUALIFICATIONS

2.      I am a U.S.-certified and internationally recognized FDE, and the focus of my research and professional experience is on handwriting and signature identification and the scientific approach to analyzing questioned signatures. I am, and since 1998 continuously have been, certified by the American Board of Forensic Document Examiners (ABFDE), the certifying board for FDEs in North America. I am also certified in document examination by the Chartered Society of Forensic Sciences (United Kingdom). I specialize in the forensic science of analyzing genuine, disguised, and simulated signatures.

3.      I co-founded and I am currently the principal at Forensic Science Consultants, Inc., where I conduct forensic document examination casework and research on handwriting and signature examination as well as other forensic document examination (e.g., document alterations, obliterations, indented impressions, or pages added or removed). I am also an adjunct professor at Oklahoma State University, where I teach graduate courses on the scientific examination of questioned documents.

4.      During and prior to my time with Forensic Science Consultants, Inc., and for nearly fourteen years, I worked as Forensic Document Examiner and Senior Document Examiner for the San Diego Sherriff's Department Regional Crime Laboratory. There, I conducted examinations of signatures and handwriting for cases investigated by San Diego County agencies as well as by local police, state, and federal agencies. I also served as Technical Lead of the Questioned Documents Section of the Regional Crime Laboratory, trained investigators and attorneys, provided expert testimony, conducted research, and produced the Questioned Documents Section Quality Manuals. Prior to that, I worked internationally as an FDE at the Laboratory of the Government Chemist (England), the Caribbean Institute of Forensic Investigations Ltd. (West

Indies), and the Trinidad and Tobago Forensic Science Center (West Indies). In those roles, I conducted forensic document examinations and testified in criminal and civil cases for multiple police forces and other government agencies.

5.      I am a Fellow of the Questioned Documents Section of the American Academy of Forensic Sciences ("AAFS"), a Fellow and diplomate of the Chartered Society of Forensic Sciences, and a member of the Canadian Society of Forensic Science. I served as the Chair of the AAFS Questioned Documents Section from 2016 to 2018. I am an appointed member and Chair of the Academy Standards Board, which was formed by the AAFS to develop consensus-based standards for the forensic sciences. I served as a member of the National Institute of Standards and Technology's Expert Working Group on Human Facts in Handwriting Examination, the National Institute of Standards and Technology Organization of Scientific Area Committees' Physics/Pattern Interpretation Scientific Area Committee, and the Scientific Working Group on Documents. I have previously served as President, Vice President, Treasurer, and Director of the American Society of Questioned Document Examiners ("ASQDE").

6.      I am the editor of the Journal of the American Society of Questioned Document Examiners.  I served on the editorial review board of the Journal of Forensic Sciences from 2005-2020, and I serve on the editorial review board of Forensic Science and Technology. I am a guest reviewer for the following journals: Forensic Science International, Science & Justice, Australian Journal of Forensic Science, Egyptian Journal of Forensic Sciences, and IEEE Transactions on Cybernetics.

7.      I have published sixteen (16) peer-reviewed articles on signature and handwriting examination, and forensic document examination. Many of my articles focus on the analysis of genuine, disguised, and forged signatures, and handwriting examination. I have also given

numerous presentations and workshops on signature and document examination worldwide, including the United States, Australia, Brazil, Canada, China, Latvia, Poland, Saudi Arabia, Scotland, and Turkey.

8.      In 2019, I authored a book titled *Forensic Examination of Signatures*, which describes and discusses state of the art techniques and research in signature examination.[1] I co-authored a book in 2012 titled *The Neuroscience of Handwriting: Applications for Forensic Document Examination*, which integrates research in the fields of motor control, neuroscience, kinematics, and robotics to evaluate questioned signatures and handwriting.[2] The book sets forth, among other things, the scientific fundamentals of motor control as relevant to handwriting; the impact of age, disease, and medication on handwriting; and a quantitative approach to signature authentication, including kinematic and laboratory analyses of genuine versus disguised versus forged signatures.

9.      In 2012, I received the American Board of Forensic Document Examiners' New Horizon Award "In Recognition of His Exceptional Contributions in Scientific Research for the Advancement of Forensic Document Examination." In 2019, I received the American Academy of Forensic Sciences Questioned Documents Section Ordway Hilton Award "In Recognition of Outstanding Contributions to Forensic Document Examination."

10.      I have testified as an expert witness in court and depositions more than 150 times on issues of signature, handwriting, and document examination in both civil and criminal cases, including cases in the United States, England, Trinidad & Tobago, and St. Vincent.

11.      I received a Ph.D. from La Trobe University in Melbourne, Australia in human biosciences, where I wrote my thesis on signature identification: "Elucidating static and dynamic

---

[1] Mohammed, L. (2019). *Forensic Examination of Signatures*. San Diego: Elsevier.

[2] Caligiuri, M.P., & Mohammed, L.A. (2012). *The Neuroscience of Handwriting: Applications for Forensic Document Examination.* Boca Raton: CRC Press/Taylor & Francis Group.

features to discriminate between signature disguise and signature forgery behavior." Prior to that, I received my undergraduate degree in science at the University of West Indies; underwent a two-year training program in document examination at the Trinidad and Tobago Forensic Science Center; and received a master's degree in forensic sciences at National University in San Diego, California.

12. My *curriculum vitae* is attached as Exhibit A. I am being compensated at a rate of $400.00 per hour. My compensation in this matter is not in any way contingent on the content of my opinion or the outcome of this matter.

## II.   BACKGROUND

13. For this Declaration, I reviewed the State of Kentucky statutes KRS §§ 117.085(6), 117.086, 117.087 and relevant academic literature.

14. Kentucky, like many states, has a signature match requirement for mail-in absentee ballots. A signature match requirement means that election officials will only accept and count an absentee ballot if they deem that the signatures of the voter on the ballot are pictorially similar to the signature of the voter on file with election officials. After marking the ballot, voters must complete and sign the ballot in two places—on the outer envelope and on the affidavit on the detachable flap on the inner envelope. KRS §§ 117.085(6); 117.086.  The voter must complete the affidavit with either a signature or a mark accompanied by the signatures of two witnesses, seal the ballot in its two envelopes, and mail it back to the county clerk. KRS § 117.085(6).

15. KRS § 117.087(3) states that: "The chairman of the county board of elections shall compare the signatures on the outer envelope and the detachable flap with the signature of the voter that appears on the registration card. If the outer envelope and the detachable flap are found to be in order, the chairman shall read aloud the name of the voter.   If the vote of the voter is not

rejected on a challenge then made as provided in subsection (4) of this section, the chairman shall remove the detachable flap and place the inner envelope unopened in a ballot box which has been provided for the purpose."

16. Even if the Chairman of the County Elections Board does not reject a ballot, there is a further opportunity for a signature mismatch to disqualify a ballot. The Chair of the County Board of Elections is to read aloud the name of voters whose ballots she deems to be "in order" - but she must give the other Board members an opportunity to challenge the ballot's validity. KRS § 117.087(3).  When the name of a voter who cast an absentee ballot by mail is read aloud by the Chair, the ballot may be challenged by any Board member or by a written challenge filed in advance with the clerk.  KRS § 117.087(4).

17.     When a mail ballot is challenged, the standard for accepting a ballot to be counted is "if the outer envelope and the detachable flap are regular, and substantially comply" with Kentucky law. *Id*.  Although the statute does not say so explicitly, the language quoted above regarding signature comparisons implies that a signature mismatch could mean that the ballot is not "regular." *Id*.

18.     The statutes provide no guidance as to what is meant by "in order" or "regular."

19.     Based on these statutes, the election officials are being asked to conduct an examination of signatures on the outer envelope and the detachable flap with the signature of the voter that appears on their registration card.

20.     Based on my understanding, Kentucky election officials are lay individuals, meaning they are not required to have any training, certification, or experience in document examination or signature comparison.

21.     Based on my understanding, there are no further written statewide standards or procedures to guide election officials in evaluating whether the signature on the absentee ballot application matches the signature on the back of the absentee ballot envelope (the voter's affidavit).

22.     Furthermore, there is no indication in the statutes in effect at this time for the General Election that the voter is notified in case of a signature mismatch or provided with an opportunity to cure the signature mismatch in order to have their ballot counted.[3]

## III.     SUMMARY OF CONCLUSIONS

23.     The Kentucky signature match statutes do not set forth sufficient standards for determining reasonably whether a signature on a ballot return envelope match the voter signature displayed in the voter's file, which I believe can result in errors. Based on my review of the election statutes, Kentucky also does not require election officials to have any training in signature examination and does not require that election officials be provided with equipment for effective document examination and signature comparison, such as proper light sources and microscopes.

24.     Based on my experience and my review of the academic literature, it is my opinion that in these circumstances, Kentucky election officials are likely to make erroneous signature-comparison determinations.

25.     Determining whether a signature is genuine or not is a difficult task for even a trained FDE, as signatures are written in different styles with varying levels of readability and variability.

---

[3] I am aware that Kentucky issued emergency regulations for the primary which includes a notice and cure opportunity: "If a signature match cannot be made, the County Board of Elections, absentee ballot processing committee, or the County Clerk shall make a reasonable effort to contact the voter using contact information provided by the voter's absentee ballot application and provide the voter with a timeframe and manner in which the voter may cure the signature discrepancy. All signature cures must be made by 4:30 p.m., local time, June 29, 2020." 31 Ky. Admin. Regs. 4:190E § 9.

Laypersons, such as Kentucky election officials, have a significantly higher rate of error in determining whether signatures are genuine. Laypersons are also more likely to wrongly determine that authentic signatures are *not* genuine than to make the opposite error. In other words, Kentucky election officials are significantly more likely than trained examiners to make an incorrect signature comparison determination and are particularly likely to incorrectly decide that the signatures are *not* signed by the same person.

26.     The high rate of error among laypersons generally results from the inability to distinguish between normal "variations" in one individual's signatures as opposed to "differences" resulting from multiple signers. An individual's signatures may vary for myriad reasons, including age, health, native language, and writing conditions. Laypersons lack the tools and training to properly account for signature variation, which leads to erroneous mismatch determinations that are particularly pronounced in populations with greater signature variability, such as the elderly, disabled, individuals suffering from poor health, young voters (ages 18 to 21), and non-native English speakers.[4]

27.     These signature-determination errors are further compounded for Kentucky election officials with diminished eyesight or "form blindness" (a type of impairment in visual perception defined below)—both of which impact an individual's ability to make accurate handwriting authenticity determinations. While FDEs are screened for these traits, Kentucky law and guidance regarding signature comparison do not require election officials to undergo such screening.

28.     Based on my review of the relevant statutes and guidance, Kentucky does not require election officials to compare the signatures on the ballot return envelope to other signatures

---

[4] *See* Hilton, O. (1969). Consideration of the writer's health in identifying signatures and detecting forgery. *Journal of Forensic Sciences*, Vol. 14, No. 2, pp. 157-166.

available on file beyond the absentee ballot application, or spend any minimum threshold of time in comparing signatures. These omissions are likely to lead to additional errors. At a minimum, multiple signature samples are required for an accurate signature determination to account for an individual's signature variability, given proper examination conditions.[5] For writers who are elderly or have poor health, a larger number of signature samples may be required to determine their range of variation. Yet Kentucky does not require election officials to compare the voter's signatures on the return envelope to more than one reference signature. In my experience, given optimum conditions such as complex signatures (see Figure 1) which are the product of a combination of the formation, concatenation, intersection of the strokes, and number of turning points that comprise the signature, original documents, and an adequate number of specimen signatures, a minimum of two hours is required to conduct a signature comparison. The examination requires that the signatures be sketched, and the fine and subtle details of the questioned and reference signatures be examined and compared in detail. Usually, examinations are conducted more than once as a check and balance. Election officials with insufficient time to evaluate the signature on the ballot return envelopes are likely to make additional errors. Based on my review of the relevant Kentucky statutes, election officials are not allotted the required minimum amount of time to examine and compare the voters' signatures.

---

[5] Hilton, O. (1965). A further look at writing standards. *The Journal of Criminal Law, Criminology and Police Science*, Vol. 56, No. 3, p. 383 (recommending a minimum of ten signature samples for accurate signature comparison determinations).



(a)

(b)

**Figure 1**   *Examples of a complex signature (a), and a simple signature (b).*

29.    In sum, it is my opinion that Kentucky's current signature matching rules and procedures, which allow individuals without adequate training—and without guidance—to reject the signatures on the absentee ballot envelopes, will result in a significant number of erroneous rejections. In other words, Kentucky election officials are likely to reject properly cast ballots, signed by the voter to whom the ballot belongs, because of their incorrect determination that the signatures on the absentee ballot envelopes are not genuine.

## IV.   ANALYSIS AND OPINIONS

### A.   Kentucky election officials are likely to make erroneous signature comparison determinations.

30.    Individuals untrained in signature examination, like Kentucky election officials, are highly likely to make mistakes when comparing signatures, particularly by erroneously rejecting signatures as inauthentic or non-matching when they are in fact written by the same individual.

These rejections are considered "Type II" errors, and laypersons are more likely than FDEs to make such errors for several reasons. First, untrained election officials cannot reliably determine whether signatures are written by different individuals, or whether the signatures are written by one person but exhibit natural variations. Second, untrained reviewers do not account for the many reasons for naturally varying signatures, causing them to erroneously reject authentic signatures. This is particularly true for writers who have less formal education, learned English as a second language, are elderly, disabled, young, or have adverse health conditions. Third, untrained elections officials also fail to account for the different signature styles and features, leading to erroneous rejections. Lastly, Kentucky election officials are not tested for form blindness, a condition that can impact their ability to accurately review signatures.

**B.** **Untrained laypersons are more likely than FDEs to erroneously determine authentic signatures are inauthentic.**

31.     There are two types of errors in signature examination. Type I errors occur when a non-genuine signature is deemed to be genuine, and a Type II error occurs when a genuine signature is concluded to be non-genuine. In Kentucky's vote by mail system, a Type II error would be an election official making a determination that the ballot signatures and the reference signature for one voter are not "in order" or not "regular", when in fact, all these signatures were written by the voter. With this Type II error, the voter's ballot would be rejected due to a perceived signature mismatch, and therefore the voter would be disenfranchised through no fault of their own.

32.     Compared to FDEs, laypersons have higher Type II error rates. In a 2001 study reviewing the error rates of FDEs and laypersons in comparing six genuine signatures with six non-genuine signatures, laypersons made Type II errors in 26.1% of cases while trained signature

FDEs made such errors in 7.05% of cases.[6] That means that laypersons are more than 3 ½ times more likely to declare an authentic signature non-genuine—which, in the case of signatures on ballot return envelopes, would mean that election officials would reject more than 3 ½ times the number of ballots than FDEs. It should be noted that for this study, six (6) specimen signatures were used. If, as in Kentucky elections, only two genuine signatures are used for comparison, it is highly likely that the error rate for both experts and laypersons would increase significantly.

### C. Kentucky election officials cannot determine reliably whether signatures are written by different individuals, or by one individual exhibiting natural variation.

33.      Determining whether signatures are made by the same or different individuals requires a reviewer to discern whether a feature or combination of features in signatures are "differences" or "variations." Signatures are the product of a motor program developed in the brain after practice, and then executed with neuro-muscular coordination. Many factors can influence an individual's motor program and neuro-muscular coordination. These factors cause variations in each person's signature.[7] Variations are deviations of personal, subconscious characteristics normally demonstrated in the habits of each writer. Individuals may have narrow, moderate, or wide ranges of natural variation. A writer's range of variation can be determined when an adequate amount of specimen signatures is examined. A significant "difference" is a characteristic that is structurally divergent between handwritten items, is outside the range of variation of the writer, and that cannot be reasonably explained.[8]

---

[6] Kam M., Gummadidala K., Fielding G., Conn R. (2001). Signature Authentication by Forensic Document Examiners, *Journal of Forensic Science*, 46(4):884-888.

[7] Mohammed, *supra* note 1. Pp. 5-11.

[8] SWGDOC Standard for the Examination of Handwritten Items, www.swgdoc.org.

34.     In the field of signature examination, unexplainable "*differences*" between signatures suggest that different individuals wrote the signatures, whereas "*variations*" between signatures mean that one individual wrote the signatures. Determining whether signature features are "differences" or "variations" is one of the most difficult determinations in signature examinations, even for experienced FDEs.

35.     Some writers may have a very wide range of variation. Figure 2 illustrates four signatures of one writer (redacted) that exhibit wide variation, and if compared, may easily be mistaken as signatures written by four different individuals. Any one signature compared with the other three could be determined by a lay person to be not "in order" or not "regular".



**Figure 2**   *Four signatures of one individual exhibiting a wide range of variation.*

36.     To reliably make such a judgment requires, at a minimum:

- Extensive training with different types of signatures: Becoming an FDE requires at

  least two[9], and typically three, years of full-time training with an experienced

---

[9] SWGDOC Standard for Minimum Training Requirements for Forensic Document Examiners,
www.swgdoc.org.

examiner, with at least eighteen (18) months of training in the examination of signatures and handwriting. FDEs learn the science of signature examination, gain experience in casework, and are tested for proficiency.

- Adequate magnification and lighting equipment.

- Excellent eyesight.

- Adequate contemporaneous specimen signatures.

- Adequate time: Insufficient time examining signatures is conducive to making errors. For example, one study found that FDEs spent more time looking at the questioned and known signatures than laypersons, and their evaluations were more accurate.[10]

Without these elements, Kentucky election officials are likely to mistake legitimate and expected "variations" between one individual's signatures for "differences" in signatures between two individuals and conclude incorrectly that someone other than the registered voter signed the ballot return envelope.

### D. Untrained reviewers erroneously reject authentic signatures because they do not account for the many reasons for naturally varying signatures.

37. Further, an individual's signatures may vary for myriad reasons, and to properly determine whether signatures are written by the same individual, one must consider the various reasons why features of the same individual's signatures may visually appear different. To do so, reviewers must possess an adequate number of sample signatures to demonstrate the writer's range of variation. In one of the leading textbooks on handwriting examination, authors Roy Huber &

---

[10] Merlino, M., Freeman, T., Dahir, V., Springer, V., et al. (Jan. 2015). *Validity, Reliability, Accuracy, and Bias in Forensic Signature Identification*. Department of Justice Grant 2010-DN-BX-K271, Document 248565, https://www.ncjrs.gov/ pdffiles1/nij/grants/248565.pdf.

A.M. Headrick identified twenty common reasons why individuals' signatures may appear to show variations:

- Adequacy of standards (or samples)—inadequate standards in terms of quantity and contemporaneousness will not be representative of the writer's range of variation. Variations may therefore be interpreted as differences.

- Accidental occurrences—i.e., these are one-off variations that will not appear in the specimen signatures.[11] Misinterpretation may lead to a decision of difference versus variation.

- Alternative styles—i.e., some writers have alternate signature styles. This may not be represented in the specimens.

- Ambidexterity.

- Carelessness or negligence.

- Changes in the health condition of the writer.

- Changes in the physical condition of the writer—e.g., fractures, fatigue, or weakness may alter features of an individual's signature.

- Changes in the mental condition or state of the writer.

- Concentration on the act of writing.

- Disguise or deliberate change.

- Influence of drugs or alcohol.

- Influence of medications.

- Intentional change for later denial.

---

[11] A specimen signature is a signature that is known to have been written by a person. It is not disputed. Typical specimens are Driver's Licenses and Identification Cards.

- Nervous tension.

- Natural variations—i.e., inherent variation as a result of differences in neuro-muscular coordination.

- Writing conditions—e.g., the writer's place or circumstances, such as in a moving vehicle or at a stationary table.

- Writing instrument—e.g., a pen versus a stylus.

- Writing position—e.g., the writer's stance.

- Writing surface—e.g., paper versus electronic screen.

- Writing under stress.

Examiners must consider each of these reasons in determining whether a feature is a "difference" created by different writers or whether the feature is simply a "variation" from the same writer. It is very unlikely that Kentucky election officials will have the knowledge, training, and experience to properly account for these factors. And the Kentucky signature matching statutes do not require election officials to consider adequate samples, as would be necessary for even an expert to distinguish a "difference" from a "variation."

38.      Studies have shown that illiterate writers, writers for whom English is a second language, elderly writers, disabled writers, and writers with health conditions tend to have less pen control than most other writers, and therefore would have a greater range of variation in their signatures.[12] And the increased variation in the signatures of these groups only compounds

---

[12] *See, e.g.*, Hilton, O. (1969). Consideration of the writer's health in identifying signatures and detecting forgery. *Journal of Forensic Sciences*, Vol. 14, No. 2, pp. 157-166; Hilton, O. (1965). *A further look at writing standards*. Journal of Criminal Law, Criminology, and Police Science, Vol. 56, No. 3, pp.383; Hilton, O. (1956). Influence of serious illness on handwriting identification, *Postgraduate Medicine*, Vol. 19, No. 2.

laypersons' tendencies to err on the side of incorrectly finding authentic signatures to be non-genuine.

39.     Since signatures are developed as a motor program in the brain, the signatures of writers for whom English is a second language are more likely to exhibit wide ranges of variation, as these writers will have to discard their former learned motor program and develop a new one for their new signature style.[13] For instance, a writer who first learned to write in a non-Latin-based script, such as Chinese, will naturally show more variation when signing a document in English than a native writer. Likewise, where the writer's native language is written right to left, such as Urdu, the writer's signature may also be more likely to show variations in letter slanting. Cherokee is a Native American tribe that has its own syllabary.[14] Signatures written by individuals who learned to write using the Cherokee syllabary may appear different to an untrained eye. Qualified, experienced experts in the area of signature verification would know of and account for these factors in evaluating signatures. Kentucky election officials, even if put through a short training session, are unlikely to be able to accurately account for these differences, particularly in an expedient time frame or when only one or a few specimen signatures are available for comparison.

40.     Furthermore, young voters (ages 18 to 25) are not likely to have fully developed signatures. According to one study, "the development and progress of one's handwriting passes through four stages in the course of a lifetime: (1) the formative stage, (2) the impressionable or

---

[13] Mohammed, *supra* note 1 at pp. 5-11.

[14] Encyclopedia Britannica, *Cherokee Syllabary*, https://www.britannica.com/topic/Cherokee-syllabary.

adolescent stage, (3) the mature stage, and (4) the stage of degeneration."[15] The signatures of young voters will fall between stages 2 and 3. The U.S. Postal Service has reported that "writer[s] achieve[] graphic maturity by the 20th birthday."[16] Handwriting was developed as a means of communication, whereas signatures are developed as a means of identification.[17] Signatures tend to be more personalized and can therefore be considered as an over-developed form of handwriting. Young writers today will likely not have developed signatures until later in life. This is exacerbated as young writers will presumably need to sign less often due to the increased use of personal identification numbers ("PINs") and other non-handwritten forms of identification. Thus, it follows that their signature development can reasonably be expected to take longer than for previous generations. This will lead to an increased range of variation in a young writer's signature. The handwriting of adolescents can cause difficulties even for trained FDEs. Comparisons by untrained individuals of young voters' signatures on the ballot return envelopes will exacerbate the potential for error in rejecting their ballots.[18]

---

[15] Huber, R.A. & Headrick, A.M. (1999). *Handwriting Identification: Facts and Fundamentals*. Boca Raton, FL: CRC Press.

[16] Bureau of the Chief Postal Inspector (1966), *20th Century Handwriting Systems and Their Importance to the Document Analyst*.

[17] Plamondon, R., Srihari, S. (2000). *Online and off-line handwriting recognition: a comprehensive survey*. IEEE Transactions on Pattern Analysis and Machine Intelligence Volume: 22, Issue:1, Jan; Srihari S.N., Srinivasan H., Chen S., Beal M.J. (2008). *Machine Learning for Signature Verification*. In: Marinai S., Fujisawa H. (eds) Machine Learning in Document Analysis and Recognition. Studies in Computational Intelligence, vol 90. Springer, Berlin, Heidelberg, p. 389.

[18] Cusack, C.T & Hargett, J.W. (1989). A Comparison Study of the Handwriting of Adolescents. *Forensic Science International*, 42(3):239-248.

### E.     Kentucky election officials may fail to account for increased variation in signatures of voters with disabilities.

41.     Signatures are executed by means of neuromuscular coordination. A motor program developed in the brain signals the muscles to produce handwriting movements. Any disability, illness, or drug that affects neuromuscular coordination will influence the production of signatures. Various diseases that affect motor neurons and neurological pathways can affect the appearance of signatures of the afflicted individual.

42.     Multiple Sclerosis (MS) occurs in 1 of 500 people worldwide with 70% of patients exhibiting symptoms between the ages of 21 to 40. The disease manifests itself in females 2 to 3 times more often than in males. A characteristic of writers with MS is tremor or shakiness.[19] Neurological damage from MS is reflected in handwriting and it is estimated that 75% of MS patients exhibit tremor in their handwriting.[20] Diseases with Lewy bodies such as Parkinson's and Alzheimer's also affect signatures. Writers with these diseases tend to write much smaller (micrographia), and this tendency may change depending on medication. Individuals who have lost their dominant hand, and must learn to write with their other hand will also exhibit wide variation in their handwriting. An example of such individuals are veterans who have been injured in war. The longer a person writes with a non-dominant hand, the more the quality of handwriting will improve. However, it will likely never appear completely normal and natural.[21]

43.     It is highly likely that writers with disabilities will exhibit a wider range of variation in their signatures than might normally be seen in the signatures of a healthy, skilled writer. This increased variation will not only present a challenge to a trained FDE, but will present an impossible task to a layperson who has to compare one signature on a ballot with one signature on an application for a ballot, and make a determination of authenticity.

44.     In Kentucky, the ballot signatures are compared with one reference signature on file with election officials. For voters with disabilities, the lack of an adequate number of specimen signatures to compare against will exacerbate the error rate. Evaluation of signatures executed by ill or disabled writers requires the evaluator to have wide experience with different types of signatures and accurate knowledge of the physical conditions of the individual as this relates to their handwriting.[22]

### F.     Kentucky elections officials also fail to account for the different signature styles and features, leading to erroneous rejections.

45.     One of the reasons that accurate signature comparison determinations prove difficult, even for a trained FDE, is that signatures are written in three different styles[23] as illustrated in Figure 3:

- Text-based: Nearly all the letters can be interpreted.



- Mixed: More than two, but not all, letters can be interpreted.

---

[19] Caliguiri & Mohammed, *supra* note 2. Pp. 62-63.

[20] Wellingham-Jones, P. (1991). Characteristics of handwriting of subjects with Multiple Sclerosis. *Perceptual and Motor Skills*, 73, 867-879.

[21] Lanners, B. (2018). A New-Dominant Hand: Training the Non-Dominant Hand to Perform the Complex Task of Handwriting. *Journal of the American Society of Questioned Document Examiners*, Volume 21, Number 2, pp. 13-28.

[22] Hilton, O. (1969). Considerations of the writer's health in identifying signatures and detecting forgery. *Journal of Forensic Sciences*, Vol. 14, No2, 2, pp. 157-166.

[23] Mohammed, L., Found, B., Rogers, D. (2008). Frequency of signature styles in San Diego County. *Journal of the American Society of Questioned Document Examiners*, Vol. 11, No. 1.



- Stylized: No letters can be interpreted.



**Figure 3**   *Examples of three signature styles.*

These signature styles exhibit significantly different characteristics that impact the signature-matching analysis, and by extension, the determination of whether signatures are genuine. For example, kinematic features of signatures, such as size, velocity, changes of acceleration, and pen pressure are important in determining whether a signature is genuine. Yet these kinematic features vary between the same individual's signatures, with the degree of variations often dependent on the signature style. The kinematic features of stylized signatures, for example, vary more significantly than the kinematic features of text-based signatures. And the less legible a signature becomes, the more the election official depends on their pattern recognition ability. Thus, signature styles can have an impact on the determination of genuineness or non-genuineness. Unfamiliarity with the different signature styles may impact a reviewer's ability to determine whether two signatures come from the same person, and would likely cause a lay person to decide that the compared signatures exhibit "differences" when the changes in features are simply "variations."

46.     To determine whether signatures are made by the same individual, a reviewer should focus on holistic features of signatures, such as alignment, slant, pen lifts, rhythm, the size of writing, the slope or slant of the letters, or other characteristics that are diagnostic of the process used to create signatures. These features are subtle, and a writer is usually unaware of the features, as they are excited by the writer's subconscious motor program. These subtle features provide significant evidence of genuineness because they occur in natural handwriting. Lay persons, however, often focus instead on more eye-catching features in evaluating signatures. For example, an eye-tracking study on signature examination found that "lay participants focused to a greater extent on individual features such as arches, eyelets, hooks, shoulders, connections, troughs, or other individual features" that catch the eye, and "appear[ed] less likely to use holistic features" when evaluating signatures.[24] Focusing on these eye-catching features is problematic because these are the types of features that a simulator will try to capture. Therefore, if the ballot signatures and the specimen signature are pictorially similar, the election official may improperly accept the ballot signatures based on the similarities in eye-catching features without realizing that the signatures are good simulations. A trained FDE should be able to detect subtle features that are indicative of simulation. Properly utilizing the subtle, holistic features of signatures to determine genuineness, however, requires both training and adequate time for review.

### G.     Kentucky election officials are not tested for form blindness, increasing the risk of erroneous signature match determinations.

47.     A laypersons' ability to make consistently correct determinations as to the genuineness of a signature may also be impacted by a condition known as "form blindness," which impairs "the

---

[24] Merlino, *supra* note 13.

ability to see minute differences in angles, forms, and sizes."[25] Most ophthalmologists agree that form perception is not an eye problem but rather a translational problem. That is, "it is a perceptual inability to distinguish the small differences between shapes, colors, and patterns."[26] Therefore, in most cases, form blindness goes undetected, but diminishes a reviewer's ability to make accurate determinations of a signature's genuineness.[27] The problem of form-blindness is discussed in detail in Chapter 24 of *Questioned Document Problems*,[28] and while FDEs must pass a form blindness test before being trained in handwriting identification, Kentucky requires no such test for election officials. There is a risk that some election officials have form blindness, and which would make them particularly prone to making erroneous signature judgments.

### H. Even trained FDEs are likely to make erroneous signature comparison determinations under Kentucky's signature matching procedures.

48.     Even for trained FDEs, Kentucky's signature matching process would be prone to erroneous determinations due to the limited number of comparison signatures and the lack of proper equipment.

49.     Normally, FDEs require multiple specimen signatures for comparison with a questioned signature, and often more if issues such as age or illness are involved. These specimens are required to adequately determine the range of variation of the writer and properly account for

---

[25] Bertram, D. (2009). Univ. of S. Miss. *Form Blindness Testing: Assessing the Ability to Perform Latent Print Examination by Traditional Versus Nontraditional* Students Dissertations. 996, p. 33; Byrd, J. & Bertram, D. (2003). Form-Blindness. *Journal of Forensic Identification*, 53(3):315-341.

[26] Moody, Meredith G., "*Form-Blindness and Its Implications: A Verification Study*" (2016); Honors Theses; Paper 388.

[27] *Id.*, p. 32.

[28] Osborn, A.S. (1946). *Questioned Document Problems. The Discovery and Proof of the Facts, 2nd. Ed.* Boyd Printing Company: Albany, NY. Pp. 218-250.

the reasons for variation within an individual's signatures discussed above. Indeed, nobody signs the same way twice: no two complex, skillfully written, genuine signatures of one writer have ever been found to be exactly alike, but such a statement should be understood to be true speaking microscopically, and not as the carpenter measures.[29] Inadequate standards, or failure to use adequate specimens fully representing the range of variation in a writer's signature, is a well-known source of error.[30]

50.    Features observed in the questioned signature(s) may not be observed in the inadequate specimens. This may lead to an erroneous interpretation of a feature as a difference (two writers) not a variation (one writer). Because Kentucky election officials are only required to compare the two signatures on the ballot return envelopes with one reference signature on file, they cannot distinguish accurately between features, variations, or differences. Furthermore, Kentucky election officials will need to compare a voter's original "wet-ink" signature on the ballot return envelopes with the voter's registration signature which is kept on file electronically. Comparing a digitized signature with an original "wet-ink" signature has many inherent limitations, some of which are caused by the resolution of the digitized signature, whether the digitized signature is being viewed on a monitor or as a printed item, and the writing instruments used for each signature. If the monitor's resolution is low, or if the digitized signature is a poor copy of the original signature to begin with, this would make it very difficult for an untrained examiner to assess the line quality of the signature. Striations made by ballpoint pens may appear to be gaps in the writing line, and may be interpreted mistakenly as evidence of simulation or forgery. While one study found that trained

[29] Osborn, A. (1910). *Questioned Documents*. The Lawyers' Publishing Co.: Rochester, NY, p. 281.

[30] Huber, R.A. & Headrick, A.M. (1999). *Handwriting Identification: Facts and Fundamentals*. Boca Raton, FL: CRC Press.

FDEs had similar error rates in evaluating the authenticity of electronic signatures when compared with signatures written with a ballpoint pen as they did in studies when comparing only "wet ink" signatures. It follows that the error rates for untrained election officials will be similar or greater than the errors found in studies cited above for laypersons comparing only "wet ink" signatures.[31]

51.     Finally, as discussed above, Kentucky does not require election officials to use or be provided with proper equipment to conduct signature comparisons, such as magnification and lighting equipment. "[T]he microscope is the instrument which makes it possible to see physical evidence directly that otherwise may be invisible. . . ."[32]  Without this type of equipment, even a well-trained eye may make errors in a signature authenticity determination.

## V.     CONCLUSION

52.     For the reasons stated herein, it is my professional opinion that Kentucky election officials are likely to make erroneous signature match determinations when reviewing absentee ballots. In particular, Kentucky election officials are significantly more likely to erroneously conclude that authentic signatures are *not* genuine than they are to make the opposite error—to accept inauthentic signatures as genuine. These erroneous determinations result from the inherent difficulty in making reliable signature authenticity determinations, particularly where, as here, the reviewer lacks training, is provided with an insufficient number of comparison signatures, and does not have access to proper equipment. The use of one registration signature as the sole reference sample for comparison with two ballot envelope signatures will most likely exacerbate the error rate. In this context, Kentucky's signature matching procedures are all but guaranteed to

---

[31] Kam, et al. *supra* note 5; Merlino, et al. *supra* note 9.

[32] Osborn, A. S. (1929). *Questioned Documents*. 2nd. Ed. Boyd Printing Company, Albany, N.Y., USA.

result in the erroneous rejection of properly cast ballots.

*   *   *

Executed on June _24_, 2020 at ___San Bruno___, California.

I declare under penalty of perjury the foregoing is true and correct.

_Linton Mohammed_

Linton Mohammed, Ph.D., D-ABFDE