# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

MICHAEL COLLINS, JEFFREY COSBY, THELA ELLIOTT, GRACIE LEWIS, DEJUAN NASH, TIFFANY PRICE, LEAGUE OF WOMEN VOTERS OF KENTUCKY, LOUISVILLE URBAN LEAGUE, and KENTUCKY CONFERENCE OF NAACP BRANCHES,

*Plaintiffs*,

v.

MICHAEL ADAMS, in his official capacity as the Secretary of State of Kentucky; ANDREW BESHEAR, in his official capacity as the Governor of Kentucky; and ALBERT BENJAMIN CHANDLER, III, in his official capacity as the Chairman of the Kentucky Board of Elections, DEANNA BRANGERS, in her official capacity as a member of the Kentucky Board of Elections, SHERRY WHITEHOUSE, in her official capacity as a member of the Kentucky Board of Elections, CORY SKOLNICK, in his official capacity as a member of the Kentucky Board of Elections, GEORGE RUSSELL, in his official capacity as a member of the Kentucky Board of Elections, DWIGHT SEARS, in his official capacity as a member of the Kentucky Board of Elections, KATRINA FITZGERALD, in her official capacity as a member of the Kentucky Board of Elections, and JAMES LEWIS, in his official capacity as a member of the Kentucky Board of Elections,

*Defendants*.

Civil Case No. 3:20-cv-00375-CRS

AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## AMENDED COMPLAINT

Plaintiffs—Michael Collins, Jeffrey Cosby, Thela Elliott, Gracie Lewis, DeJuan

Nash, Tiffany Price, the League of Women Voters of Kentucky ("LWVKY"), the

Louisville Urban League, and the Kentucky Conference of NAACP Branches (the

"Kentucky NAACP")—by and through their undersigned attorneys, bring this Complaint

against the above-named Defendants; their respective agents, officers, employees, and

successors; and all persons acting in concert with each or any of them.  In support of this

Complaint, Plaintiffs allege the following:

## INTRODUCTION

1.    The COVID-19 pandemic is an unprecedented public health emergency

that poses an ongoing and very real threat to Kentuckians' ability to participate safely in

their electoral democracy.  In the first wave of the virus, COVID-19 has spread

throughout Kentucky at an exponential rate.  In the month of April alone, Kentucky's

number of confirmed cases of COVID-19 increased by more than sixfold, and the

number of associated deaths increased by twelvefold.[1]  As of the date of filing this

Complaint, Kentucky has reported 8,951 positive cases and 390 deaths.[2]

---

[1] Amber Rush, *680 Positive Cases of COVID-19, 20 Deaths Reported in Ky. on Wednesday*, KFVS 12 (Apr. 1, 2020), https://www.kfvs12.com/2020/04/01/gov-beshear-give-update-pm-planning-statewide-drive-thru-testing/; *Ky. COVID-19 Numbers Now at 4,708 Cases, 240 Total Deaths*, WKYT (Apr. 30, 2020), https://www.wkyt.com/content/news/WATCH-LIVE-Gov-Andy-Beshears-daily-COVID-19-update-570089181.html.

[2] Kentucky Dep't of Pub. Health, *Kentucky Coronavirus Monitoring* (last updated May 26, 2020 at 5:00 P.M. E.T.), https://govstatus.egov.com/kycovid19.

2.      Because the highly contagious COVID-19 spreads through close contact between individuals, public health experts recommend that individuals protect themselves from the virus by staying home and maintaining at least six-feet of distance from people outside of their household.[3]

3.      Recognizing this threat, Kentucky officials used their power and took several steps to protect Kentuckians' right to vote safely in the June 23 primary election. Acting in accordance with the legislature's recent decision to give election officials the flexibility to change Kentucky's extremely restrictive voting laws, the Secretary of State, the Governor, and the Board of Elections used that power to create a new set of rules to conform to the unique circumstances of this pandemic.  Unfortunately, they have declined to take similar steps to safeguard the November 3, 2020 general election.

4.      Public health officials project that the pandemic will continue to impact our lives in the coming days, weeks, months, and even years.[4]  There is no doubt that COVID-19 poses an ongoing threat.  And even if the current outbreak subsides over the

---

[3] CDC, *Coronavirus Disease 2019: Protect Yourself* (last updated Apr. 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Fprevention.html.

[4] Savannah Behrmann, *'Convinced': Fauci Says There Will Be Coronavirus in the Fall After Trump Says 'It May Not Come Back'*, USA Today (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/22/coronavirus-dr-anthony-fauci-says-i-am-convinced-second-wave/3009131001/; John Lauerman, *Covid-19 Pandemic Likely to Last Two Years, Report Says*, Bloomberg News (May 1, 2020), https://www.bloomberg.com/news/articles/2020-05-01/covid-19-pandemic-likely-to-last-two-years-report-says (citing report from the Center for Infectious Disease Research and Policy at the University of Minnesota).

summer, substantial health risks will remain.[5]  Although the curve is beginning to

flatten in some parts of the country, "going in the right direction . . . does not mean we

have, by any means, total control of this outbreak," according to public health officials.[6]

The scientific community continues to learn new information about the risks of COVID-

19, and as Dr. Anthony Fauci, who has served as Director of the National Institute of

Allergy and Infectious Diseases since 1984, testified before the United States Senate:

"we should be humble about what we don't know. . . .we don't know everything about

this virus, and we really better be very careful."[7]

     5.     Moreover, public health experts have confirmed that the second wave is

"inevitable" and on the way.[8]  As Dr. Fauci has stated, "[w]e will have coronavirus in the

---

[5] Adrianna Rodriguez, *The US is 'Slightly' Past Its First Peak, But Expert Says the Pandemic is Far from Over*, USA Today (Apr. 28, 2020), https://www.usatoday.com/story/news/health/2020/04/28/coronavirus-johns-hopkins-expert-says-covid-19-pandemic-far-over/3038429001/; Apoorva Mandavilli & Katie Thomas, *Will an Antibody Test Allow Us to Go Back to School or Work?*, N.Y. Times (Apr. 10, 2020), https://www.nytimes.com/2020/04/10/health/coronavirus-antibodytest.html; Jason Silverstein, *Fauci Says He "Can't Guarantee" In-Person Voting in November Will Be Safe*, CBS News (Apr. 13, 2020), https://www.cbsnews.com/news/coronavirus-fauci-says-he-cant-guarantee-inperson-voting-in-november-will-be-safe/?ftag=CNM-00-10aac3a.

[6] *Dr. Anthony Fauci & CDC Director Senate Testimony Transcript May 12* at 85, Rev (May 12, 2020), https://www.rev.com/blog/transcripts/dr-anthony-fauci-cdc-director-senate-testimony-transcript-may-12.

[7] *Id.* at 62.

[8] Christina Maxouris, *US Could Be in for 'a Bad Fall and a Bad Winter' If It's Unprepared for a Second Wave of Coronavirus, Fauci Warns*, CNN (Apr. 29, 2020), https://www.cnn.com/2020/04/29/health/us-coronavirus-wednesday/index.html.

fall . . . . I am convinced of that because of the degree of transmissibility that it has, the global nature."[9]

6.      This second wave will almost certainly arrive before an effective vaccine is accessible to the public.  Public health experts warn that the virus will continue to pose a serious threat to public health and safety until a vaccine becomes available,[10] and have projected that it is unlikely that an FDA-approved vaccine will be mass produced and widely available in time for the November election.[11]

7.      Despite the near certainty that COVID-19 will continue to pose a severe health threat into the fall, Kentucky has not taken steps to alleviate the health risks of in-person voting for the November 3, 2020 general election.  The Secretary of State and Governor, in conjunction with the Kentucky Board of Elections, have modified some of Kentucky's election procedures for the upcoming primary election, including delaying the primary date from May 19 until June 23 and permitting all eligible Kentucky voters

---

[9] Savannah Behrmann, *'Convinced': Fauci Says There Will Be Coronavirus in the Fall After Trump Says 'It May Not Come Back'*, USA Today (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/22/coronavirus-dr-anthony-fauci-says-i-am-convinced-second-wave/3009131001/.

[10] Devan Cole, *Fauci Admits Earlier Covid-19 Mitigation Efforts Would Have Saved More American Lives*, CNN (Apr. 12, 2020), https://www.cnn.com/2020/04/12/politics/anthony-fauci-pushback-coronavirus-measures-cnntv/index.html.

[11] TEGNA, *FDA Approves Coronavirus Vaccine Candidate to Begin Phase 2 Trial*, WUSA 9 (May 7, 2020), https://www.wusa9.com/article/news/health/coronavirus/fda-approves-coronavirus-vaccine-candidate-to-begin-phase-2-trial/507-7119865c-3ffb-42b0-8066-6df24aae2c5d; *Dr. Anthony Fauci & CDC Director Senate Testimony Transcript May 12* at 32, Rev (May 12, 2020), https://www.rev.com/blog/transcripts/dr-anthony-fauci-cdc-director-senate-testimony-transcript-may-12.

to apply to vote by mail-in absentee ballot.[12]  But even after recognizing the election-related risks inherent in the COVID-19 pandemic, Kentucky has failed to extend these modifications and provide all voters with an option to vote safely from home in the general election in November 2020.[13]  Kentucky voters hoping to abide by recommended social distancing practices and vote safely from home in the general election will still need to satisfy one of several narrowly-circumscribed "excuses"[14]; merely seeking to avoid exposure to the virus will not be sufficient.  In other words, Kentucky is forcing voters to choose between their health and their right to vote.

8.     Worse yet, Defendants' failure to extend these modified rules throughout the COVID-19 crisis is compounded by the Kentucky General Assembly's remarkable decision to make voting *less accessible* in the midst of the pandemic by adding a new onerous photo identification ("ID") requirement.  This new statute, in practice, will increase Kentuckians' risk of exposure to the virus by forcing them to visit ID-issuing offices and/or copy centers to exercise their right to vote.[15]

9.     Absent relief from this Court, which would only extend the rules governing the June primary while the risk of exposure to COVID-19 remains, Kentucky's election laws will deprive thousands of the chance to participate in the general election in November 2020 by forcing voters to choose between risking the health and safety of

---

[12] Ky. Bd. of Elections, *Procedures for June 23, 2020 Election*, 31 Ky. Admin. Regs. 4:190E (2020).

[13] *Id.*

[14] Ky. Rev. Stat. §§ 117.077, 117.085.

[15] *See* S.B. 2, 2020 Gen. Assemb., Reg. Sess. (Ky. 2020).

themselves and their community or foregoing their constitutional right to vote. Accordingly, Plaintiffs challenge two components of Kentucky's election laws and regulations (together, the "Challenged Requirements").

10.     *First*, Plaintiffs challenge Kentucky statutes regarding absentee voting— most significantly, the statutory provisions requiring that voters qualify for one of several narrow excuses to vote safely from home (the "Excuse Requirement")—while the COVID-19 pandemic continues to threaten the health and safety of Kentucky voters.  As noted, a voter who does not qualify under any of Kentucky's statutorily-enumerated categories of persons permitted to vote by mail-in absentee ballot must vote in person in November or not at all.  Defendants have interpreted Kentucky's Excuse Requirement so that none of the listed absentee "excuses" apply to the thousands of voters faced with the risk that voting in person in the November 2020 election will expose them to COVID-19.

11.     Defendants have already acknowledged that the Excuse Requirement threatens the health and safety of voters during the COVID-19 pandemic, and have accordingly eliminated the Excuse Requirement for the primary election on June 23, 2020, by allowing all voters to submit applications to vote by mail-in absentee ballot by reason of "medical emergency."[16]  And for the June primary, Defendants have also (a) eliminated the notarization requirement for medical emergency absentee ballot applications, (b) extended the absentee ballot deadline to include ballots postmarked by Election Day and received by the Saturday following the election, and (c) implemented new regulations to provide voters with notice and an opportunity to cure any absentee

---

[16] Ky. Rev. Stat. § 117.077.

ballot that is rejected based on signature verification issues.  But they have yet to extend these critical protections to the general election.

12.     Just as Defendants have already acknowledged that upholding the Excuse Requirement will endanger voters in June, requiring the vast majority of eligible voters to be physically present at their traditional polling places will continue to threaten both public safety and the health of individual voters this November.  In-person voters will have to wait in line with other individuals, sometimes for hours, before they can vote.  At the polling place, they will have to use voting machines that may or may not be adequately sanitized between each use.  And some polling places may be unable to accommodate necessary social distancing.  Reinstating the Excuse Requirement for the general election in November 2020 unreasonably burdens the fundamental right to vote of Kentuckians who are practicing recommended social distancing to protect their and their community's health from transmission of COVID-19, and it unnecessarily endangers poll workers and other election officials.

13.     *Second*, Plaintiffs challenge the Kentucky statute requiring photo ID to vote in person and by mail-in absentee ballot.  The newly-enacted Senate Bill 2 (the "Photo ID Law" or "S.B. 2") requires voters to present photo ID to vote in person, and it requires voters applying for a mail-in absentee ballot to include a copy of the voter's photo ID with the ballot application.  If a voter does not yet have a photo ID, S.B. 2 requires that they execute a voter affirmation in the presence of an election officer

confirming their identity and that the voter has a statutorily-enumerated reasonable impediment to procuring a photo ID.[17]

14.     Complying with the Photo ID Law is presently impossible for many voters, who are unable to obtain and copy a photo ID or execute an affirmation in the presence of an election official, given the continued closure of many county clerks' offices, ID-issuing offices, and copy centers.  And even when these offices reopen, obtaining licenses, copies, or affirmations will subject voters to unacceptable health risks that will remain life-threatening through the general election in November 2020, even if ID-issuing offices, copy centers, and election offices reopen.  Like the Excuse Requirement, the Photo ID Law unreasonably burdens the fundamental right to vote of Kentuckians who are practicing recommended social distancing to protect the health and safety of themselves and their communities.

15.     Furthermore, Kentucky's photo ID requirement for absentee ballot applications is unrelated to any valid state interest such as preventing voter fraud or safeguarding voter confidence.  Any additional marginal benefit the Photo ID Law may offer is greatly outweighed by the risk of disenfranchisement.

16.     Plaintiffs bring this action to vindicate their rights under the First and Fourteenth Amendments to the U.S. Constitution and prevent the needless deprivation of their fundamental right to vote.  Kentucky's failure to maintain the elimination of the Challenged Requirements to adapt to the realities of the COVID-19 crisis forces voters to make the untenable choice between their health and their vote.

---

[17] S.B. 2 § 1(1)(c); S.B. 2 § 5(2).

17.     Accordingly, the Challenged Requirements will each, separately and jointly, unduly burden Kentuckians' right to vote in the general election in November 2020.  Moreover, the Challenged Requirements' impact will fall more heavily on certain categories of voters who have been disproportionately impacted by COVID-19, including Black voters, elderly voters, voters with underlying health conditions, and voters with disabilities.

18.     Defendants have already acknowledged that the right to vote in the June primary would be compromised by the present public health crisis unless Defendants acted.  They exercised the power granted to them by the legislature to allow voting in the upcoming election without any of the Challenged Requirements.  However, the right to vote will be compromised in November unless Defendants eliminate those same Challenged Requirements throughout the 2020 election calendar, during which the COVID-19 pandemic will continue to impact Kentuckians' health and safety.  Plaintiffs therefore ask that the Court enjoin the Challenged Requirements and declare them unconstitutional for the duration of the 2020 election calendar.

19.     Plaintiffs' need for relief from this Court is urgent for at least two reasons. First, the plaintiff organizations are already diverting their limited time and resources to respond to the Challenged Requirements, including by educating voters on the Photo ID Law instead of undertaking other voter registration and engagement efforts.  Second,

the changes required to make the November 2020 general election accessible are time sensitive.[18]

## JURISDICTION AND VENUE

20.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the First and Fourteenth Amendments to the U.S. Constitution.

21.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.  Plaintiffs bring this action to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the U.S. Constitution and federal law.

22.     This Court has personal jurisdiction over Defendants, who are sued only in their official capacity as officers and officials of the Commonwealth of Kentucky.  The violations complained of concern their conduct in such capacity.

23.     Plaintiffs bring this action to secure equitable relief under federal law providing for the protection of voting rights, pursuant to 28 U.S.C. §§ 2201 and 2202.

24.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

---

[18] Emily Bazelon, *Will Americans Lose Their Right to Vote in the Pandemic?*, N.Y. Times (May 5, 2020), https://www.nytimes.com/2020/05/05/magazine/voting-by-mail-2020-covid.html.

25.     Venue is proper in this Court under 28 U.S.C. § 1391(b).  LWVKY, Louisville Urban League, and Kentucky NAACP have members in Louisville, and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.

## PARTIES

### I.     Plaintiffs

#### A.     Michael Collins

26.     Plaintiff Michael Collins is a 59-year-old Black man who lives in Louisville, Kentucky.  Mr. Collins is a U.S. citizen and a registered voter in the Commonwealth of Kentucky.

27.     Mr. Collins suffers from Chronic Obstructive Pulmonary Disease ("COPD"), which puts him at high risk for severe illness from COVID-19.

28.     Since the pandemic began, Mr. Collins has been staying at home and avoiding social interaction whenever possible.  Mr. Collins lives alone and only leaves his home once every other week to go to the grocery store or Walgreens.  When Mr. Collins does leave his home, he wears a mask and makes sure he has hand sanitizer available.

29.     Mr. Collins intends to vote in the November 2020 election.  Due to his high-risk status, he wants to vote by mail to avoid the health risks of voting in person during the pandemic.  But under Kentucky's Excuse Requirement, Mr. Collins is not permitted to vote by mail, so he will have to choose between his health and his right to vote in November.

### B.    Jeffrey Cosby

30.    Plaintiff Jeffrey Cosby is a 64-year-old Black man living in Ashland, Kentucky.  He is a U.S. citizen and lawfully registered Kentucky voter.

31.    Mr. Cosby has suffered from COPD, asbestosis, diabetes, chronic kidney disease, thyroid issues, and gallbladder problems.  He has undergone many serious medical procedures, including quadruple coronary artery bypass surgery, placement of multiple stents in his heart, and a hip replacement.  He is very afraid to leave his home because of the risk of exposure to COVID-19, especially given his various underlying medical conditions.

32.    Mr. Cosby has not left his property for any nonessential reason since the start of the pandemic—he has left his property only one time to go to the pharmacy, and even then, he stayed inside the car while his wife went inside.  He and his wife do not allow any visitors into their house.  Mr. Cosby relies on his wife to replenish essential items at home, and his wife takes careful precautions before leaving home, including by bringing hand sanitizer and wearing a mask.

33.    While Mr. Cosby usually votes in person, he wants to use a mail-in absentee ballot in November to vote safely from home and avoid the health risks of voting in person during the pandemic.  But under Kentucky's Excuse Requirement, Mr. Cosby is not permitted to use a mail-in absentee ballot to vote safely from home, so he will have to choose between his health and his right to vote in November.

34.    Mr. Cosby does have a driver's license, but he does not have a printer or copier at home.  To comply with the Photo ID Law's requirement to include a copy of his ID with his mail-in absentee ballot application, he would need to ask his wife, who

would need to visit a public business. But because of Mr. Cosby's health conditions, they want to avoid the health risks of such in-person interactions with the public during the pandemic.

### C.   Thela Elliott

35.     Plaintiff Thela Elliott is a 58-year-old Black woman who lives in Louisville, Kentucky. She is a U.S. citizen and lawfully registered Kentucky voter.

36.     Ms. Elliott has several underlying health conditions that compromise her immune system and increase her risk of serious illness from COVID-19, including Hepatitis C, high blood pressure, and bladder cancer.

37.     Ms. Elliott has not left her home for any nonessential reason since the start of the pandemic—she has left her home only for essential activities such as grocery shopping, doctor appointments, and walking her dog, and she has taken safety precautions while outside her home, such as wearing a mask and gloves and practicing social distancing.

38.     Ms. Elliott has been a committed voter since she turned 18 years old, and she has been voting in Kentucky elections since she moved to the Commonwealth 30 years ago. As a committed, lifelong voter, Ms. Elliott wants to use a mail-in absentee ballot to vote safely from home in the November 2020 election, because of the health risks of voting in person during the pandemic. But under Kentucky's Excuse Requirement, Ms. Elliott is not permitted to use a mail-in absentee ballot to vote safely from home, so she will have to choose between her health and her right to vote in November.

39.     Ms. Elliott has a valid photo ID, but she does not have access to a photocopier or printer to comply with the Photo ID Law's requirement to include a copy of her ID with her mail-in absentee ballot application.  She does not want to go to a public place to print a copy of her photo ID during the pandemic because of her medical conditions.

### D.     Gracie Lewis

40.     Plaintiff Gracie Lewis is a 72-year-old Black woman who lives in Louisville, Kentucky.  She is a U.S. citizen and lawfully registered Kentucky voter, and she has served as a poll worker in many past Kentucky elections.

41.     Ms. Lewis has several health conditions that increase her risk of serious illness from COVID-19, including COPD, congestive heart failure, lymphedema, and high blood pressure.

42.     Ms. Lewis has not left her home for any nonessential reason since the start of the pandemic—she has left her home only for essential activities such as grocery shopping and doctor appointments, and she has worn a mask and gloves and practiced social distancing on those occasions.  Ms. Lewis works at the Kentucky Commission for Human Rights, and although that office has reopened, her supervisors have permitted her to maintain her precautionary practices and continue to work from home because of her health conditions and the related risks during the COVID-19 pandemic.

43.     Ms. Lewis wants to use a mail-in absentee ballot to vote safely from home in the November 2020 election, because of the health risks of voting in person during the pandemic.  But under Kentucky's Excuse Requirement, Ms. Lewis is not permitted

to use a mail-in absentee ballot to vote safely from home, so she will have to choose between her health and her right to vote in November.

### E.   DeJuan Nash

44.   Plaintiff DeJuan Nash is a 51-year-old Black man from Louisville, Kentucky.  He is a U.S. citizen and lawfully registered Kentucky voter.

45.   Mr. Nash suffers from several health conditions that increase his risk of serious illness from COVID-19, which include hypertension, kidney disease, and diabetes.

46.   Since the pandemic began, Mr. Nash has been staying at home and has made occasional trips outside only for limited purposes and with the necessary precautions.  Specifically, he has left his home to go shopping for essentials, such as groceries, takeout, or other household items, and to run essential errands, such as helping his adult daughter get her car fixed.  He always wears gloves and masks when he leaves his home and tries to time his trips during the midday or evening.  When Mr. Nash's 17-year-old son visits him every couple of weeks, he and his son follow social distancing guidelines, even while inside Mr. Nash's home.

47.   Mr. Nash intends to vote in November and strongly prefers to vote by mail.  He has serious concerns about safety if Kentuckians are forced to vote in person during the pandemic.  But under Kentucky's Excuse Requirement, Mr. Nash is not permitted to use a mail-in absentee ballot to vote safely from home, so he will have to choose between his health and his right to vote in November.

### F.     Tiffany Price

48.     Plaintiff Tiffany Price is a 39-year-old Black woman who lives in Louisville, Kentucky.  She is a U.S. citizen and is lawfully registered to vote in Kentucky.

49.     Ms. Price suffers from underlying health conditions that compromise her immune system and increase her risk of serious illness from COVID-19, including diabetes and hypertension.

50.     Since the pandemic began, she has been sheltering in place.  Ms. Price has only left her home for essential reasons, such as going to the grocery store or to pick up food.  Because Ms. Price does not drive, she has relied on her mother, brother, and aunt to give her a ride to these places, but Ms. Price wears a mask and adheres to social distancing guidelines while doing so.  Ms. Price lives with her school-aged daughter, who has been sheltering in place apart from occasional bike rides to her grandmother's house.

51.     Ms. Price strongly prefers to vote by mail in the general election in November 2020, because of the health risks of voting in person during the pandemic. But under Kentucky's Excuse Requirement, Ms. Price is not permitted to use a mail-in absentee ballot to vote safely from home, so she will have to choose between her health and her right to vote in November.

52.     Ms. Price has a valid photo ID, but she does not have access to a copier or printer to comply with the Photo ID Law's requirement to include a copy of her ID with her mail-in absentee ballot application.

17

### G.    League of Women Voters of Kentucky

53.    LWVKY is a "non-partisan organization that promotes the informed and active participation of citizens in government through study and action."[19]  LWVKY is an affiliate of the League of Women Voters of the United States, which began as a "mighty political experiment" designed to help 20 million women carry out their new responsibilities as voters.[20]

54.    One of LWVKY's guiding principles is "that every citizen should be protected in the right to vote."[21]  LWVKY is "committed to the protection of voting rights" in the Commonwealth of Kentucky, and it believes that "Kentucky's election process should be reformed by eliminating barriers to citizens voting and making the registration and voting process more convenient for citizens while also making sure that elections are secure."[22]

55.    LWVKY has 375 members and five local league chapters throughout the Commonwealth.  LWVKY has members that are eligible and planning to cast ballots in elections in November 2020 and have chronic or other underlying health conditions that put them at heightened risk of complications from COVID-19.  Others live with family members or in communities with people who are in an at-risk population, and

---

[19] League of Women Voters of Kentucky, *Our Mission*, https://www.lwvky.org/aboutus#mission (last visited Apr. 29, 2020).

[20] League of Women Voters of the United States, *100 Years of LWV*, https://www.lwv.org/about-us/history (last visited May 21, 2020).

[21] League of Women Voters of Kentucky, *Our Mission*, https://www.lwvky.org/aboutus#mission (last visited Apr. 29, 2020).

[22] League of Women Voters of Kentucky, *Issues of Focus*, https://www.lwvky.org/issues (last visited Apr. 29, 2020).

who could be exposed to the dangers of COVID-19 if the member is required to vote in person in the general election in November 2020.  Under such circumstances, many of LWVKY's members would, if eligible, seek to vote absentee in the November 2020 elections.  However, Kentucky's restrictive Excuse Requirement places limitations on Kentuckians' ability to vote safely from home in the November 2020 election, which will cause many of LWVKY's members to risk their own health, and the health of their family and community, to cast ballots in person on Election Day.

56.    LWVKY has members who are poll workers or work directly with poll workers and other election officials who will need to assist voters on Election Day regarding the new Photo ID Law.  With such burdensome guidelines happening so soon after passage, the implementation of S.B. 2 will likely cause widespread confusion for poll workers and election officials, resulting in eligible voters being disenfranchised.

57.    LWVKY also has members who are eligible and planning to vote in November 2020 and do not currently have a Kentucky driver's license, a student ID, or a photo ID provided by the U.S. government.  These voters will find it difficult to obtain a ballot under Kentucky's new Photo ID Law given the constraints imposed by the pandemic.

58.    A substantial part of LWVKY's work includes registering voters and generally encouraging voter participation in elections.  In preparation for the 2020 election, LWVKY had planned to devote resources to these voter registration and engagement efforts, including by explaining procedures for voting and voting registration to people with felony records whose voting rights were restored as a result of Governor Beshear's executive order on December 12, 2019.

19

59.     The new Photo ID Law has caused LWVKY to change its plans and divert resources away from its planned voter registration and get out the vote efforts.  LWVKY is instead devoting time and resources to completely revamp its educational materials to include information about the new Photo ID Law, including details on the cumbersome process for how to obtain and copy an ID during the pandemic.  LWVKY must reduce its other services to voters in order to spread information regarding the new Photo ID Law and assist those without photo IDs to get them.  This diversion of resources to fund mailings and paid advertising to keep voters informed will produce a significant challenge to LWVKY's volunteers and place a serious strain on its financial resources.

60.     Kentucky's failure to treat the COVID-19 pandemic as an excuse to vote safely from home in the upcoming general election harms LWVKY members' ability to cast ballots and have them count in the 2020 election cycle, hinders the organization's efforts to register Kentuckians to vote and increase voter participation, and causes the organization to divert resources intended for its voter registration and education efforts to ensure that registered Kentuckians can vote in the general election.

61.     If the Excuse Requirement goes back into effect for the November 2020 election, LWVKY will have to divert even more resources from its voter registration and engagement activities, because during the pandemic, every voter will need to learn who does and does not qualify for an absentee ballot, when notaries will be needed, and other details of Kentucky's burdensome system.  What has usually mattered only to a limited part of the electorate suddenly will be key to the health and safety of every voter.  To educate Kentucky citizens about these requirements and assist any of its members

who have difficulty complying, LWVKY must again reduce its other services and spend from its limited financial reserves.

### H.    Louisville Urban League

62.    The Louisville Urban League is a "nonprofit, nonpartisan, community service organization dedicated to eliminating racism and its adverse impacts" on the community in Louisville, Kentucky.  Its mission is to "assist African Americans and other marginalized populations in attaining social and economic equality through direct services and advocacy."[23]

63.    The Louisville Urban League has members and clients that are eligible and planning to cast ballots in elections in November 2020, and have chronic or other underlying health conditions that put them at heightened risk of complications from COVID-19.  Others live with family members or in communities with people who are in an at-risk population, and who could be exposed to the dangers of COVID-19 if the member is required to vote in person in the general election in November 2020.  Under such circumstances, many of the Louisville Urban League's members and clients would, if eligible, seek to vote absentee in the November 2020 elections.  However, Kentucky's restrictive Excuse Requirement places limitations on Kentuckians' ability to vote safely from home in the November 2020 election, which will cause many of the Louisville Urban League's members and clients to risk their own health, and the health of their family and community to cast ballots in person on Election Day.

---

[23] Louisville Urban League, *About Us*, https://lul.org/about/ (last visited Apr. 25, 2020).

64.     The Louisville Urban League has members and clients who are eligible and planning to vote in November 2020, and do not currently have a Kentucky driver's license, a student ID, or a photo ID provided by the U.S. government.  These voters will find it difficult to obtain a ballot under Kentucky's new Photo ID Law, given the constraints imposed by the pandemic.

65.     The Louisville Urban League has traditionally provided election assistance by educating Kentuckians about voter registration, facilitating voter registration, and advocating for restoration of voting rights to Kentuckians with felony convictions.[24]

66.     In preparation for the 2020 election, the Louisville Urban League had planned to devote resources to voter registration efforts and to an outreach and educational campaign to assist individuals with felony records who had their voting rights restored by Governor Beshear's executive order on December 12, 2019.

67.     The new Photo ID Law has caused the Louisville Urban League to change its plans and divert resources away from its planned voter engagement and education efforts.  The Louisville Urban League is instead devoting its time and resources toward educating the community about the new Photo ID Law.  The Louisville Urban League will also now have to divert resources toward transportation and assistance for

---

[24] *See, e.g.*, Louisville Urban League, *Register to Vote* (Apr. 25, 2020), https://lul.org/event/register-to-vote/2020-04-25/; *Urban League, NAACP to Hold 'Drive Up' for Voter Registration Event*, WHAS 11 (Oct. 6, 2018), https://www.whas11.com/article/news/politics/elections/urban-league-naacp-to-hold-drive-up-for-voter-registration-event/417-601669303; Philip M. Bailey, *Being Black in Louisville is 'Aspiration-Crushing,' Urban League Leader Says*, Louisville Courier Journal (Feb. 12, 2018), https://www.courier-journal.com/story/news/local/2018/02/09/louisville-urban-league-state-black-louisville-2018-report/322869002/ (describing advocacy for automatic restoration of voting rights).

communities that have trouble accessing photo ID or compiling the requisite documentation to obtain photo ID, such as seniors, homeless Kentuckians, and disconnected youth.

68.     Kentucky's failure to treat the COVID-19 pandemic as an excuse to vote safely from home in the upcoming general election harms the Louisville Urban League members' and clients' ability to cast ballots and have them count in the 2020 election cycle, hinders the organization's efforts to register Kentuckians to vote and increase voter participation, and causes the organization to divert resources intended for its voter registration and restoration efforts to ensure that registered Kentuckians can vote in the general election.  In particular, the Louisville Urban League will need to investigate, respond to, mitigate, and address the concerns of its members and clients who face serious health risks if they are forced to leave their homes to obtain or copy photo ID, seek out a notary, or vote in the general election.

## I.     The Kentucky Conference of NAACP Branches

69.     The Kentucky NAACP is a nonpartisan, multi-racial, non-profit membership organization headquartered in Louisville, Kentucky.  The Kentucky NAACP serves as the Kentucky arm of the National Association for the Advancement of Colored People.  Its mission is to eliminate race-based discrimination through securing political, educational, social, and economic equality rights and ensuring the health and well-being of all persons.

70.     The Kentucky NAACP has local branch units and youth councils throughout the state, and its membership primarily consists of African Americans, other

people of color, and allies.  The Kentucky NAACP and its local branch units are volunteer-run, and all officers are volunteers.

71.     The Kentucky NAACP has members that are eligible and planning to cast ballots in November 2020 and have chronic or other underlying health conditions that put them at heightened risk of complications from COVID-19.  Others live with family members or in communities with people who are in an at-risk population, and who could be exposed to the dangers of COVID-19 if the member is required to vote in person in the general election in November 2020.  Under such circumstances, many of the Kentucky NAACP's members would, if eligible, seek to vote absentee in the November 2020 election.  However, Kentucky's restrictive eligibility criteria for absentee ballots for the November 2020 election will cause many of the Kentucky NAACP's members to risk their own health, and the health of their family and community, to cast ballots in person on Election Day.

72.     The Kentucky NAACP has members who are eligible and planning to vote in November 2020 and do not currently have a Kentucky driver's license, a student ID, or a photo ID provided by the U.S. government.  These voters will find it difficult to obtain a ballot under Kentucky's new Photo ID Law, given the constraints imposed by the pandemic.

73.     In support of its advocacy agenda, the Kentucky NAACP engages in voter outreach efforts, including through voter registration, education, and mobilization work in communities that have had historically low voter registration and turnout.

74.     For the November 2020 election, the Kentucky NAACP planned to engage in several efforts aimed at ensuring voters in key constituencies had access to the ballot

24

box.  The Kentucky NAACP was planning to conduct targeted outreach to registered voters that Kentucky election officials previously identified as inactive,[25] and to ensure that registration information for these voters was up-to-date and that these voters cast ballots during the election.  Similarly, the Kentucky NAACP also planned registration efforts to assist individuals who had voting rights restored by the Governor.  The Kentucky NAACP planned to obtain contact information for individuals in both groups and to devote staff to reaching out, providing important information and assistance relating to registration, and encouraging individuals to vote.  In addition, the Kentucky NAACP planned to develop public service announcements designed to drive registration in these groups.

75.    The new Photo ID Law has caused the Kentucky NAACP to change its plans and divert resources away from its planned voter registration and get out the vote efforts.  The Kentucky NAACP is now engaging in efforts aimed at addressing confusion around the new Photo ID Law, including providing information to voters on what forms of identification are acceptable and how voters can obtain qualifying IDs.  In addition, the organization expects that it will need to devote resources to assisting individuals obtain the necessary IDs.  In the communities served by the Kentucky NAACP, this includes elderly voters, as well as voters who do not have a driver's license or car.

76.    Kentucky's failure to treat the COVID-19 pandemic as an excuse to vote safely from home in the upcoming general election harms Kentucky NAACP members'

---

[25] Sarah Ladd, *Judge Orders 175,000 Kentucky Voters Reinstated After They Were Classified as 'Inactive'*, Louisville Courier Journal (Oct. 14, 2019), https://www.courier-journal.com/story/news/politics/2019/10/14/judge-175-000-inactive-kentucky-voters-reinstated/3979277002/.

ability to cast ballots and have them count in the 2020 general election, hinders the organization's efforts to register Kentuckians to vote and increase voter participation, and causes the organization to divert resources intended for its voter engagement and education efforts to ensure that registered Kentuckians can vote in the general election. In particular, the Kentucky NAACP will need to investigate, respond to, mitigate, and address the concerns of its members and constituents who face serious health risks if they are forced to leave their homes to obtain or copy photo ID, seek out a notary, or vote in the general election.

## II.     Defendants

### A.     Secretary of State Michael Adams

77.     Defendant Michael Adams is the Secretary of State of Kentucky and is sued in his official capacity.  The Secretary is the Commonwealth's Chief Election Official.[26]

78.     The Secretary of State also serves as an *ex officio*, nonvoting member of the Kentucky Board of Elections, an independent agency that administers the Commonwealth's election laws and promulgates administrative regulations necessary to properly carry out its duties.[27]

---

[26] Ky. Sec'y of State, *Office of Elections*, https://www.sos.ky.gov/elections/Pages/default.aspx (last visited Apr. 29, 2020).

[27] Ky. Rev. Stat. § 117.015(3).

79.     Pursuant to recently enacted H.B. 351, the Governor of Kentucky can only issue an executive order altering the time, place, or manner of an election during a state of emergency at the recommendation of the Secretary of State.[28]

80.     Once the Governor issues such an executive order, the Kentucky Board of Elections has the power to establish emergency plans that would permit all Kentucky voters to use mail-in absentee ballots to vote safely from home during the pandemic.[29]

81.     H.B. 351 then mandates that the Secretary of State and the Governor must approve any election procedures established by the Kentucky Board of Elections during a state of emergency before the procedures can take effect.[30]

**B.     Governor Andrew Beshear**

82.     Defendant Andrew Beshear is the Governor of the Commonwealth of Kentucky and is sued in his official capacity.

83.     Pursuant to recently enacted H.B. 351, the Governor of Kentucky, upon the recommendation of the Secretary of State, can issue an executive order altering the time, place, or manner of an election during a state of emergency.[31]

84.     Once the Governor issues such an executive order, the Kentucky Board of Elections has the power to establish emergency plans that would permit all Kentucky voters to use mail-in absentee ballots to vote safely from home during the pandemic.[32]

---

[28] H.B. 351 § 74(1)(l), 2020 Gen. Assemb., Reg. Sess. (Ky. 2020).

[29] Ky. Rev. Stat. § 14.318; H.B. 351 § 74(1)(l).

[30] H.B. 351 § 74(1)(l).

[31] *Id.*

[32] Ky. Rev. Stat. § 14.318; H.B. 351 § 74(1)(l).

85.     H.B. 351 then mandates that the Secretary of State and the Governor must approve any election procedures established by the Kentucky Board of Elections during a state of emergency before the procedures can take effect.[33]

## C.     Chairman Albert Benjamin Chandler, III

86.     Defendant Albert Benjamin Chandler, III is the current Chairman of the Kentucky Board of Elections and is sued in his official capacity.

87.     The Kentucky Board of Elections has the authority to "promulgate administrative regulations as necessary" to "administer the election laws of the state."[34]

88.     Pursuant to recently enacted H.B. 351, once the Governor declares a state of emergency and issues an executive order altering the time, place, or manner of an election, the Kentucky Board of Elections is responsible for establishing procedures for election officials to follow to accommodate the alteration.[35]

89.     As such, the Kentucky Board of Elections has the power to establish emergency plans that would permit all Kentucky voters to use mail-in absentee ballots to vote safely from home during the pandemic.[36]

## D.     DeAnna Brangers

90.     Defendant DeAnna Brangers is a current member of the Kentucky Board of Elections and is sued in her official capacity.

---

[33] H.B. 351 § 74(1)(l).

[34] Ky. Rev. Stat. § 117.015.

[35] H.B. 351 § 74(1)(l).

[36] Ky. Rev. Stat. § 14.318; H.B. 351 § 74(1)(l).

91.     The Kentucky Board of Elections has the authority to "promulgate administrative regulations as necessary" to "administer the election laws of the state."[37]

92.     Pursuant to recently enacted H.B. 351, once the Governor declares a state of emergency and issues an executive order altering the time, place, or manner of an election, the Kentucky Board of Elections is responsible for establishing procedures for election officials to follow to accommodate the alteration.[38]

93.     As such, the Kentucky Board of Elections has the power to establish emergency plans that would permit all Kentucky voters to use mail-in absentee ballots to vote safely from home during the pandemic.[39]

### E.    Sherry Whitehouse

94.     Defendant Sherry Whitehouse is a current member of the Kentucky Board of Elections and is sued in her official capacity.

95.     The Kentucky Board of Elections has the authority to "promulgate administrative regulations as necessary" to "administer the election laws of the state."[40]

96.     Pursuant to recently enacted H.B. 351, once the Governor declares a state of emergency and issues an executive order altering the time, place, or manner of an election, the Kentucky Board of Elections is responsible for establishing procedures for election officials to follow to accommodate the alteration.[41]

---

[37] Ky. Rev. Stat. § 117.015.

[38] H.B. 351 § 74(1)(l).

[39] Ky. Rev. Stat. § 14.318; H.B. 351 § 74(1)(l).

[40] Ky. Rev. Stat. § 117.015.

[41] H.B. 351 § 74(1)(l).

97.     As such, the Kentucky Board of Elections has the power to establish emergency plans that would permit all Kentucky voters to use mail-in absentee ballots to vote safely from home during the pandemic.[42]

### F.     Cory Skolnick

98.     Defendant Cory Skolnick is a current member of the Kentucky Board of Elections and is sued in his official capacity.

99.     The Kentucky Board of Elections has the authority to "promulgate administrative regulations as necessary" to "administer the election laws of the state."[43]

100.     Pursuant to recently enacted H.B. 351, once the Governor declares a state of emergency and issues an executive order altering the time, place, or manner of an election, the Kentucky Board of Elections is responsible for establishing procedures for election officials to follow to accommodate the alteration.[44]

101.     As such, the Kentucky Board of Elections has the power to establish emergency plans that would permit all Kentucky voters to use mail-in absentee ballots to vote safely from home during the pandemic.[45]

### G.     George Russell

102.      Defendant George Russell is a current member of the Kentucky Board of Elections and is sued in his official capacity.

---

[42] Ky. Rev. Stat. § 14.318; H.B. 351 § 74(1)(l).

[43] Ky. Rev. Stat. § 117.015.

[44] H.B. 351 § 74(1)(l).

[45] Ky. Rev. Stat. § 14.318; H.B. 351 § 74(1)(l).

103.    The Kentucky Board of Elections has the authority to "promulgate administrative regulations as necessary" to "administer the election laws of the state."[46]

104.    Pursuant to recently enacted H.B. 351, once the Governor declares a state of emergency and issues an executive order altering the time, place, or manner of an election, the Kentucky Board of Elections is responsible for establishing procedures for election officials to follow to accommodate the alteration.[47]

105.    As such, the Kentucky Board of Elections has the power to establish emergency plans that would permit all Kentucky voters to use mail-in absentee ballots to vote safely from home during the pandemic.[48]

### H.    Dwight Sears

106.     Defendant Dwight Sears is a current member of the Kentucky Board of Elections and is sued in his official capacity.

107.    The Kentucky Board of Elections has the authority to "promulgate administrative regulations as necessary" to "administer the election laws of the state."[49]

108.    Pursuant to recently enacted H.B. 351, once the Governor declares a state of emergency and issues an executive order altering the time, place, or manner of an election, the Kentucky Board of Elections is responsible for establishing procedures for election officials to follow to accommodate the alteration.[50]

---

[46] Ky. Rev. Stat. § 117.015.

[47] H.B. 351 § 74(1)(l).

[48] Ky. Rev. Stat. § 14.318; H.B. 351 § 74(1)(l).

[49] Ky. Rev. Stat. § 117.015.

[50] H.B. 351 § 74(1)(l).

109.    As such, the Kentucky Board of Elections has the power to establish emergency plans that would permit all Kentucky voters to use mail-in absentee ballots to vote safely from home during the pandemic.[51]

### I.    Katrina Fitzgerald

110.    Defendant Katrina Fitzgerald is a current member of the Kentucky Board of Elections and is sued in her official capacity.

111.    The Kentucky Board of Elections has the authority to "promulgate administrative regulations as necessary" to "administer the election laws of the state."[52]

112.    Pursuant to recently enacted H.B. 351, once the Governor declares a state of emergency and issues an executive order altering the time, place, or manner of an election, the Kentucky Board of Elections is responsible for establishing procedures for election officials to follow to accommodate the alteration.[53]

113.    As such, the Kentucky Board of Elections has the power to establish emergency plans that would permit all Kentucky voters to use mail-in absentee ballots to vote safely from home during the pandemic.[54]

### J.    James Lewis

114.    Defendant James Lewis is a current member of the Kentucky Board of Elections and is sued in his official capacity.

---

[51] Ky. Rev. Stat. § 14.318; H.B. 351 § 74(1)(l).

[52] Ky. Rev. Stat. § 117.015.

[53] H.B. 351 § 74(1)(l).

[54] Ky. Rev. Stat. § 14.318; H.B. 351 § 74(1)(l).

115.    The Kentucky Board of Elections has the authority to "promulgate administrative regulations as necessary" to "administer the election laws of the state."[55]

116.    Pursuant to recently enacted H.B. 351, once the Governor declares a state of emergency and issues an executive order altering the time, place, or manner of an election, the Kentucky Board of Elections is responsible for establishing procedures for election officials to follow to accommodate the alteration.[56]

117.    As such, the Kentucky Board of Elections has the power to establish emergency plans that would permit all Kentucky voters to use mail-in absentee ballots to vote safely from home during the pandemic.[57]

## FACTUAL ALLEGATIONS

### I.    The COVID-19 Pandemic Poses a Serious Threat to Public Health and Safety in Kentucky.

#### A.    Public Health Impact of COVID-19

118.    COVID-19 is an infectious disease caused by a novel coronavirus that has spread throughout the world at a rapid pace.[58]  The virus "can infect organs throughout the body, including lungs, throat, heart, liver, brain, kidneys and the intestines," and

---

[55] Ky. Rev. Stat. § 117.015.

[56] H.B. 351 § 74(1)(l).

[57] Ky. Rev. Stat. § 14.318; H.B. 351 § 74(1)(l).

[58] CDC, *What You Should Know about COVID-19 to Protect Yourself and Others* (Apr. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

contracting the virus can ultimately result in death, blood clots, and/or severe and lasting damage to various organs.[59]

119.     The United States has a higher number of COVID-19 cases than any other country.[60]  As of the date of filing this Complaint, the confirmed number of infections in the United States has surpassed 1.6 million, and at least 98,938 people have lost their lives nationwide.[61]  And the *confirmed* number of cases and deaths may be significantly lower than the *actual* total.  The FDA recently issued an alert about the accuracy of one of the widely used rapid tests for COVID-19 after researchers at New York University found they could be "missing a third to almost half of the positive cases,"[62] and a recent investigation by the Yale School of Public Health and the Washington Post suggests that the number of deaths caused by COVID-19 could be much higher than reported.[63]  Dr.

---

[59] Maggie Fox, *Covid-19 Infects Intestines, Kidneys and Other Organs, Studies Find*, CNN Health (May 13, 2020), https://www.cnn.com/2020/05/13/health/wellness-covid-attacks-organs-kidney/index.html.

[60] Donald G. McNeil, Jr., *The U.S. Now Leads the World in Confirmed Coronavirus Cases*, N.Y. Times (Mar. 26, 2020), https://www.nytimes.com/2020/03/26/health/usa-coronavirus-cases.html.

[61] *Coronavirus Map: Tracking the Global Outbreak*, N.Y. Times (last updated May 27, 2020 at 8:18 A.M. E.T.), https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html.

[62] Salvador Rodriguez, *FDA Issues Warning on Accuracy of Abbott's Rapid Coronavirus Test After Study Finds False Negatives*, CNBC (May 14, 2020), https://www.cnbc.com/2020/05/14/fda-data-suggests-abbotts-rapid-coronavirus-diagnostic-test-is-delivering-inaccurate-results.html.

[63] Emma Brown et al., *U.S. Deaths Soared in Early Weeks of Pandemic, Far Exceeding Number Attributed to Covid-19*, Wash. Post (Apr. 27, 2020), https://www.washingtonpost.com/investigations/2020/04/27/covid-19-death-toll-undercounted/?arc404=true.

Fauci testified before the Senate that the number of deaths caused by COVID-19 are "almost certainly" higher than the number of deaths that have been reported.[64]

120.    The surge of cases around the world has caused incredible strains on healthcare systems, including critical shortages of medical personnel, lifesaving equipment, and personal protective equipment ("PPE") for healthcare workers on the front lines.

121.    Virtually all aspects of life in the United States have been affected by the global COVID-19 pandemic.  According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 spreads aggressively, and even asymptomatic and pre-symptomatic individuals can potentially infect others with whom they come into contact.[65]  Americans of all ages and from all walks of life have contracted the virus.[66]

122.    Although COVID-19 has affected Americans of every age, public health experts have warned that it can be particularly dangerous for certain demographics. The CDC has observed that current data on the COVID-19 pandemic "suggest a disproportionate burden of illness and death among racial and ethnic minority

---

[64] *Dr. Anthony Fauci & CDC Director Senate Testimony Transcript May 12* at 45, Rev (May 12, 2020), https://www.rev.com/blog/transcripts/dr-anthony-fauci-cdc-director-senate-testimony-transcript-may-12.

[65] CDC, *Coronavirus Disease 2019 (COVID-19): How It Spreads* (last updated May 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

[66] Robert Verity, PhD. et al., *Estimates of the Severity of Coronavirus Disease 2019: A Model-Based Analysis* at 6, Lancet Infectious Diseases (Mar. 30, 2020), https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(20)30243-7/fulltext.

groups,"[67] and it has concluded that older persons and individuals with underlying medical conditions are at risk for severe illness or death if they contract COVID-19.[68] Importantly, however, the threat of COVID-19 is not limited to these most impacted demographics—for example, studies have shown that a majority of coronavirus patients, and 22% of those admitted to a hospital's intensive care unit, did not have any of the underlying health conditions that result in increased susceptibility to the virus.[69]

123.     Crucial "social distancing" measures and guidance imposed by federal, state, and local governments have been key to preventing even wider infection and death.  One early model from Imperial College in London suggested that without any preventative measures, the United States could have seen as many as 2.2 million deaths.[70]

---

[67] CDC, *Coronavirus Disease 2019 (COVID-19): Racial and Ethnic Minority Groups* (last updated Apr. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html.

[68] CDC, *Coronavirus Disease 2019 (COVID-19): Clinical Care Guidance* (last visited Apr. 6, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html; CDC, *Coronavirus Disease 2019 (COVID-19): At Risk for Severe Illness* (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[69] CDC, *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020* (Apr. 3, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm.

[70] Neil M. Ferguson et al., *Report 9: Impact of Non-Pharmaceutical Interventions (NPIs) to Reduce COVID-19 Mortality and Healthcare Demand*, Imperial College COVID-19 Response Team (Mar. 16, 2020), https://www.imperial.ac.uk/media/imperial-college/medicine/sph/ide/gida-fellowships/Imperial-College-COVID19-NPI-modelling-16-03-2020.pdf.

124.    Public health experts have cautioned against prematurely ending social distancing measures, warning that reopening too soon creates a "real risk that you will trigger an outbreak that you might not be able to control," and that the absence of adequate precautions "will have the deleterious consequence of more infections and more deaths."[71]

125.    It is unknown if those who have already been infected will develop an immune response sufficient to prevent reinfection.[72]  Consequently, this unprecedented public health emergency continues to wreak havoc on all aspects of life in the United States and around the world, and the crisis has no clear end in sight.

126.    Nor will the virus soon disappear.  Implementing social distancing is designed to extend the duration of the virus in order to flatten the curve of new cases and relieve pressure on health care resources.[73]  Consequently, Dr. Fauci has described the presence of COVID-19 in the fall as "inevitable" in recent briefings,[74] stating:  "We

---

[71] *Dr. Anthony Fauci & CDC Director Senate Testimony Transcript May 12* at 57, 87, Rev (May 12, 2020), https://www.rev.com/blog/transcripts/dr-anthony-fauci-cdc-director-senate-testimony-transcript-may-12.

[72] Apoorva Mandavilli & Katie Thomas, W*ill an Antibody Test Allow Us to Go Back to School or Work?*, N.Y. Times (Apr. 10, 2020), https://www.nytimes.com/2020/04/10/health/coronavirus-antibodytest.html.

[73] *See generally* Neil M. Ferguson et al., *Report 9: Impact of Non-Pharmaceutical Interventions (NPIs) to Reduce COVID-19 Mortality and Healthcare Demand*, Imperial College COVID-19 Response Team (Mar. 16, 2020), https://www.imperial.ac.uk/media/imperial-college/medicine/sph/ide/gida-fellowships/Imperial-College-COVID19-NPI-modelling-16-03-2020.pdf.

[74] Christina Maxouris, *US Could Be in for 'a Bad Fall and a Bad Winter' If It's Unprepared for a Second Wave of Coronavirus, Fauci Warns*, CNN (Apr. 29, 2020), https://www.cnn.com/2020/04/29/health/us-coronavirus-wednesday/index.html.

will have coronavirus in the fall. . . . I am convinced of that because of the degree of transmissibility that it has, the global nature.  What happens with that will depend on how we're able to contain it when it occurs."[75]

127.    Many experts, including CDC Director Dr. Robert Redfield, have warned that this second surge of COVID-19 may become even more difficult to manage in the fall, resulting in longer lockdowns, more severe economic disruption, and increased risks to vulnerable populations.[76]  Accordingly, Dr. Redfield testified before the Senate that "[i]t's important to emphasize that we're not out of the woods yet" as states begin to reopen, explaining:  "We need to stay vigilant with social distancing.  It remains an imperative."[77]

128.    Dr. David Nabarro, a WHO Special Envoy on COVID-19, has warned that the virus will continue to pose a serious threat to public health and safety until a vaccine is developed, stating:  "We think it's going to be a virus that stalks the human race for

---

[75] Savannah Behrmann, *'Convinced': Fauci Says There Will Be Coronavirus in the Fall After Trump Says 'It May Not Come Back'*, USA Today (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/22/coronavirus-dr-anthony-fauci-says-i-am-convinced-second-wave/3009131001/.

[76] Denise Grady, *The Fear of Coronavirus and Flu Colliding in the Fall*, N.Y. Times (Apr. 22, 2020), https://www.nytimes.com/2020/04/22/health/coronavirus-flu-season-deaths.html; Olga Khazan, *The Scariest Pandemic Timeline*, The Atlantic (Apr. 24, 2020), https://www.theatlantic.com/health/archive/2020/04/could-there-be-another-coronavirus-quarantine/610630/; Lena H. Sun, *CDC Director Warns Second Wave of Coronavirus is Likely to be Even More Devastating*, Wash. Post (Apr. 21, 2020), https://www.washingtonpost.com/health/2020/04/21/coronavirus-secondwave-cdcdirector/.

[77] *Dr. Anthony Fauci & CDC Director Senate Testimony Transcript May 12* at 23, Rev (May 12, 2020), https://www.rev.com/blog/transcripts/dr-anthony-fauci-cdc-director-senate-testimony-transcript-may-12.

quite a long time to come until we can all have a vaccine that will protect us and that there will be small outbreaks that will emerge sporadically and they will break through our defenses."[78]

129.    And it is highly unlikely that an effective and accessible vaccine will be available by the fall.[79]  As Dr. Fauci testified before the Senate, "the idea of having treatments available, or a vaccine" by this this fall "would be something that would be a bit of a bridge too far."[80]  Even if a vaccine could be developed by the fall, Dr. Fauci has explained that "there's no guarantee that the vaccine is actually going to be effective."[81]

### B.    COVID-19 in Kentucky

130.    Kentucky is no exception to the pandemic facing the rest of the world.  As of the date of filing this complaint, the virus has already infected 8,951 Kentuckians and resulted in 394 deaths in the Commonwealth.[82]

---

[78] Devan Cole, *Fauci Admits Earlier Covid-19 Mitigation Efforts Would Have Saved More American Lives*, CNN (Apr. 12, 2020), https://www.cnn.com/2020/04/12/politics/anthony-fauci-pushback-coronavirus-measures-cnntv/index.html.

[79] WUSA 9, *FDA Approves Coronavirus Vaccine Candidate to Begin Phase 2 Trial* (May 7, 2020), https://www.wusa9.com/article/news/health/coronavirus/fda-approves-coronavirus-vaccine-candidate-to-begin-phase-2-trial/507-7119865c-3ffb-42b0-8066-6df24aae2c5d; Hailey Waller et al., *Bill Gates' Coronavirus Vaccine Could be Manufacturing at Scale in a Year*, Fortune (Apr. 26, 2020), https://fortune.com/2020/04/26/bill-gates-coronavirus-vaccine-covid-19/.

[80] *Dr. Anthony Fauci & CDC Director Senate Testimony Transcript May 12* at 32, Rev (May 12, 2020), https://www.rev.com/blog/transcripts/dr-anthony-fauci-cdc-director-senate-testimony-transcript-may-12.

[81] *Id.* at 19, 92.

[82] Ky. Dep't of Pub. Health, *Kentucky Coronavirus Monitoring* (last updated May 26, 2020 at 5:00 P.M. E.T.), https://govstatus.egov.com/kycovid19.

131.    On March 22, 2020, Governor Beshear issued a state-wide "healthy-at-home" order in response to the crisis and urged residents to maintain social distancing in order to combat the virus's spread.[83]  Governor Beshear also ordered that all non-life-sustaining businesses must cease in-person services by March 23, 2020, and he advised that Kentucky's schools should remain closed for the rest of the 2019–2020 school year.[84]  The Governor also deployed the National Guard and additional law enforcement personnel to assist at hospitals and medical facilities.[85]

132.    At the same time, Kentucky's legislature passed emergency legislation granting new powers to the Governor, the Secretary of State, and the Board of Elections to modify Kentucky's existing voting procedures during a state of emergency.[86]  The Governor vetoed portions of the legislation but the legislature overrode that line-item veto.

133.    On April 4, 2020, Governor Beshear and the Kentucky Department of Public Health adopted guidance from the CDC recommending that people wear cloth masks and observe social distancing practices in public to slow the spread of the virus.[87]

---

[83] Ky. Office of the Governor, *State of Emergency*, Exec. Order No. 2020-257 (Mar. 25, 2020), https://governor.ky.gov/attachments/20200325_Executive-Order_2020-257_Healthy-at-Home.pdf.

[84] Ky. Office of the Governor, *Kentucky's Response to COVID-19* (May 17, 2020), https://governor.ky.gov/covid19; Commonwealth of Kentucky, *Gov. Beshear Advises Schools to Remain Closed to In-Person Instruction* (Apr. 20, 2020), https://kentucky.gov/Pages/Activity-stream.aspx?n=GovernorBeshear&prId=135.

[85] *Id.*

[86] H.B. 351 § 74(1)(l).

[87] *Id.*

The mask guidance was followed by Executive Order 2020-275 on April 8, 2020, which limited the number of people inside essential businesses that remain open by restricting shopping trips to one adult per household at a time.[88]  In a move to prevent crowds from congregating, Governor Beshear also announced the closure of several state parks.[89]

134.    On April 21, the Governor announced the "Healthy at Work" initiative, which hopes to help Kentucky businesses reopen safely.  The Healthy at Work plan establishes that the economy will not reopen until the Governor determines that Kentucky has met the following benchmarks:  14 days of decreasing cases, increased testing capacity and contact tracing, PPE availability, ability to protect at-risk populations, ability to social distance and follow the CDC's guidelines on large gatherings, preparedness for possible future spike, and status of vaccine and treatment.[90]

135.    On April 23, the Secretary of State issued recommendations for how elections held in June should be conducted due to the pandemic.[91]  On April 24, the

---

[88] Ky. Office of the Governor, *State of Emergency*, Exec. Order No. 2020-275 (Apr. 8, 2020), https://governor.ky.gov/attachments/20200408_Executive-Order_2020-275_State-of-Emergency.pdf; Ky. Bd. of Elections, *Procedures for June 23, 2020 Election*, 31 Ky. Admin. Regs. 4:190E (2020).

[89] Kala Kachmar, *Coronavirus Closures: Beshear to close Cumberland Falls, Natural Bridge State Parks*, Louisville Courier Journal (Apr. 9, 2020), https://www.courier-journal.com/story/news/2020/04/09/beshear-closes-cumberland-falls-natural-bridge-state-parks-due-coronavirus/5126564002/.

[90] Ky. Cabinet for Econ. Development, *Healthy at Work: Reopening Kentucky* (last updated May 26, 2020), https://govstatus.egov.com/ky-healthy-at-work.

[91] Letter from Sec'y of State Adams to Governor Beshear (Apr. 23, 2020), https://governor.ky.gov/attachments/20200423_Ltr-from-Sec-of-State-Adams.pdf.

Governor issued an Executive Order, pursuant to the Kentucky Constitution and KRS Chapter 39A, directing the Kentucky Board of Elections to promulgate regulations to change the procedures for the June elections to minimize the spread of COVID-19.[92] The Board of Elections subsequently issued emergency regulations which lifted each of the then-existing Challenged Requirements, but only for the June 23 election.[93]

136.    Governor Beshear announced that, on April 27, 2020, the state would begin a "gradual restart and reopening of our Phase 1 health care services and facilities, although even then they will operate vastly differently than they did before the outbreak of the novel coronavirus 2019 (COVID-19)."[94]  The Commonwealth is still taking intense precautions in long-term care facilities and nursing homes, including "encouraging all residents to wear masks, cancelling communal dining and social activities, minimizing entry into resident rooms, restricting non-essential personnel from entering the building, daily temperature checks and adopting a low threshold to transfer ill residents to a higher level of care."[95]  Phase 2 of the health care reopening process began on May 6, 2020, at which point outpatient and ambulatory surgery and invasive procedures

---

[92] Ky. Office of the Governor, *State of Emergency Relating to Kentucky Elections*, Exec. Order 2020-296 (Apr. 24, 2020), https://elect.ky.gov/SiteAssets/Pages/default/EO%202020-296.pdf.

[93] Ky. Bd. of Elections, *Procedures for June 23, 2020 Election*, 31 Ky. Admin. Regs. 4:190E (2020), https://elect.ky.gov/SiteAssets/Pages/default/SBE%20Covid19%20Emergency%20Regulation.pdf.

[94] Ky. Office of the Governor, *Kentucky's Response to COVID-19* (May 17, 2020), https://governor.ky.gov/covid19.

[95] *Id.*

resumed.  And Phase 3 began on May 13, 2020, when the Governor announced that hospitals and care facilities could begin performing non-emergency surgeries and procedures at 50% of their patient volume before the pandemic.[96]

137.    On May 4, 2020, Governor Beshear announced that certain businesses could reopen on May 11, 2020, including manufacturing, distribution, and supply chain businesses; construction; vehicle or vessel dealerships; office-based businesses (at 50% pre-pandemic capacity); horse racing (without fans in attendance); pet care, grooming, and boarding; and photography.  On May 7, 2020, Governor Beshear announced a tentative schedule for reopening other Kentucky businesses, under which restaurants could reopen on May 22 (with limited 33% capacity and outdoor seating), movie theaters and fitness centers could reopen on June 1, public and private campgrounds could reopen on June 11, and child care could reopen on June 15 (with reduced capacity; and potentially low-touch and outdoor youth sports).[97]  And on May 15, Governor Beshear announced that state parks will reopen on June 1.

138.    Although the Governor provided guidance permitting Kentucky government offices to begin reopening on May 18,[98] several government offices— including ones that are critical to Kentucky elections—have declined to reopen for safety

---

[96] *Id.*

[97] *Id.*

[98] Phil Pendleton, *Kentucky Government Offices Allowed to Reopen Monday*, WKYT (May 18, 2020),
https://www.wkyt.com/content/news/Kentucky-government-offices-allowed-to-reopen-Monday-570560991.html.

reasons.[99]  As Fayette County Clerk Don Blevins, Jr. has explained, "Most County Clerk offices will need to remain closed to the public until after the Primary election in late June," because they "simply cannot risk a member of staff contracting the virus and forcing a quarantine of all or part of an office," which would "jeopardize [their] ability to support and conduct the election."  Additionally, the Kentucky Supreme Court's orders on reopening Kentucky's judicial branch does not yet permit circuit court clerk offices to begin issuing driver's licenses.[100]

139.    Although the Governor suggested that Kentucky's number of new cases per day may have plateaued as of April 21, 2020, the total number of cases in the Commonwealth is still on the rise.[101]  And even if the current outbreak subsides over the summer, substantial evidence continues to develop about the risk of continued infections into the fall as well as the danger of a second wave of the virus.[102]

---

[99] Steve Rogers, *Fayette Circuit Clerk, Others to Remain Closed*, WTVQ (May 18, 2020), https://www.wtvq.com/2020/05/18/fayette-circuit-clerk-others-remain-closed/.

[100] Supreme Court of Ky., Order No. 2020-39 (May 15, 2020), https://kycourts.gov/courts/supreme/Rules_Procedures/202039.pdf; Supreme Court of Ky., Order No. 2020-40 (May 19, 2020), https://kycourts.gov/courts/supreme/Rules_Procedures/202040.pdf; Supreme Court of Ky., Order No. 2020-41 (May 20, 2020), https://kycourts.gov/courts/supreme/Rules_Procedures/202041.pdf.

[101] Daniel Desrochers, *COVID-19 Has 'Likely Plateaued' in Kentucky. 17 New Deaths and 177 New Cases Tuesday.*, Lexington Herald Leader (Apr. 21, 2020), https://www.kentucky.com/news/coronavirus/article242179936.html; N.Y. Times, Kentucky Coronavirus Map and Case Count (May 20, 2020), https://www.nytimes.com/interactive/2020/us/kentucky-coronavirus-cases.html.

[102] *See, e.g.*, *Matthew Impelli, What Experts Have Said About a Second Wave of Coronavirus in the U.S.*, Newsweek (Apr. 22, 2020), https://www.newsweek.com/what-experts-have-said-about-second-wave-coronavirus-us-1499501; *Dr. Anthony Fauci & CDC Director Senate Testimony Transcript May 12* at 62, 85, Rev (May 12, 2020),

### C.       Health Risks of In-Person Voting During a Pandemic

140.     As Defendants have already conceded, forcing individuals to vote in person during the COVID-19 pandemic creates a myriad of health and safety risks.  The prolonged exposure to numerous people that takes place during in-person voting can lead to transmission of the virus, putting poll workers and voters at increased risk of exposure, illness, and death.[103]

141.     Proof of the health risks associated with in-person voting is unfortunately accumulating during this primary season.  Multiple Florida poll workers tested positive for COVID-19 in the aftermath of the in-person primary election.[104]  Chicago officials have also reported that a poll worker for the city's March 17 election died of COVID-19, prompting officials to send letters notifying voters, poll workers, field investigators, and cartage companies who were present at the same polling site.[105]

---

https://www.rev.com/blog/transcripts/dr-anthony-fauci-cdc-director-senate-testimony-transcript-may-12.

[103] CDC, *Coronavirus Disease 2019 (COVID-19): Recommendations for Election Polling Locations* (Mar. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html; *see also* Doug Chapin & Lawrence Jacobs, *Conducting a Safe National Election During a Pandemic Will be Difficult*, Minneapolis Star Tribune (Apr. 3, 2020), https://www.startribune.com/conducting-a-safe-national-election-during-a-pandemic-will-be-difficult/569364552/.

[104] Kent Justice & Steve Patrick, *Duval County Poll Worker Tests Positive for Coronavirus*, News 4 Jax (Mar. 30, 2020), https://www.news4jax.com/news/local/2020/03/30/duval-county-poll-worker-tests-positive-for-coronavirus/; David Smiley & Bianca Padró Ocasio, *Florida Held Its Primary Despite Coronavirus. Two Broward Poll Workers Tested Positive*, Miami Herald (Mar. 27, 2020), https://www.miamiherald.com/news/politics-government/article241539451.html.

[105] Mary Ann Ahern, *Poll Worker at Chicago Voting Site Dies of Coronavirus, Election Officials Say*, 5 Chicago (Apr. 13, 2020),

142.     The recent primary election in Wisconsin particularly highlights the risks of voting in person during the pandemic.  In the days leading up to the election, Wisconsin election officials faced a huge backlog of requests for absentee ballots and questions about voting absentee, including how to satisfy the state's registration requirements, how to properly request an absentee ballot, and how to return it in time to be considered.  Election officials also dealt with a reduced number of poll workers due to age, fears of illness, or actual illness.  Under these circumstances, "the extent of the risk of holding [the] election ha[d] become increasingly clear" well before the day of the primary.[106]  Indeed, the likely consequences were readily apparent, including "a dramatic shortfall in the number of voters on election day as compared to recent primaries" and "a dramatic increase in the risk of cross-contamination of the coronavirus among in-person voters, poll workers and, ultimately, the general population in the State."[107]

143.     When Wisconsin proceeded to hold its election without sufficiently addressing these apparent issues, widespread disenfranchisement and electoral chaos predictably ensued.[108]  Cities in Wisconsin were forced to close polling locations, and

---

https://www.nbcchicago.com/news/local/chicago-politics/poll-worker-at-chicago-voting-site-dies-of-coronavirus-election-officials-say/2255072/.

[106] *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1638374, at *1 (W.D. Wis. Apr. 2, 2020).

[107] *Id.*

[108] Astead W. Herndon and Jim Rutenberg, *Wisconsin Election Fight Heralds a National Battle Over Virus-Era Voting*, N.Y. Times (Apr. 6, 2020), https://www.nytimes.com/2020/04/06/us/politics/wisconsin-primary-voting-coronavirus.html.

these closures impacted voters unequally.  The city of Madison had over 60 open polling sites, while in Milwaukee—a city more than twice Madison's size, with a population of roughly 600,000—only 18,803 voters cast their ballots in person, because all but five of the city's 180 polling locations had closed.[109]

144.   The result in Milwaukee was large crowds, long lines, and excessive wait times—all in the middle of a global pandemic.  As shown in the image below, these conditions made social distancing almost impossible:



[110]

---

[109] Jason Calvi, *'2Different Cities:' Milwaukee Had 5 Polling Sites During COVID-19 Election; Madison Had 60+*, Fox 6 Now (Apr. 8, 2020), https://fox6now.com/2020/04/08/2-different-cities-milwaukee-had-5-polling-sites-during-covid-19-election-madison-had-60/.

[110] David Bowen, *Wisconsin's Primary Subjected People of Color to Yet Another Covid-19 Disadvantage*, The Guardian (Apr. 8, 2020), https://www.theguardian.com/us-news/2020/apr/08/wisconsin-coronavirus-black-communities-inequality.

145.    Milwaukee was far from alone.  For example, "[t]here were also long lines in Green Bay, where the usual 31 polling sites were consolidated to just two."[111]  Some Green Bay voters waited in line for four hours, and some were unable to cast a vote until after midnight.[112]

146.    A contact-tracing analysis conducted by the Wisconsin Department of Health found that 52 persons who voted under these conditions tested positive for COVID-19, and economists have found a "statistically and economically significant association between in-person voting and the spread of COVID-19 two to three weeks after the election."[113]  Importantly, these statistics and images may represent a *mild* version of the outcome for Kentucky voters, because the risks of COVID-19 in Wisconsin's in-person primary were muted by Wisconsin's no-excuse absentee ballot laws, which enabled more than one million Wisconsin residents to vote safely from home.[114]

---

[111] Jason Calvi, *'2 Different Cities:' Milwaukee Had 5 Polling Sites During COVID-19 Election; Madison Had 60+*, Fox 6 Now (Apr. 8, 2020), https://fox6now.com/2020/04/08/2-different-cities-milwaukee-had-5-polling-sites-during-covid-19-election-madison-had-60/.

[112] *Id.*

[113] Chad D. Cotti et al., *The Relationship Between In-Person Voting, Consolidated Polling Locations, and Absentee Voting on COVID-19: Evidence from the Wisconsin Primary* at 1–2, National Bureau of Econ. Research (May 2020), https://www.nber.org/papers/w27187.pdf.

[114] Wisconsin Elections Comm'n, *I Want to Vote Absentee* (last visited May 4, 2020), https://www.elections.wi.gov/voters/absentee; Laurel White, *More Than 1M in Wisconsin Vote By Mail, But Full Election Turnout Still Unclear*, Wisconsin Pub. Radio (Apr. 8, 2020), https://www.wpr.org/more-1m-wisconsin-vote-mail-full-election-turnout-still-unclear.

147.     By contrast, the risks of voting by mail are minimal.  There is no evidence that COVID-19 can be spread through voting by mail, and the U.S. Postal Service has implemented safeguards to protect against the pandemic by "eliminat[ing] the requirement that customers sign [its] Mobile Delivery Devices for delivery" and requiring the customer "to step back a safe distance or close the screen door" when accepting delivery.[115]  Both Republican and Democratic governors have moved to expand their states' vote-by-mail schemes to encourage social distancing and avoid dangers to public health.[116]

148.     The risks posed by in-person voting will not subside by the time Kentucky holds its general election:  because of the likely resurgence of COVID-19 in the fall, Dr. Fauci recently stated that he "can't guarantee" that in-person voting will be safe in November 2020.[117]  Accordingly, more than 800 public health experts have called "on our leaders to prepare for a Presidential election by mail, in which ballots are sent to all registered voters, to allow them to vote from home and ensure their health and safety" in November 2020, because "Americans should never again be asked to choose between

---

[115] U.S. Postal Service, *Media Statement - COVID-19* (Apr. 30, 2020), https://about.usps.com/newsroom/statements/usps-statement-on-coronavirus.htm (citing guidance from World Health Organization, CDC, and Surgeon General).

[116] Grace Segers, *Calls for Increased Access to Vote-by-Mail Gain Traction Amid Coronavirus Pandemic*, CBS News (Apr. 22, 2020), https://www.cbsnews.com/news/vote-by-mail-gains-traction-coronavirus-pandemic/.

[117] Jason Silverstein, *Fauci Says He "Can't Guarantee" In-Person Voting in November Will Be Safe*, CBS NEWS (Apr. 13, 2020), https://www.cbsnews.com/news/coronavirus-fauci-says-he-cant-guarantee-in-person-voting-in-november-will-be-safe/.

performing one of the most hallowed obligations and privileges of citizenship—voting

for our representatives at the local, state and federal levels—and our health."[118]

149.    The health risks of in-person voting are especially severe for certain

categories of voters:  voters with underlying medical conditions, Black voters, older

voters, and voters with disabilities.

### i.    Voters with Underlying Medical Conditions

150.    Kentucky's current Excuse Requirement will disproportionately burden

voters with certain underlying medical conditions, who face heightened risks from

contracting COVID-19.

151.    "Based on currently available information and clinical expertise," the CDC

has warned that "people of any age who have serious underlying medical conditions

might be at higher risk for severe illness from COVID-19."  The CDC has identified

certain conditions that are likely to exacerbate the impact of COVID-19, including

asthma, chronic lung disease, diabetes, serious heart conditions, chronic kidney disease

being treated with dialysis, severe obesity, liver disease, immune deficiencies, and a

myriad of other conditions that compromise an individual's immune system.[119]

Plaintiffs Michael Collins, Jeffrey Cosby, Thela Elliott, Gracie Lewis, DeJuan Nash,

Tiffany Price, and members of the plaintiff organizations suffer from one or more of

---

[118] Sam Hananel, *RELEASE: More Than 800 Public Health Experts Urge Congress To Fund Vote by Mail in November*, Center for American Progress (May 5, 2020), https://www.americanprogress.org/press/release/2020/05/05/484590/release-800-public-health-experts-urge-congress-fund-vote-mail-november/.

[119] CDC, *Coronavirus Disease 2019 (COVID-19): At Risk for Severe Illness* (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

these underlying medical conditions that increase their risk of serious illness from COVID-19.

152.    A study of COVID-19 patients in China discovered that "people infected with the coronavirus who were already coping with a chronic condition were 1.8 times more likely to have a 'poor outcome,' such as being put on a ventilator or dying, than those with no underlying conditions," and that "those with two chronic conditions were at 2.6 greater risk."[120]

153.    This data shows that COVID-19 poses a special threat to people with asthma, diabetes, or other common and treatable conditions who would not be normally considered homebound because of illness, many of whom would not qualify to vote by mail-in absentee ballot under the Excuse Requirement.  As the President has stated, "This is a very advanced — this is a very horrible thing we're fighting. . . . [I]f you have any problem — heart, diabetes, even a little weak heart, a little diabetes, a little — this thing is vicious, and it can take you out, and it can take you out very strongly."[121]

154.    "An estimated 60 percent of all Americans have at least one chronic health condition, and 40 percent have more than one."[122]  And "Kentucky leads the nation in

---

[120] Roni Caryn Rabin, *Coronavirus Threatens Americans With Underlying Conditions*, N.Y. Times (Mar. 14, 2020), https://www.nytimes.com/2020/03/12/health/coronavirus-midlife-conditions.html.

[121] White House, *Remarks by President Trump in a Fox News Virtual Town Hall* (May 4, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-fox-news-virtual-town-hall/.

[122] Roni Caryn Rabin, *Coronavirus Threatens Americans With Underlying Conditions*, N.Y. Times (Mar. 14, 2020), https://www.nytimes.com/2020/03/12/health/coronavirus-midlife-conditions.html.

several indicators of the burden of chronic disease.  Kentucky has the highest rate of new cases and deaths from lung cancer in the nation[,] the 3rd highest adult obesity rate, and Kentucky ranks 4th highest in current adult asthma prevalence."[123]

155.    Because of these increased risks to their health and safety, Kentucky voters with any of these conditions would face especially severe burdens if forced to choose between potential exposure to the virus and their constitutional right to vote.

### ii.    Black Voters

156.    Kentucky's current Excuse Requirement will disproportionately burden Black voters, who face heightened risks from contracting COVID-19 because of disparities in health and health care that raise the stakes for them at every step of the process.

157.    *First*, Black voters face a greater risk of contracting the virus on their way to the polls.  Black Americans are less likely to own cars than any other demographic of Americans,[124] and they "represent about one-quarter of all public transit users."[125]

---

[123] Ky. Cabinet for Health & Family Services, Chronic Disease Prevention Branch, *Unbridled Health: A Plan for Coordinated Chronic Disease Prevention and Health Promotion* (Nov. 2013), https://chfs.ky.gov/agencies/dph/dpqi/cdpb/Documents/UnbridledHealthPlanNovember2013.pdf ("With statistics such as these, it is likely that every Kentuckian has a family member, friend or coworker that has been affected by chronic disease.").

[124] Jamelle Bouie, *Why Coronavirus Is Killing African-Americans More Than Others*, N.Y. Times (Apr. 14, 2020), https://www.nytimes.com/2020/04/14/opinion/sunday/coronavirus-racism-african-americans.html; National Equity Atlas, *Car Equity* (2015), https://nationalequityatlas.org/indicators/Car_access.

[125] Rashawn Ray, *Why Are Blacks Dying at Higher Rates from COVID-19?*, Brookings (Apr. 9, 2020), https://www.brookings.edu/blog/fixgov/2020/04/09/why-are-blacks-dying-at-higher-rates-from-covid-19/.

Additionally, Black people with low income more often face "driver's license suspensions because they cannot pay fines and fees charged for minor violations such as traffic and parking tickets," which similarly leaves them "dependent on friends or public transportation, unable to practice the social distancing recommended by the CDC and the World Health Organization."[126]  Often, without access to private transportation, Black voters face additional risks of contact with exposed individuals in close quarters on public transportation when en route to their polling places.  Plaintiffs Michael Collins, Thela Elliott, Gracie Lewis, Tiffany Price, and members and/or clients of the plaintiff organizations do not own cars, and they are therefore exposed to these additional risks of contracting COVID-19 on their way to the polls.

158.    *Second*, Black voters are disproportionately burdened by long lines at the polls.  Maintaining the Excuse Requirement will result in long lines, an inability to practice adequate social distancing, and decreases in polling places and poll workers.[127] For Black voters, these problems are exacerbated by existing racial disparities in wait times:  a recent study based on data from millions of smartphone users during the 2016 presidential election found that residents of entirely-Black neighborhoods waited 29% longer to vote and were 74% more likely to spend more than 30 minutes at their polling

---

[126] ReNika Moore, *If COVID-19 Doesn't Discriminate, Then Why Are Black People Dying at Higher Rates?*, ACLU (Apr 8, 2020), https://www.aclu.org/news/racial-justice/if-covid-19-doesnt-discriminate-then-why-are-black-people-dying-at-higher-rates/.

[127] *See supra* ¶¶ 112–18.

place than residents of all-white neighborhoods.[128]  And Black voters can least afford

unnecessarily long wait times as the price to pay for voting, because Black people are

"more likely to be working in jobs without flexibility or paid sick leave," which means

any delays at the polls disproportionately threaten their job security.[129]

159.    *Third*, if Black voters contract the virus while voting in person, they are

more likely to suffer serious and even deadly consequences, because they

disproportionately suffer from the underlying medical conditions that exacerbate the

virus.[130]  Decades of research, statements from public health experts, and data from the

U.S. Department of Health and Human Services all reflect that Black Americans have

disproportionately high rates of asthma, diabetes, high blood pressure, and obesity.[131]

---

[128] M. Keith Chen et al., *Racial Disparities in Voting Wait Times: Evidence from Smartphone Data* (Nov. 14, 2019),
https://www.kareemhaggag.com/f/Racial_Disparities_in_Voting_Wait_Times.pdf.

[129] Laura Williamson, *How to Build a Racially Inclusive Democracy During COVID-19 and Beyond*, Demos (Apr. 28, 2020), https://www.demos.org/policy-briefs/how-build-racially-inclusive-democracy-during-covid-19-and-beyond; Lonnie Golden, *Limited Access: Disparities in Flexible Work Schedules and Work-at-Home*, 29 J. Family & Econ. Issues 86–109 (2008).

[130] Linda Villarosa, *'A Terrible Price': The Deadly Racial Disparities of COVID-19 in America*, N.Y. Times (Apr. 29, 2020),
https://www.nytimes.com/2020/04/29/magazine/racial-disparities-covid-19.html (describing studies explaining how historic and present-day factors—such as "environmental inequality" and "the physiological ramifications of an atmosphere of bias and discrimination"—have led to higher rates of poor health outcomes for Black Americans).

[131] Office of Minority Health, *Profile: Black/African Americans*, U.S. Dep't of Health & Hum. Servs. (Aug. 22, 2019),
https://minorityhealth.hhs.gov/omh/browse.aspx?lvl=3&lvlID=61; *see also* Joseph P. Williams, *Rumor, Disparity and Distrust: Why Black Americans Face an Uphill Battle Against COVID-19*, U.S. News & World Report (Mar. 25, 2020),
https://www.usnews.com/news/healthiest-communities/articles/2020-03-25/why-black-americans-face-an-uphill-battle-against-the-coronavirus; Lisa B. Signorello et al.,

The CDC has cited racial disparities in these underlying medical conditions as a factor that influences the disproportionate impact of COVID-19 on the Black community.[132]

160.    Dr. Georges E. Benjamin, executive director of the American Public Health Association and emergency medicine physician, has explained that these disparities gave public health leaders concern about the impact on Black communities from the time of the earliest reports of the virus:  "You had early evidence from Asia that showed that older folks, older than 60 or 65, with chronic disease would do worse when they got the infection.  So when you put that together with the understanding that in this country you already have a [Black] population disproportionately affected by disparities in things like diabetes, heart disease and asthma, we understood that if those populations got infected they would be more at risk."[133]

---

*Comparing Diabetes Prevalence Between African Americans and Whites of Similar Socioeconomic Status*, 97(12) Am. J. Pub Health 2260–2267 (Dec. 2007) ("Prevailing statistics suggest that African American adults are 50% to 100% more likely to have diabetes than are Whites.").

[132] CDC, *Coronavirus Disease 2019 (COVID-19): Racial and Ethnic Minority Groups* (last updated Apr. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (citing A.P. Bartel et al., *Racial and Ethnic Disparities in Access to and Use of Paid Family and Medical Leave: Evidence from Four Nationally Representative Datasets,* U.S. Bureau of Labor Statistics (Jan. 2019); T.J. Cunningham et al., *Vital Signs: Racial Disparities in Age-Specific Mortality Among Blacks or African Americans—United States, 1999–2015*, 66(17) Morbidity and Mortality Weekly Report 444 (2017)); *see also* Ibram X. Kendi, *Stop Blaming Black People for Dying of the Coronavirus*, The Atlantic (Apr. 14, 2020), https://www.theatlantic.com/ideas/archive/2020/04/race-and-blame/609946/ ("Without question, African Americans suffer disproportionately from chronic diseases such as hypertension, cardiovascular disease, diabetes, lung disease, obesity, and asthma, which make it harder for them to survive COVID-19.").

[133] Elizabeth Thomas & Dr. Nancy A. Anoruo, *Coronavirus is Disproportionately Killing the Black Community. Here's What Experts Say Can Be Done About It*, ABC News (Apr.

161.    Dr. Fauci spoke about these health disparities during a White House Coronavirus Task Force briefing,[134] explaining that Black Americans' increased likelihood of underlying medical conditions "wind them up in the ICU and ultimately give them a higher death rate."[135]  This risk has already manifested in Kentucky, where "Black patients in Fayette County have a higher rate of hospitalization than white patients."[136]

162.    *Fourth*, if Black voters contract the virus while voting in person, they are also more likely to suffer serious consequences because of inequalities in our health care system.  Numerous studies conducted by the American Journal of Public Health, the Agency for Healthcare Research and Quality, and other organizations over the past few decades indicate that Black people are less likely to have insurance and access to

---

9, 2020), https://abcnews.go.com/Politics/coronavirus-disproportionately-killing-black-community-experts/story?id=70011986.

[134] Rashawn Ray, *Why Are Blacks Dying at Higher Rates from COVID-19?*, Brookings (Apr. 9, 2020), https://www.brookings.edu/blog/fixgov/2020/04/09/why-are-blacks-dying-at-higher-rates-from-covid-19/ ("Health disparities have always existed for the African American community," Fauci stated, and COVID-19 is "shining a bright light on how unacceptable that is because, yet again, when you have a situation like the coronavirus, they are suffering disproportionately.").

[135] Elizabeth Thomas & Dr. Nancy A. Anoruo, *Coronavirus is Disproportionately Killing the Black Community. Here's What Experts Say Can Be Done About It*, ABC News (Apr. 9, 2020), https://abcnews.go.com/Politics/coronavirus-disproportionately-killing-black-community-experts/story?id=70011986.

[136] Beth Musgrave, *Black Fayette County Patients More Likely to Be Hospitalized from Coronavirus*, Lexington Herald Leader (Apr. 7, 2020), https://www.kentucky.com/news/coronavirus/article241833116.html ("Approximately 30 percent of all blacks testing positive have had to be hospitalized with only 12 percent of whites who have tested positive have needed inpatient treatment, the data shows.  Of the 31 patients hospitalized, more than half are black.").

affordable medical testing.[137]  The CDC has cited "barriers to getting health care,"

including lack of health insurance coverage, as one factor that "might make members of

many racial and ethnic minority groups especially vulnerable in public health

emergencies like outbreaks of COVID-19."[138]  Additionally, "[r]esearch indicates African

Americans are more likely than whites to rely on hospital emergency rooms for primary

care – departments that soon may be overwhelmed with anticipated surges of COVID-19

patients."[139]  And some studies have shown that, even when Black people can obtain

health care, they receive unequal quality of care.[140]

---

[137] Elizabeth Thomas & Dr. Nancy A. Anoruo, *Coronavirus is Disproportionately Killing the Black Community. Here's What Experts Say Can Be Done About It*, ABC News (Apr. 9, 2020), https://abcnews.go.com/Politics/coronavirus-disproportionately-killing-black-community-experts/story?id=70011986; Kenya Evelyn, *'It's a Racial Justice Issue': Black Americans Are Dying in Greater Numbers from Covid-19*, The Guardian (Apr 8, 2020) https://www.theguardian.com/world/2020/apr/08/its-a-racial-justice-issue-black-americans-are-dying-in-greater-numbers-from-covid-19 ("African Americans are twice as likely to lack health insurance compared with their white counterparts, and more likely to live in medically underserved areas, where primary care is sparse or expensive.").

[138] CDC, *Coronavirus Disease 2019 (COVID-19): Racial and Ethnic Minority Groups* (last updated Apr. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html.

[139] Joseph P. Williams, *Rumor, Disparity and Distrust: Why Black Americans Face an Uphill Battle Against COVID-19*, U.S. News & World Report (Mar. 25, 2020), https://www.usnews.com/news/healthiest-communities/articles/2020-03-25/why-black-americans-face-an-uphill-battle-against-the-coronavirus (citing Dr. Lisa Cooper, internist and social epidemiologist with Johns Hopkins Bloomberg School of Public Health).

[140] Linda Villarosa, *'A Terrible Price': The Deadly Racial Disparities of COVID-19 in America*, N.Y. Times (Apr. 29, 2020), https://www.nytimes.com/2020/04/29/magazine/racial-disparities-covid-19.html ("In 2003, the National Academy of Sciences documented the effects of bias in the medical system in a report that laid out the facts in damning detail.  "Unequal Treatment: Confronting Racial and Ethnic Disparities in Health Care" examined 480 previous studies and found that in every medical intervention, black people and other people of color received poorer-quality care than

163.    *Fifth*, if Black voters contract the virus while voting in person, they also face increased risks of spreading the virus to their loved ones and community.  As discussed above, Black voters are more likely to rely on public transportation,[141] and Black voters are more likely to live in "subpar neighborhoods [that] are rooted in the historical legacy of redlining" and in "densely populated areas, further heightening their potential contact with other people."[142]  Dr. Sarah Moyer, Louisville's public health strategist, has echoed these concerns for Black Kentuckians, explaining that "[p]eople of

---

white people, even when income and insurance were equal.  This unequal treatment in the health care system persists today in numerous studies . . ."); Elizabeth Thomas & Dr. Nancy A. Anoruo, *Coronavirus is Disproportionately Killing the Black Community. Here's What Experts Say Can Be Done About It*, ABC News (Apr. 9, 2020), https://abcnews.go.com/Politics/coronavirus-disproportionately-killing-black-community-experts/story?id=70011986 ("Studies looking at manifestations of racial bias within the health care system have found black patients are sometimes treated differently than whites, leading to things such as undertreatment of pain and racial differences in what treatment is offered for a heart attack."); Kenya Evelyn, *'It's a Racial Justice Issue': Black Americans Are Dying in Greater Numbers from Covid-19*, The Guardian (Apr 8, 2020) https://www.theguardian.com/world/2020/apr/08/its-a-racial-justice-issue-black-americans-are-dying-in-greater-numbers-from-covid-19 ("Unconscious racial bias can also contribute to unequal health outcomes, especially when health professionals are inexperienced with the culture of the community they serve, according to the Journal of General Internal Medicine.  The Century Foundation found that healthcare providers located within majority African American or Latinx neighborhoods tend to provide lower-quality care."); Michael O. Schroeder, *Racial Bias in Medicine Leads to Worse Care for Minorities*, U.S. News & World Report (Feb. 11, 2016), https://health.usnews.com/health-news/patient-advice/articles/2016-02-11/racial-bias-in-medicine-leads-to-worse-care-for-minorities.

[141] *See supra* ¶ 129.

[142] Rashawn Ray, *Why Are Blacks Dying at Higher Rates from COVID-19?*, Brookings (Apr. 9, 2020), https://www.brookings.edu/blog/fixgov/2020/04/09/why-are-blacks-dying-at-higher-rates-from-covid-19/.

color are more likely than white counterparts to live in densely populated settings" and "rely on public transportation," which "makes it easier for COVID to spread."[143]

164.    These risks, both individually and collectively, demonstrate that in-person voting imposes an especially severe burden on Black voters.  As highlighted by the preceding paragraphs, racial disparities in serious illness and death due to COVID-19 are inextricably linked to a long history and ongoing patterns of racial discrimination against African Americans.[144]  "Essentially, inequality in all facets of American society appears to have set up black Americans to bear the brunt of this crisis."[145]

165.    These systemic failures help to explain why COVID-19 is currently ravaging Black communities in Kentucky and nationwide.  As the CDC has noted, "[h]istory shows that severe illness and death rates tend to be higher for racial and ethnic minority groups during public health emergencies," and COVID-19 data demonstrates that the same is true of the current pandemic.[146]  Demographic data

---

[143] Jon Hale, *Kentucky Forms Regional Partnership, African American COVID-19 Deaths Rise in Louisville*, Louisville Courier Journal (Apr. 15, 2020), https://www.courier-journal.com/story/news/2020/04/15/coronavirus-kentucky-politics-heats-up-despite-beshears-stance/5136206002/.

[144] Associated Press, *Outcry Over Racial Data Grows as Virus Slams Black Americans*, PBS (Apr. 8, 2020), https://www.pbs.org/newshour/health/outcry-over-racial-data-grows-as-virus-slams-black-americans.

[145] Anna North, *Every Aspect of the Coronavirus Pandemic Exposes America's Devastating Inequalities*, Vox (Apr. 10, 2020), https://www.vox.com/2020/4/10/21207520/coronavirus-deaths-economy-layoffs-inequality-covid-pandemic.

[146] CDC, *Coronavirus Disease 2019 (COVID-19): Racial and Ethnic Minority Groups* (last updated Apr. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (citing N. Dash, "Race and Ethnicity" in *Social Vulnerability to Disasters* at 113–28 (2d ed. 2013)); *see also* Ibram X. Kendi, *Stop Blaming Black People for Dying of the Coronavirus*, The Atlantic (Apr. 14, 2020),

reported by the CDC on the number of COVID-19 cases for which race was available

nationwide (49.2% of the 1,327,267 cases analyzed) shows that Black people make up

26.3% of the reported COVID-19 cases, although they only make up 13.4% of the total

U.S. population.[147]  And although only 8.3% of the Kentucky population is Black, 14.61%

of Kentuckians who have died from COVID-19 have been Black.[148]

166.    These statistics are even more outsized in some counties—data from the

Lexington-Fayette County Health Department demonstrates that, as of early April,

Black people comprised roughly 30% of the county's more than 188 coronavirus

patients, though only 15% of the county's population is Black.[149]  Lexington and Fayette

---

https://www.theatlantic.com/ideas/archive/2020/04/race-and-blame/609946/ ("A
Washington Post analysis found that majority-black counties had infection rates three
times the rate of majority-white counties. A Centers for Disease Control and Prevention
analysis of nearly 1,500 hospitalizations across 14 states found that black people made
up a third of the hospitalizations, despite accounting for 18 percent of the population in
the areas studied. An Associated Press analysis of available death data found that black
people constituted 42 percent of the victims, doubling their share of the populations of
the states the analysis included.").

[147] CDC, *Coronavirus Disease 2019 (COVID-19): Cases in the US* (last updated May 26,
2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html;
U.S. Census Bureau, *Quick Facts*,
https://www.census.gov/quickfacts/fact/table/US/PST045218 (last visited May 20,
2020).

[148] Beth Musgrave, *COVID-19 Has Hit Kentucky, Lexington's Black Population
Especially Hard. Why?*, Lexington Herald Leader (Apr 9, 2020),
https://www.kentucky.com/news/local/counties/fayette-
county/article241884161.html; Ky. Dep't of Pub. Health, *Kentucky Coronavirus
Monitoring* (last updated May 26, 2020 at 5:00 P.M. E.T.),
https://govstatus.egov.com/kycovid19.

[149] Beth Musgrave, *COVID-19 Has Hit Kentucky, Lexington's Black Population
Especially Hard. Why?*, Lexington Herald Leader (Apr 9, 2020),
https://www.kentucky.com/news/local/counties/fayette-
county/article241884161.html.

County do not stand alone—data from cities within this District, including Louisville, demonstrate a disproportionate impact on Black residents as well.  "Black people made up 23.5% of [Louisville]'s population in 2019, according to U.S. Census data," but in April, Black Louisville residents "ma[d]e up 31% of the city's coronavirus patients and 34% of the deaths."[150]

### iii.  Older Voters

167.   Kentucky's current Excuse Requirement will disproportionately burden older voters and poll workers, who face heightened risks from contracting COVID-19.

168.   Kentucky does not provide a blanket excuse for residents to vote by mail-in absentee ballot if they have reached a certain age.  Rather, Kentucky's current Excuse Requirement only permits older voters to vote by mail-in absentee ballot if they are "[n]ot able to appear at the polls on election day on the account of age."[151]  Many older voters who want to stay home because they face health risks associated with COVID-19 would otherwise be *able to appear* at the polls on Election Day, so they are currently forbidden from voting safely from home.

169.   If older voters contract the virus while voting in person, they are more likely to suffer serious and even deadly consequences.  The CDC has warned that "[p]eople aged 65 years and older" are at higher risk for severe illness and death from

---

[150] Jon Hale, *Kentucky Forms Regional Partnership, African American COVID-19 Deaths Rise in Louisville*, Louisville Courier Journal (Apr. 15, 2020), https://www.courier-journal.com/story/news/2020/04/15/coronavirus-kentucky-politics-heats-up-despite-beshears-stance/5136206002/.

[151] Ky. Rev. Stat. § 117.085(1)(a)(8).

COVID-19, because "[t]he immune systems of older adults weaken with age, making it harder to fight off infections," and "older adults commonly have chronic diseases that can increase the risk of severe illness from COVID-19." Thus, "the older you are, the higher your risk of serious disease."[152]

170.    Plaintiff Gracie Lewis and members and/or clients of the plaintiff organizations are over the age of 65 and therefore have an increased risk of serious illness from COVID-19.

171.    Studies reveal that the death rate associated with the virus increases significantly with age:  a large study of COVID-19 patients in China showed that the virus killed 1.3% of patients between the ages of 50 and 59, 3.6% of patients between the ages of 60 and 69, 8% of patients between the ages of 70 and 79, and 15% of patients ages 80 and older.[153]

172.    The virus is already having a devastating impact on elderly individuals in Kentucky.  More than 42% of Kentuckians who have contracted COVID-19 are ages 50 and older, and that same age group represents over 97% of Kentucky's confirmed deaths.[154]

---

[152] CDC, *Coronavirus Disease 2019 (COVID-19): At Risk for Severe Illness* (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[153] Roni Caryn Rabin, *Coronavirus Threatens Americans With Underlying Conditions*, N.Y. Times (Mar. 14, 2020), https://www.nytimes.com/2020/03/12/health/coronavirus-midlife-conditions.html.

[154] Ky. Dep't of Pub. Health, *Kentucky Coronavirus Monitoring* (last updated May 26, 2020 at 5:00 P.M. E.T.), https://govstatus.egov.com/kycovid19.

173.    If older voters contract the virus while voting in person, they also face increased risks of spreading the virus to their loved ones and community, because they are more likely to require in-person care or assistance.  The CDC has warned that the "communal nature of nursing homes and long-term care facilities, and the population served (generally older adults often with underlying medical conditions), put those living in nursing homes at higher risk of infection and severe illness from COVID-19."[155] The impact of COVID-19 in Kentucky nursing homes serves as a stark example:  to date, more than 54% of the total confirmed COVID-19 deaths in Kentucky have been residents of nursing homes.[156]

174.    These same risks will also impact many older poll workers, who make up a large proportion of election officials.  "In the 2018 general election, around six-in-ten U.S. poll workers (58%) were ages 61 and older, including roughly a quarter (27%) who were over 70."[157]

175.    Maintaining the Excuse Requirement will also result in long lines, an inability to practice adequate social distancing, and decreases in polling places and poll

---

[155] CDC, *Coronavirus Disease 2019 (COVID-19): At Risk for Severe Illness* (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[156] Ky. Cabinet for Health & Family Servs., *Long-Term Care and Other Congregate Facilities Update* (last updated May 23, 2020), https://chfs.ky.gov/agencies/dph/covid19/ LTCupdate.pdf; Ky. Dep't of Pub. Health, *Kentucky Coronavirus Monitoring* (May 23, 2020), https://govstatus.egov.com/kycovid19.

[157] Michael Barthel & Galen Stocking, *Older People Account for Large Shares of Poll Workers and Voters in U.S. General Elections*, Pew Research Center (Apr. 6, 2020), https://www.pewresearch.org/fact-tank/2020/04/06/older-people-account-for-large-shares-of-poll-workers-and-voters-in-u-s-general-elections/.

workers.[158]  These conditions, taken together, will subject older voters and poll workers to a serious risk of infection at their polling places—and, with it, a greater risk of illness. Consequently, upholding the Excuse Requirement necessitates that older voters and poll workers either place themselves in harm's way, or stay home and forego their right to vote.

### iv.   Voters with Disabilities

176.   Kentucky's current Excuse Requirement will disproportionately burden voters with certain disabilities, especially those who need to vote in person during the pandemic.

177.   Voters with certain disabilities face an unreasonable risk of contracting COVID-19 at the polls or on their way to polling locations.  Many voters with disabilities are unable to drive to the polls and will therefore need to share transportation to the polls with other drivers or passengers, which increases their risk of exposure to COVID-19.  "Many people with disabilities cannot mark paper ballots without assistance, so they rely on special voting machines" with features like touch screens, other manual input devices, and earphones to vote,[159] any of which could carry the COVID-19 virus from previous users and poll workers.[160]  Additionally, social distancing practices are more

---

[158] *See supra* ¶¶ 112–18.

[159] Matt Vasilogambros, *How Voters With Disabilities Are Blocked From the Ballot Box*, Pew Research Center(Feb. 21, 2018), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2018/02/01/how-voters-with-disabilities-are-blocked-from-the-ballot-box.

[160] CDC, *Coronavirus Disease 2019 (COVID-19): How It Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (noting that while the virus spreads most easily from person-to-person, it

difficult for voters with certain disabilities—for example, voters who are blind or have limited vision cannot see visual markers on the ground instructing voters to line up six feet apart from each other.

178.    These difficulties are compounded by the fact that an inability to use paper ballots without assistance forecloses many voters with disabilities from voting by mail.[161]  Because many voters with disabilities are unable to submit mail-in absentee ballots without assistance or accommodations, they will continue to need to vote in person during the pandemic, despite the risks posed by in-person voting.

179.    Making polling places as safe as possible for voters who need to vote in person is vitally important.  Eliminating the Excuse Requirement would make voting significantly less risky for people with certain disabilities who need to vote in person by reducing the total number of people at the polls—which, in turn, reduces the number of interactions with other voters, the number of people touching the voting equipment, and the overall chance of transmission.

180.    Instead, Kentucky's maintenance of the Excuse Requirement will unnecessarily bring thousands of people out to the polls, needlessly increasing the risk of transmission:  larger crowds will result in exposure to more people, and longer lines

---

"may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes") (last visited May 21, 2020).

[161] Matt Vasilogambros, *How Voters With Disabilities Are Blocked From the Ballot Box*, Pew Research Center (Feb. 21, 2018), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2018/02/01/how-voters-with-disabilities-are-blocked-from-the-ballot-box.

will result in prolonged exposure, both of which place voters with certain disabilities at increased risk of contracting the virus.

181.    In addition to unreasonably burdening voters with disabilities who need to vote in person in the general election in November 2020, Kentucky's maintenance of the Excuse Requirement will likely dissuade some voters with disabilities from voting altogether, such as people whose disabilities serve as comorbidities for COVID-19, people whose disabilities make social distancing more difficult, and people whose physical disabilities make them unable to stand in long lines at the polls.

## II.    Kentucky's Current Election Laws Unduly and Unreasonably Burden the Voting Rights of Kentuckians.

### A.    Kentucky Election Law

#### i.    Excuse Requirement to Vote by Mail-In Absentee Ballot

182.    Kentucky is an excuse-required absentee voting state, which means that Kentucky law limits the availability of voting by mail to eight specific categories of voters with qualifying excuses.  Those eight categories of voters with qualifying excuses are:

- eligible uniformed-service voters or overseas voters registered to vote in Kentucky;

- students temporarily residing outside their county of residence;

- incarcerated voters charged with a crime who have not yet been convicted;

- voters who have changed their place of residence to a state other than Kentucky after the deadline to register to vote in their new state of residence has passed;

- Kentuckians temporarily outside the state but still eligible to vote;

- voters whose employment requires the voter to be outside the county of residence on all hours and all days of in-person absentee voting;

- participants in the Secretary of State's crime victim address confidentiality protection program; and

- those who are "[n]ot able to appear at the polls on election day on the account of age, disability, or illness," and have not been declared mentally disabled by a court of competent jurisdiction.[162]

183.    Additionally, for voters experiencing a "medical emergency" within "fourteen (14) days or less of an election," the affected registered voter and their spouse "may apply for an absentee ballot." The application "shall be notarized" and "shall state that the emergency condition occurred within the fourteen (14) day period."[163]

184.    Defendants have already demonstrated that they have the power to construe the "medical emergency" excuse to include valid concerns regarding the risk of contracting COVID-19. For the purposes of other elections, including the general election in November 2020, however, Defendants have not agreed to allow such a basis to satisfy the Excuse Requirement, and none of the existing excuses have been construed to include voters who have valid concerns about the risk of contracting COVID-19 either when voting, satisfying the photo ID requirement, or executing a voter affirmation.[164]

185.    In Kentucky, individuals may only vote by mail-in absentee ballot if (1) one of the above excuses applies to them, and (2) they submit a timely application for an

---

[162] Ky. Rev. Stat. § 117.085.

[163] Ky. Rev. Stat. § 117.077.

[164] Letter from Sec'y of State Adams to Governor Beshear (Apr. 23, 2020), https://governor.ky.gov/attachments/20200423_Ltr-from-Sec-of-State-Adams.pdf (defining "medical emergency" to include "a reasonable fear of infection or transmission during a state of public health emergency declared by the Governor," but only for the June primary election); Ky. Bd. of Elections, *Procedures for June 23, 2020 Election*, 31 Ky. Admin. Regs. 4:190E (2020).

absentee ballot to the county clerk that states the voter's qualifying excuse.  The county clerk must receive the voter's completed application no later than seven days before the election.[165]

186.    A qualified voter may request an application for an absentee ballot by telephone, facsimile machine, mail, electronic mail, or in person.  Once requested, the county clerk will then transmit applications back to the voter by mail, electronic mail, or in person if the voter so chooses.  An absentee ballot may be requested by the voter or the voter's spouse, parents, or children, but may only be used by the voter.  The voter must sign and verify the application.[166]

### ii.    Photo ID Law

187.    S.B. 2's key provisions add a photo ID requirement, subject to certain exceptions, to those seeking to vote in person or applying to vote by mail-in absentee ballot.[167]

188.    Valid identification, as defined by Section 23 of S.B. 2, means a document that was issued by:

(a) The United States or the Commonwealth of Kentucky . . . [;]

(b) The United States Department of Defense, a branch of the uniformed services, the Merchant Marines, or the Kentucky National Guard . . . [;]

(c) A public or private college, university, or postgraduate technical or professional school located within the United States . . . [;] or

---

[165] Ky. Rev. Stat. § 117.085(1)(a), 2.

[166] Ky. Rev. Stat. § 117.085(1),(2).

[167] *See generally* S.B. 2.

(d) Any city government, county government, or urban-county government, charter county government, consolidated local government, or unified local government, which is located within this state . . . [.][168]

The ID must also contain the name and photograph of the individual to whom the document was issued.[169]

189.    S.B. 2 states that if a voter is unable to provide a photo ID on Election Day or when voting absentee in person, the voter may still cast a ballot if the person:  "(a) [i]s eligible to vote under KRS 116.025; (b) [i]s entitled to vote in that precinct; and (c) **[i]n the presence of an election officer,** executes a voter affirmation" on a form furnished by the Kentucky Board of Elections.[170]  Voters unable to provide a photo ID must also provide certain non-photo identification documents, such as the voter's social security card or credit card with the voter's name on it.[171]

190.    To execute the voter affirmation required by S.B. 2, the voter must affirm, under penalty of perjury, various aspects of their identity and qualifications to vote, as well as confirm that one of eight possible "impediments" prevents them from procuring a photo ID (the "Impediment Requirement").[172]  The eight impediments enumerated in S.B. 2 are:  (a) lack of transportation; (b) inability to obtain their birth certificate or other documents needed to show proof of identification; (c) work schedule; (d) lost or stolen identification; (e) disability or illness; (f) family responsibilities; (g) the proof of

---

[168] S.B. 2 § 23(12).

[169] *Id.*

[170] S.B. 2 § 1(1) (emphasis added).

[171] S.B. 2 § 1(2).

[172] S.B. 2 § 1(1)(c).

identification has been applied for, but not yet received; or (h) the voter has a religious objection to being photographed.[173]

191.    The Impediment Requirement does not provide a basis for excusing the requirements of the Photo ID Law for in-person voting if the COVID-19 pandemic prevents a voter from procuring a copy of their photo ID.

192.    S.B. 2's identification requirements of either presenting photo ID or in-person execution of a voter affirmation also extend to those applying for a mail-in absentee ballot.[174]

193.    S.B. 2 imposes a photo ID requirement for the absentee ballot application, stating that "the voter shall provide a copy of his or her proof of identification" or an "executed voter affirmation" in the voter's mail-in absentee ballot application.[175]  The Kentucky Board of Elections must provide "an instructional statement prescribing the requirements for providing a copy of the voter's proof of identification or voter affirmation when applicable" as part of the mail-in absentee ballot application form transmitted by the county clerk to the voter.[176]

194.    If a voter is able to provide a photo ID, the voter must submit a copy of their photo ID with the ballot application.[177]

---

[173] *Id.*

[174] *See* S.B. 2 § 5(2).

[175] *Id.*

[176] *Id.*

[177] *Id.*

195.     If a voter is unable to provide a photo ID, the voter's mail-in absentee ballot application must include an executed voter affirmation that (a) indicates which of the qualifying impediments is preventing them from procuring a photo ID, consistent with the Impediment Requirement,[178] and (b) affirms the following:

- that "[t]he voter is a citizen of the United States";

- "[t]he voter's date of birth";

- that "[t]he voter is qualified to vote in" the relevant precinct;

- "[t]he voter's name";

- that "[t]he voter has not voted and will not vote in any other precinct";

- "[t]he voter's current residential address"; and

- that "[t]he voter understands that making a false statement on the affirmation is punishable under penalties of perjury."[179]

196.     The Impediment Requirement does not provide a basis for excusing the photo ID requirement for mail-in absentee ballot applications if the COVID-19 pandemic prevents the voter from procuring a copy of their photo ID.

### iii.     Modifications for Primary Election

197.     In light of the danger posed by COVID-19, Kentucky officials recently enacted important modifications for the upcoming primary election.[180]  The emergency

---

[178] *See supra* ¶ 162.

[179] S.B. 2 § 1(1)(c); S.B. 2 § 5(2).

[180] Ky. Sec'y of State, *Approval of Procedures Established for Election During State of Emergency*, Exec. Order 2020-01 (May 1, 2020), https://www.sos.ky.gov/elections/Documents/5-1-2020%20EO.pdf; Ky. Office of the Governor, *State of Emergency Relating to Kentucky Elections*, Exec. Order No. 2020-311 (May 1, 2020),

regulations passed by the Kentucky Board of Elections—which are based on the recommendations of the Secretary of State and the Governor's executive order—explain that these measures "will benefit the entirety of the Commonwealth," because they "will allow for the conduction of elections that minimize the health-risk of all involved during the ongoing state of emergency related to the COVID-19 pandemic."[181]

198.    Kentucky election laws that "directly conflict" with the Secretary of State's recommendation, the Governor's executive order, or the Kentucky Board of Election's emergency regulations are temporarily displaced by the emergency regulations for the primary election on June 23, 2020.[182]

199.    The emergency regulations extend the option to vote absentee to all voters by defining the term "medical emergency" from Ky. Rev. Stat. § 117.077 as "a reasonable fear of infection or transmission during a state of public health emergency declared by the Governor."[183]

200.    Further, it states that the medical emergency absentee ballot application for the primary election "a) shall not require the applicant to state that the emergency condition occurred within 14 days of the election, b) need not be notarized, and c) shall

---

http://apps.sos.ky.gov/Executive/Journal/execjournalimages/2020-MISC-2020-0311-267630.pdf.

[181] Ky. Bd. of Elections, *Procedures for June 23, 2020 Election*, 31 Ky. Admin. Regs. 4:190E (2020).

[182] *Id.*

[183] *Id.*

entitle the applicant, upon verification of the application, to vote by absentee, by mail or in person by appointment, as advised, if otherwise a lawful voter."[184]

201.    The emergency regulations also require the Kentucky Board of Elections to establish a secure online portal that allows voters to submit requests for absentee ballots to the county clerk in the county in which the requester is registered.[185]

202.    In addition, the regulations require signature matching as an identity verification method for the primary election.  The emergency regulations say:  "No absentee ballot may be . . . counted unless and until the absentee ballot processing committee verifies the signature on the absentee ballot envelope to match the voter's signature of record."[186]

203.    If the signatures are found not to match, Kentucky election officials "shall make a reasonable effort to contact the voter using the contact information provided by the voter's absentee ballot application, and provide the voter with a timeframe and manner in which the voter may cure the discrepancy."  Cures for a signature discrepancy must be made by 4:30 p.m on the Monday following the election.[187]

204.    The emergency regulations also allow the Kentucky Board of Elections to purchase secure drop-boxes and provide them to county clerks upon request for in-person drop off of ballots by voters, and directs county clerks to reduce the number of

---

[184] *Id.*

[185] *Id.*

[186] *Id.*

[187] *Id.*

in-person voting sites, which must be pre-approved by the Kentucky Board of Elections.[188]

205.   The emergency regulations also extend Kentucky's statutory absentee ballot receipt deadline, instructing election officials to count all absentee ballots that are postmarked by Election Day and received by close of business on the Saturday following the election.[189]

### B.   Unreasonable Burden Imposed by the Excuse Requirement

206.   Historically, most voters in Kentucky have to vote in person and on Election Day,[190] because Kentucky's Excuse Requirement prevents most voters from pursuing either mail-in voting or early in-person voting.[191]  For most voters, that means physically appearing at a designated polling place where they must not only be in close contact with other voters, observers, and poll workers, but also repeatedly touch equipment and material such as voting machines, paper ballots, and shared writing instruments.  At present, public health officials consider all of these activities as risking exposure to the transmission of COVID-19.[192]

---

[188] *Id.*

[189] *Id.*; *cf.* Ky. Rev. Stat. § 117.086(1).

[190] *See, e.g.*, U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2018 Comprehensive Report* 29 (2018) (only 29,244 of over 1.6 million ballots cast in Kentucky's 2018 midterm elections were mail-in absentee ballots, and 64,407 ballots were cast by in-person early voting), https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf.

[191] Ky. Rev. Stat. § 117.085.

[192] CDC, *Coronavirus Disease 2019 (COVID-19): How It Spreads*, https://www.cdc.gov/ coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (noting that the

207.    Meaningful opportunities to vote in person are still necessary to many Kentucky voters, including those who lack access to reliable mail service or need the kinds of accommodations for persons with disabilities and personal assistance for people with limited literacy that are only available at in-person sites.

208.    To reduce the risk that individuals who need to vote in person will be exposed to COVID-19, the CDC has issued specific guidelines for voting during the pandemic, which recommend that states "[e]ncourage voters to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations," including "mail-in methods of voting."[193]  These are essential recommendations, especially because the risks of voting by mail are minimal.[194]

209.    Kentucky is an excuse-required absentee voting state, which means that the Commonwealth prohibits voting by mail for all but eight specific categories of voters with qualifying excuses.[195]

210.    Relevant here, Kentucky voters who are "[n]ot able to appear at the polls on election day on the account of . . . *illness*" can apply to cast their votes by mail-in absentee ballot.[196]

---

virus "easily" between persons, and that it "may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes") (last visited May 21, 2020).

[193] CDC, *Coronavirus Disease 2019 (COVID-19): Recommendations for Election Polling Locations* (Mar. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html.

[194] *See supra* ¶ 119.

[195] S.B. 2 § 5(1)(a) (codified at Ky. Rev. Stat. § 117.085(1)(a)).

[196] S.B. 2 § 5(1)(a)(8) (emphasis added); *see also supra* ¶ 154.

211.    In addition, Kentucky voters can apply for an absentee ballot if they suffer an unexpected "medical emergency" within 14 days of an election, but such a medical emergency absentee ballot application must be notarized.[197]

212.    For the purposes of the general election on November 3, 2020, Defendants have not construed the "illness" excuse or the "medical emergency" excuse to include all voters facing health risks associated with COVID-19.[198]

213.    Kentucky's current Excuse Requirement is plainly unreasonable, because the refusal to allow all Kentuckians to vote safely from home in response to the pandemic cannot be justified by any legitimate state interest.  The COVID-19 pandemic poses the same concerns underlying the "illness" excuse that the Kentucky General Assembly has already made available to Kentuckians for the June 23 primary:  voters should not have to make the untenable decision between risking their health and giving up their right to vote.

214.    Defendants have not adopted a construction of the "illness" excuse that provides all voters with the option of voting by mail in November.  The existence of any legitimate state interest to support Defendants' narrow construction of the "illness" excuse is undercut by the practice of other states.  Most states have already entirely eliminated any excuse requirement to vote by mail-in absentee ballot, even when their voters are not threatened by a public health crisis.[199]

---

[197] Ky. Rev. Stat. § 117.077; *see also supra* ¶ 155.

[198] *See supra* ¶ 156.

[199] National Conference of State Legislatures, *Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options* (Apr. 24, 2020),

215.    Defendants themselves have already acknowledged that any state interest in a restrictive interpretation of the Excuse Requirement must give way in light of the COVID-19 pandemic.  By taking steps to permit all Kentucky voters to use mail-in absentee ballots to vote safely from home in the June 23, 2020 primary, Defendants made clear that the pandemic necessitates such changes in Kentucky.  But Defendants have failed to extend these modifications to the Excuse Requirement to the November 3, 2020 general election.

216.    Defendants' decision to permit all Kentucky voters to use mail-in absentee ballots for the primary election reflects the reality and gravity of the current environment.  Over the past two months, COVID-19 has spread throughout the Commonwealth of Kentucky at a rapid pace.[200]  And public health officials are "convinced" that COVID-19 will continue to threaten voters' health and safety this fall, both because of the looming second wave of the virus and the improbable availability of a vaccine by November 2020.[201]

217.    Because of these continued risks, many Kentuckians who would otherwise vote in person on Election Day will reasonably opt and/or be required to stay home and continue practicing social distancing for the foreseeable future, even after the peak of

---

https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx (34 states and Washington, D.C., offer "no-excuse" absentee/mailed ballot voting).

[200] *See supra* ¶¶ 1, 102–11.

[201] Savannah Behrmann, *'Convinced': Fauci Says There Will Be Coronavirus in the Fall After Trump Says 'It May Not Come Back'*, USA Today (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/22/coronavirus-dr-anthony-fauci-says-i-am-convinced-second-wave/3009131001/; *see supra* ¶¶ 98–101.

the current outbreak of COVID-19 in Kentucky.  The ongoing health risks posed by COVID-19 necessitate an excuse that would prevent thousands of individuals from lining up with other voters at polling places (sometimes for hours), touching the same equipment, having face-to-face interactions with poll workers, and threatening their own health and the health of others.

218.    In light of public health officials' assurances that the United States will have a second wave of the coronavirus in the fall, Kentucky's current Excuse Requirement will severely burden the fundamental right of all eligible voters who are practicing self-quarantining and social distancing.

219.    Kentucky's failure to allow all eligible voters to vote safely from home in the general election will impose substantial burdens on a broad cross-section of the public, including but not limited to voters who have a heightened risk of contracting COVID-19; voters who live with, care for, or work with individuals who have a heightened risk of contracting COVID-19; and all poll workers.  As the health data from states that have held in-person primaries indicate, requiring in-person voting during the pandemic is not a mere inconvenience:  failing to treat the pandemic as an excuse, even after the complete shelter-in-place orders have lifted, can increase cases and cost lives.

220.    While COVID-19 will pose a threat to all Kentuckians required to vote in person in the fall, Kentucky's current Excuse Requirement will impose especially severe and disproportionate burdens on the rights of particularly vulnerable Kentuckians, as well as individuals who live with vulnerable Kentuckians.  As described above, voters with underlying medical conditions, Black voters, older voters, and voters with certain disabilities have an increased risk of suffering severe illness or death if they contract the

78

virus.[202]  Many of these individuals would not have an excuse to vote safely from home under Kentucky's current system, despite the increased risk that the pandemic poses for them.[203]  For example, immunocompromised voters, who commonly vote in person and are not considered "physically disabled," would be placed at high risk of severe illness from COVID-19 if they were forced to vote in person, but Kentucky's restrictive construction of the "illness" excuse would leave them no other choice.[204]  Other underlying conditions that can lead to severe illness from COVID-19 but would unlikely qualify as an excuse independent of the pandemic include, but are not limited to, moderate-to-severe asthma, bone marrow or organ transplantation, prolonged use of corticosteroids and other immune-weakening medications, severe obesity, and diabetes.[205]

221.    The burdens imposed by the Excuse Requirement are exacerbated by various additional restrictions on mail voting that are still in effect for the November general election in Kentucky, including:  (a) the requirement that any voter seeking to vote by mail due to a medical emergency must have their application notarized,[206]

---

[202] *See supra* ¶¶ 121–53.

[203] *Id.*

[204] Savannah Eadens, *Coronavirus Questions: Readers Have Asked, We've Got Answers on the COVID-19 Outbreak*, Louisville Courier Journal (Mar. 24, 2020), https://www.courier-journal.com/story/life/wellness/health/2020/03/24/coronavirus-2020-everything-know-covid-19-and-kentucky/2897603001/.

[205] CDC, *Coronavirus Disease 2019 (COVID-19): At Risk for Severe Illness* (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[206] Ky. Rev. Stat. § 117.077.

(b) the failure to provide voters with notice and an opportunity to cure their mail-in ballot application if it is rejected based on alleged signature mismatch,[207] and (c) an onerous deadline for the receipt of mail ballots (i.e., that the ballot must be received by the end of Election Day).[208]  Defendants have modified all three of these requirements for the June primary election, and extending these modifications to the November general election is necessary to protect the right to vote.

### C.    Unreasonable Burden Imposed by Photo ID Law

### i.    S.B. 2 Constructively Denies Many Kentuckians the Right to Vote

222.    S.B. 2, enacted in the midst of a global pandemic, places a severe burden on Kentuckians' fundamental voting rights by mandating dangerous or impossible actions to vote by mail-in absentee ballot.

223.    Even under ordinary circumstances, the U.S. Supreme Court has recognized that photo ID requirements impose some burdens on voters.[209]  But the COVID-19 pandemic adds a layer of health and safety risks and practical impossibility to those existing complications.

224.    S.B. 2 requires voters applying for a mail-in absentee ballot to either (1) include a copy of the voter's photo ID with the ballot application, or (2) if the voter does not yet have a photo ID, execute a voter affirmation in the presence of an election officer confirming their identity and that the voter has a reasonable impediment to

---

[207] Ky. Rev. Stat. § 117.085(6).

[208] Ky. Rev. Stat. § 117.086(1).

[209] *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197–99 (2008).

procuring a photo ID.[210] Both options are presently impossible and will remain life-threatening for many voters through the general election.

225.    There is currently no method for most voters without a photo ID to vote absentee. To get the most common form of photo ID in Kentucky—a driver's license—voters must visit their local circuit court clerk's office or REAL ID Regional Driver's Licensing Office in person.[211] But "[f]ollowing the guidance from Governor Beshear to limit in person services[,] all statewide license issuance locations . . . will be closed to the public until further notice."[212]

226.    As of the date of filing this Complaint, only one driver licensing regional office in the entire Commonwealth had reopened—all of the remaining statewide license issuance locations, including REAL ID offices, are still "closed to the public until further notice."[213]

227.    Until all license issuance locations have reopened, many voters without a photo ID cannot obtain a state-issued photo ID and therefore cannot include a copy of the photo ID in their mail-in absentee ballot application as required.

228.    Even when the circuit court clerk and licensing offices reopen, they will have reduced capacity to manage the increased demand associated with the Photo ID

---

[210] S.B. 2 § 1(1)(c); S.B. 2 § 5(2).

[211] Ky. Transp. Cabinet, *Driver's License & ID Cards*, https://drive.ky.gov/driver-licensing/Pages/Drivers-License-and-ID-Card.aspx#identification-card-id (last visited Apr. 17, 2020).

[212] Ky. Transp. Cabinet, *Confident Kentucky*, https://drive.ky.gov/ConfidentKY/Pages/default.aspx (last visited May 27, 2020).

[213] *Id.*

Law by November 2020, because they are in the midst of implementing a separate, demanding program.  In 2005, Congress passed the REAL ID Act, which established baseline security standards for state-issued driver's licenses and ID cards.[214]  Kentucky passed a law to implement REAL IDs in 2017, and the Commonwealth "has struggled to roll out its REAL ID program" ever since.[215]  For example, in late 2019, Kentucky Transportation Secretary Greg Thomas was forced to abruptly halt the REAL ID rollout due to "significant unforeseen workload and staffing issues."[216]  And in 2020, the federal government recently extended the implementation date of the REAL ID program from October 1, 2020, to October 1, 2021,[217] citing concerns about "crowding at state motor-vehicle department offices."[218]  Because Kentucky circuit court clerk and licensing offices are already overwhelmed with the conversion to REAL IDs, even if these offices do reopen, Kentucky voters will encounter difficulty in obtaining photo IDs in advance of the election.

---

[214] U.S. Dep't of Homeland Sec., *REAL ID Frequently Asked Questions*, https://www.dhs.gov/real-id-frequently-asked-questions (last visited May 5, 2020).

[215] Ben Tobin & Sarah Ladd, *Kentucky Halts Real ID Rollout as Federal Deadline for Travelers Looms*, Louisville Courier Journal (Sept. 18, 2019), https://www.courier-journal.com/story/news/local/2019/09/18/kentucky-transportation-cabinet-halts-real-id-county-by-county-rollout/2361914001/.

[216] *Id.*

[217] Chris Woodyard & Curtis Tate, *Travelers Get a Break: REAL ID Deadline Extended to Oct. 1 2021, Due to Coronavirus*, USA Today (Mar. 26, 2020), https://www.usatoday.com/story/travel/airline-news/2020/03/23/real-id-deadline-pushed-back-trump-says-coronavirus/2905323001/.

[218] Chris Woodyard, *Travelers Get a Break: REAL ID Deadline Being Pushed Back Due to the Coronavirus*, Louisville Courier Journal (Mar. 24, 2020), https://www.courier-journal.com/story/news/2020/03/24/real-id-deadline-pushed-back-trump-says-coronavirus/2905838001/.

229.    Kentucky's botched rollout of the REAL ID program also highlights the very real danger that the circuit court clerk and licensing offices will be unable to accommodate the increased demand associated with the new Photo ID Law in time for the general election in November 2020—because in this context, any delay could result in widespread disenfranchisement.

230.    Even if a Kentuckian *does* have a photo ID, fulfilling S.B. 2's photocopy requirement for mail-in absentee ballots brings its own life-threatening risks, particularly for those with underlying health conditions.  Many voters will not have a photocopying machine in their home to make the statutorily required photocopy of their ID.[219]  Practically, this means that, in the middle of a pandemic, voters will be forced to choose between entering public businesses or libraries—many of which are not yet open—to use copying and printing equipment, a possible vector for contracting COVID-19, or losing the "precious" and "fundamental" right to vote.[220]

231.    Similar risks also inhere for Kentuckians who choose to vote in person during the pandemic.  Having to physically hand over photo ID makes maintaining six feet of distance impossible.  Transferring the photo ID between the voter and the poll worker exponentially increases the risk of contracting COVID-19 for both voters and election officials, especially because poll workers will have to repeatedly engage in such exchanges with many voters.  And because checking photo IDs will lengthen the voting process for every voter, administration of the new Photo ID Law will also increase line

---

[219] *See* S.B. 2 § 5(2).

[220] *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966).

length and wait times at the polls, which further increases voters' risk of exposure to the virus.

232.    Regardless of whether government offices and businesses reopen soon, all Kentuckians will still face unacceptable risks to vote.  The severe burden posed by S.B. 2 is evident when comparing the bill's provisions with current CDC guidelines for elections.  The CDC has recommended that election officials "[e]ncourage voters to use voting methods that minimize direct contact with other people" and "[e]ncourage mail-in methods of voting."[221]  S.B. 2 does the opposite.  At present, S.B. 2 in effect necessitates hazardous direct contact with local government officials to obtain either a voter's affirmation or a photo ID, as well as local businesses to make a photocopy of that ID.

233.    The principal exception to S.B. 2—the Impediment Requirement—does not cure these injuries to Kentucky voters.  The Impediment Requirement does not permit individuals to vote without a photo ID unless they execute a voter affirmation form that cites one of eight specifically enumerated impediments to justify their inability to obtain a photo ID.[222]  S.B. 2's Impediment Requirement does not provide a basis for excusing the requirements of the Photo ID Law if the COVID-19 pandemic prevents the voter from obtaining a photo ID or procuring a copy of their photo ID.  Moreover, S.B. 2's

---

[221] CDC, *Coronavirus Disease 2019 (COVID-19): Recommendations for Election Polling Locations* (Mar. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html.

[222] S.B. 2 §§ 1(1)(c), 5(2).

Impediment Requirement creates the same health risks as obtaining a license, because it requires the voter to execute a voter affirmation in the presence of an election officer.

234.   Implementing the Photo ID Law in the general election in November 2020 will continue to unreasonably endanger Kentuckians' health and safety, as health experts are "convinced" that the COVID-19 threat will persist in the fall.[223]

235.   While all Kentuckians remain at risk for COVID-19 in the fall, this burden is even more pronounced for particularly vulnerable Kentuckians.  As described above, COVID-19 imposes an especially severe burden on certain voters—including Black voters, older voters, and voters with underlying medical conditions[224]—who have an increased risk of suffering severe illness or death if they contract the virus.  For these voters, interacting with government workers or print shop employees will remain a life-threatening risk.  Requiring these endangered Kentuckians to visit a county clerk's office to vote in the general election in November 2020 would essentially eviscerate their ability to obtain the health benefits of voting by mail.  Thus, S.B. 2's absentee provisions will continue to put voters' lives in danger through the general election in November 2020.

236.   Kentucky's first-time implementation of the Photo ID Law for the general election in November 2020 is an urgent problem that warrants this Court's immediate intervention.  Kentucky's maintenance of the Excuse Requirement is already impacting

---

[223] Christina Zhao, *Fauci Says U.S. Will Have Coronavirus in the Fall After Trump Says It Might Not Come Back*, Newsweek (Apr. 22, 2020), https://www.newsweek.com/fauci-says-us-will-have-coronavirus-fall-after-trump-says-it-might-not-come-back-1499639; *see supra* ¶¶ 98–101.

[224] *See supra* ¶¶ 121–53.

the plaintiff organizations.  LWVKY, Louisville Urban League, and Kentucky NAACP are diverting resources now to respond to the new Photo ID Law, including by using their limited time and resources to educate voters on how to obtain and copy photo ID in the midst of a pandemic.

### ii.   The Photo ID Requirement for Mail-In Absentee Ballot Applications is Unrelated to Any Valid State Interest

237.   Even if the burdens on voting are found to be minimal, Kentucky's photo ID requirement for absentee ballot applications is unrelated to any valid state interest.

238.   Kentucky may claim this requirement prevents voter fraud or safeguards voter confidence, but there is no evidence of voter fraud in Kentucky.  Defendant Secretary Adams recently stated that, because he ran on a platform of fighting voting fraud, he recognizes that concerns surrounding absentee voting are "partly on [him] because [he] talked about it in [his] campaign."[225]  But since taking office, Adams's views have shifted.  After recommending that all voters have the option to vote safely from home in the Kentucky primary election, Adams stated that the "presumption that absentee voting is less secure is frustrating because Kentucky has safeguards in place to protect against fraud."[226]  Adams has also acknowledged that there "is no evidence of

---

[225] Pam Fessler, *'It's Partly On Me': GOP Official Says Fraud Warnings Hamper Vote-By-Mail Push*, NPR (May 15, 2020), https://www.npr.org/2020/05/15/856189149/it-s-partly-on-me-gop-official-says-fraud-warnings-hamper-vote-by-mail-push?utm_medium=social&utm_term=nprnews&utm_source=facebook.com&utm_campaign=npr.

[226] *Id.*

extensive fraud in U.S. elections or of multiple voting,"[227] and that he is "not aware of any instance over the past decade in which voter fraud was committed in Kentucky by someone impersonating another eligible voter."[228]

239.    To the extent that preventing voter fraud or safeguarding voter confidence is considered a valid state interest despite the lack of evidence of voter fraud in Kentucky, "the fact remains that nothing suggests that absentee ballot fraud would be limited by a photo-identification requirement that applied to absentee voting."[229]

240.    Under S.B. 2, a valid photo ID must possess:  "1. The name of the individual to whom the document was issued; and 2. A photograph of the individual to whom the document was issued."[230]

241.    The main purpose of requiring a voter to present photo ID at the polls is so an election official can use the photo on the ID to verify the identity of the voter.  Unlike in-person voting, when the voter applies for an absentee ballot by placing a photocopied picture of the voter's ID in an envelope and mailing the ballot, there is "no way for the state election officials to determine whether the photo ID actually belonged to the

---

[227] LRC Public Information, *Voter ID Bill Receives Favorable Hearing*, Richmond Register (Jan. 24, 2020), https://www.richmondregister.com/news/election/voter-id-bill-receives-favorable-hearing/article_5a1129c3-9938-55b2-9443-e33bb16c1017.html.

[228] Joe Sonka, *Kentucky Republicans Say Voter ID Bill 'Increase Confidence' in Election Process*, Louisville Courier Journal (Jan. 8, 2020), https://www.courier-journal.com/story/news/politics/2020/01/08/voter-id-requirements-kentucky-secretary-state-supports-bill/2846020001/.

[229] *Am. Civ. Liberties Union of New Mexico v. Santillanes*, 546 F.3d 1313, 1320 (10th Cir. 2008).

[230] S.B. 2 § 23(12).

absentee voter," because "he wouldn't be presenting his face at the polling place for comparison with the photo."[231]  Further, a photo ID is not necessary in the absentee voting context, because "the unique procedures for absentee voting allow for a separate process confirming the identification of a voter."[232]

242.    Ultimately, "the absence of a person standing before the election officials precludes linking the enclosed identification with the person actually casting the ballot."[233]  Since the primary purpose of a photo ID is rendered irrelevant in the absentee ballot context, S.B. 2's photo ID provisions for mail-in absentee ballot applications must be invalidated because "even rational restrictions on the right to vote are invidious if they are unrelated to voter qualifications."[234]

## **CLAIMS FOR RELIEF**

**Count 1:  During the COVID-19 Crisis, Kentucky's Absentee Requirements Burden the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments
(42 U.S.C. § 1983)**

243.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

244.    Eligible individuals have a fundamental right to vote under the First and Fourteenth Amendments of the U.S. Constitution.  In cases where the fundamental right

---

[231] *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008).

[232] *Santillanes*, 546 F.3d at 1320.

[233] *Id.*

[234] *Crawford*, 553 U.S. at 189.

to vote is burdened, the court first determines the severity of the burden on the right to vote by evaluating the character and magnitude of the asserted injury.[235]  If the restriction on the right to vote is a severe burden, then it is subject to strict scrutiny.[236] Strict scrutiny requires the restriction to be "narrowly drawn to advance a state interest of compelling importance."[237]  "[R]egulations that impose a more-than-minimal but less-than-severe burden" are subject to a more "flexible" analysis.[238]  And "minimally burdensome and nondiscriminatory" regulations are subject to a "less-searching examination closer to rational basis."[239]

245.    If this Court does not grant the relief that Plaintiffs request, the combination of the Defendants' enforcement of the Excuse Requirement and the health risks posed by the COVID-19 pandemic will severely and unduly burden the right to vote—because for thousands of eligible voters, the inability to use mail-in absentee ballots to vote safely from home means they will not be able to vote at all.  This burden is especially severe for voters who face increased risk of serious illness or death from voting during the COVID-19 pandemic, including voters with underlying medical conditions, Black voters, older voters, and voters with disabilities.  Thus, Defendants' enforcement of the Excuse Requirement during the pandemic will prevent or virtually prevent Kentuckians from exercising their right to vote.

---

[235] *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983).

[236] *See id.* at 434.

[237] *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

[238] *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016).

[239] *Id.*

246.    By enforcing Kentucky's Excuse Requirement, Defendants, acting under color of state law, will deprive Plaintiffs Michael Collins, Jeffrey Cosby, Thela Elliott, Gracie Lewis, DeJuan Nash, and Tiffany Price of rights secured to them by the First and Fourteenth Amendments to the U.S. Constitution—namely, the fundamental right to vote—and protected by 42 U.S.C. § 1983.  Enforcement of the Excuse Requirement will also strip members and or/clients of the LWVKY, Louisville Urban League, and Kentucky NAACP of their right to vote.

247.    In addition to endangering individual voters and their communities, Defendants' enforcement of the Excuse Requirement will also require organizations like the LWVKY, Louisville Urban League, and Kentucky NAACP to funnel resources intended for voter registration and restoration efforts toward helping Kentuckians minimize the public health and safety risks of in-person elections.

248.    Defendants cannot provide any colorable justification for their refusal to make changes to Kentucky's voting system that accommodate the significant challenges voters will face in the general election in November 2020 as a result of the pandemic. Defendants' maintenance of the Excuse Requirement is not supported by any state interest that is sufficient to justify the resulting burdens on the right to vote.  This fact is underscored by Defendants' decision to relax the Excuse Requirement for the June 23, 2020 primary, which seriously undermines any justification for refusing to do the same for the November 3, 2020 general election.

249.    In light of public health officials' assurances that the United States "will have coronavirus in the fall,"[240] Defendants' failure to provide all Kentucky voters with the ability to vote safely from home during the time of the COVID-19 pandemic cannot pass constitutional muster.  Unless Plaintiffs are granted the relief requested herein, thousands of Kentuckians' right to vote—including each of the individual plaintiffs and many members and/or clients of the LWVKY, Louisville Urban League, and Kentucky NAACP—will be severely burdened or eliminated entirely in the upcoming general election on November 3, 2020.

250.    Additionally, in order to implement relaxation of the Excuse Requirement effectively under the circumstances of the COVID-19 pandemic, other modifications in place for the June 23, 2020 primary must be in place for the November 3, 2020 election. These are:

a.    Eliminating the notarization requirement for medical emergency absentee ballot applications; [241]

b.    Counting all ballots postmarked by Election Day and received by close of business on the Saturday following the election;[242] and

---

[240] Savannah Behrmann, *'Convinced': Fauci Says There Will Be Coronavirus in the Fall After Trump Says 'It May Not Come Back'*, USA Today (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/22/coronavirus-dr-anthony-fauci-says-i-am-convinced-second-wave/3009131001/.

[241] Ky. Bd. of Elections, *Procedures for June 23, 2020 Election*, 31 Ky. Admin. Regs. 4:190E § 3 (2020).

[242] *Id.* § 6.

    c.      Requiring Defendants to make a reasonable effort to contact voters  whose ballots are rejected during election officials' signature verification process and to provide the voter with a timeframe and manner in which the voter may cure the discrepancy.[243]

251.     Failure to impose these requirements for the November 3, 2020 election in order to fully effectuate relaxation of the Excuse Requirement, under the circumstances of the COVID-19 pandemic, will impose a severe and unreasonable burden on the voters of Kentucky and is therefore invalid under the *Anderson-Burdick* framework.[244]  Thus, the Defendants' failure to continue implementing these modifications during the pandemic will prevent or virtually prevent Kentuckians from exercising their right to vote.

252.     In light of public health officials' assurances that the United States "will have coronavirus in the fall,"[245] Defendants' failure to provide all Kentucky voters with the ability to vote safely from home during the time of the COVID-19 pandemic cannot pass constitutional muster.  Unless Plaintiffs are granted the relief requested herein, thousands of Kentuckians' right to vote—including each of the individual plaintiffs and many members of the LWVKY, Louisville Urban League, and Kentucky NAACP—will be

---

[243] *Id.* § 9.

[244] *See Burdick*, 504 U.S. 428; *Anderson*, 460 U.S. 780.

[245] Savannah Behrmann, *'Convinced': Fauci Says There Will Be Coronavirus in the Fall After Trump Says 'It May Not Come Back'*, USA Today (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/22/coronavirus-dr-anthony-fauci-says-i-am-convinced-second-wave/3009131001/.

severely burdened or eliminated entirely in the upcoming general election on November 3, 2020.

### Count 2:  During the COVID-19 Crisis, Kentucky's Photo ID Law Burdens the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments (42 U.S.C. § 1983)

253.   Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

254.   In cases where the fundamental right to vote is burdened, the court first determines the severity of the burden on the right to vote and then applies the appropriate level of scrutiny, as detailed above.[246]  The heavier the burden, the more compelling the state's interest must be.[247]  For severe burdens, strict scrutiny applies.[248]

255.   The combination of the Defendants' enforcement of S.B. 2 and the health risks posed by the COVID-19 pandemic imposes a severe burden on the right to vote. S.B. 2 mandates that voters provide a valid photo ID before casting a ballot in person. Similarly, voters applying for an absentee ballot must include a copy of valid photo ID with their application.  For those voters without photo ID, obtaining one is currently impossible.  All but one of the statewide license-issuance locations are currently closed.

256.   Even if voters do have a photo ID, S.B. 2 requires a photocopy of that ID to be included in the absentee ballot application.  For voters without a copy machine in their home, this requirement imposes a severe burden by forcing voters to enter

---

[246] *See supra* ¶ 216.

[247] *See Ohio Democratic Party*, 834 F.3d at 627.

[248] *See Burdick*, 504 U.S. at 434.

businesses in public use to photocopy their ID, putting them in danger of contracting coronavirus.  This burden is especially severe for voters who face increased risk of serious illness or death from contact with others during the COVID-19 pandemic, including voters with underlying medical conditions, Black voters, older voters, and voters with certain disabilities.

257.    Even if government offices and printing/copying businesses reopen, Kentucky voters will continue to face these health risks through the general election in November 2020.  As the CDC and the Kentucky Department of Public Health have recommended, the most effective way to prevent contracting COVID-19 is to "practice social distancing, meaning staying at home as much as possible and otherwise maintaining six feet of distance from other individuals."[249]  Forcing Kentuckians to reject this advice and interact with others in places of public use in order to vote constitutes a severe and unnecessary danger to individual health and public safety.

258.    S.B. 2's only exception to the photo ID requirement does not obviate the unacceptable risks to voters' health and safety that the statute inflicts.  First, S.B. 2's Impediment Requirement does not provide an exemption for those Kentucky voters who reasonably fear they will contract COVID-19 if forced to obtain a photo ID during the pandemic.  And second, even for voters who can claim one of the narrowly prescribed, statutorily enumerated impediments, fulfilling the Impediment Requirement during the pandemic imposes the same unacceptable risks as the photo ID

---

[249] Ky. Office of the Governor, *State of Emergency Relating to Kentucky Elections*, Exec. Order 2020-296 (Apr. 24, 2020); Ky. Bd. of Elections, *Procedures for June 23, 2020 Election*, 31 Ky. Admin. Regs. 4:190E (2020).

requirement itself, as it requires voters to subject themselves to potential exposure to COVID-19 by executing a voter affirmation in front of an election official.  Thus, the enforcement of S.B. 2 during the pandemic will prevent or virtually prevent Kentuckians from exercising their right to vote.

259.    By enforcing Kentucky's Photo ID Law, Defendants, acting under color of state law, will deprive Plaintiffs Jeffrey Cosby, Thela Elliott, and Tiffany Price of rights secured to them by the First and Fourteenth Amendments to the U.S. Constitution—namely, the fundamental right to vote—and protected by 42 U.S.C. § 1983.  Enforcement of the Excuse Requirement will also strip members and/or clients of the LWVKY, Louisville Urban League, and Kentucky NAACP of their right to vote.

260.    In addition to endangering individual voters and their communities, Defendants' enforcement of the Photo ID Law will also require organizations like the LWVKY, Louisville Urban League, and Kentucky NAACP to funnel resources intended for voter registration and restoration efforts toward assisting Kentuckians with compliance with the Photo ID Law.

261.    There is no valid state interest in requiring a photocopy of a photo ID with an absentee ballot application.  The purpose of requiring a photo ID is to allow an election official to verify the identity of the voter by comparing the photo on the ID with the voter in front of them.  This purpose is not fulfilled under S.B. 2.  Election officials have no way of verifying who put the copy of the ID in the envelope with the absentee ballot application.  Thus, traditional justifications for photo ID laws, such as preventing voter fraud and bolstering public confidence in election integrity, are irrelevant in this context.

262.    Furthermore, given the clear life-threatening danger posed by COVID-19 to all voters, any interest Kentucky may have in preventing election fraud or safeguarding election integrity is outweighed by the need to simultaneously protect both human life and the franchise.

263.    This Court should enjoin the Photo ID Law and provide appropriate relief to ensure all voters may safely access absentee voting for the general election.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that Kentucky's enforcement of the Excuse Requirement (as codified by Ky. Rev. Stat. §§ 117.077 and 117.085) violates the fundamental right to vote under the First and Fourteenth Amendments to the U.S. Constitution while the risk of community transmission of COVID-19 continues to threaten the health and safety of Kentucky voters;

B.    Declare that Defendants' failure to extend the modifications they have already provided to protect the right to vote and "reduce[] the amount of exposure voters, poll workers, and administrators have to possible infection" [250] in the June primary election to the November general election violates the fundamental right to vote under the First and Fourteenth Amendments to the U.S. Constitution while the risk of community transmission of COVID-19 continues to threaten the health and safety of Kentucky voters.  These measures include:  (a) eliminating the notarization requirement

---

[250] *See* Ky. Bd. of Elections, *Procedures for June 23, 2020 Election*, 31 Ky. Admin. Regs. 4:190E (2020).

for medical emergency absentee ballots, (b) counting all ballots that are postmarked by Election Day and received by the Saturday following the election, and (c) making a reasonable effort to contact voters whose ballots are rejected during election officials' signature verification process and to provide the voter with a timeframe and manner in which the voter may cure the discrepancy.

      C.     Declare that Kentucky's enforcement of the Photo ID Law (as stated in S.B. 2 §§ 1(1) and 5(2)) violates the fundamental right to vote under the First and Fourteenth Amendments to the U.S. Constitution while the risk of community transmission of COVID-19 continues to threaten the health and safety of Kentucky voters;

      D.     Issue a preliminary and permanent injunction that orders relief including:

          1.     Prohibiting Defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Excuse Requirement (as codified by Ky. Rev. Stat. §§ 117.077 and 117.085) to prevent any eligible voter, regardless of age and physical condition, to request, receive, and have counted, an absentee ballot while the risk of community transmission of COVID-19 continues to threaten the health and safety of Kentucky voters;

          2.     Ordering Defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, to apply to the November 3, 2020 general election the same precautions that Defendants have already enacted to conduct the June 23, 2020 primary election "in a manner that reduces the amount of exposure

97

voters, poll workers, and administrators have to possible infection"[251]—including (a) eliminating the notarization requirement for medical emergency absentee ballots, (b) counting all ballots that are postmarked by Election Day and received by the Saturday following the election, and (c) making a reasonable effort to contact voters whose ballots are rejected during election officials' signature verification process and to provide the voter with a timeframe and manner in which the voter may cure the discrepancy—while the risk of community transmission of COVID-19 continues to threaten the health and safety of Kentucky voters;

3.      Prohibiting Defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Photo ID Law (as stated in S.B. 2) for all voters while the risk of community transmission of COVID-19 continues to threaten the health and safety of Kentucky voters;

4.      Ordering Defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, to modify election materials, including absentee ballots, to reflect the elimination of the excuse and photo ID requirements, and conduct a public information campaign informing Kentucky voters about the elimination of the excuse and photo ID requirements, in coordination with city and county officials before and during the absentee balloting

---

[251] *Id.*

period, and ordering Defendants to issue guidance instructing city and

county election officials to issue absentee ballots to all eligible voters;

E.      Award Plaintiffs attorneys' fees in this action;

F.      Award Plaintiffs their costs of suit; and

G.      Grant such other and further relief as this Court deems just and proper in

the circumstances.

Respectfully submitted,


_/s Corey Shapiro_

Corey Shapiro, Ky. Bar No. 96897
   *Counsel of Record*
Heather Gatnarek, Ky. Bar No. 95113
Mashayla Hays, Ky. Bar No. 98506
ACLU OF KENTUCKY FOUNDATION
325 W. Main Street, #2210
Louisville, KY 40202
(502) 581-9746
corey@aclu-ky.org
heather@aclu-ky.org
mashayla@aclu-ky.org

Megan C. Keenan
Mary Elise Holman
Scott J. Garfing
Jayne Ponder
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
mkeenan@cov.com
eholman@cov.com
sgarfing@cov.com
jponder@cov.com

Robert D. Fram
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
rfram@cov.com

Adriel I. Cepeda Derieux
Sophia Lin Lakin
Dale E. Ho
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
acepedaderieux@aclu.org
slakin@aclu.org
dho@aclu.org

Ceridwen Cherry
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15TH STREET, NW
Washington, DC 20005-2313
(202) 675-2326
ccherry@aclu.org

Ezra Rosenberg
Ajay Saini
Natasha Chabria
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
asaini@lawyerscommittee.org
natashachabria@lawyerscommittee.org

Date:  July 30, 2020